# Exhibit M

Volume I
Pages 1 to 83
Exhibits See Index

THE LABOR RELATIONS CONNECTION, INC.
Grievance No. 328-25, Articles 12.01, 24 and 26,
Class Action - Anniversary Increases

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of Arbitration between:

1199SEIU UNITED HEALTHCARE WORKERS EAST
-and-
BOSTON MEDICAL CENTER (SOUTH)

- - - - - - - - - - - - - - - - - - - - - -x

ALL PARTICIPANTS APPEARED VIA ZOOM VIDEOCONFERENCING

ARBITRATOR: Marc Greenbaum

APPEARANCES:

Pyle Rome Ehrenberg PC
(by Ian Russell, Esq.)
2 Liberty Square, 10th Floor, Boston, MA 02109, for the Union.
lrussell@pylerome.com
617.367.7200

Jackson Lewis P.C.
(by Robert H. Morsilli, Esq., and Ashley Krezmien, Esq.)
75 Park Plaza, 4th Floor, Boston, MA 02116, for the Employer.
robert.morsilli@jacksonlewis.com
ashley.krezmien@jacksonlewis.com
617.367.0025

ALSO PRESENT: Amanda Wells (LRC)
Andrew Rodgers
Daniel Friel
Helene Benedict
John Hickey

Held Via Zoom
Friday, March 20, 2026
10:19 a.m.

(Jane M. Werner, Registered Merit Reporter)

* * *



I N D E X


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN HICKEY | | | | |
| (By Ms. Krezmien) | 20 | | | |
| (By Mr. Russell) | | 20 | | |
| DANIEL FRIEL | | | | |
| (By Ms. Krezmien) | 29 | | 39 | |
| (By Mr. Russell) | | 34 | | 40 |
| ANDREW RODGERS | | | | |
| (By Mr. Russell) | 56 | | | |


* * *

E X H I B I T S


| JOINT EX. NO. | | In Evid. |
|---|---|---|
| EXHIBIT 1 | CBA and Memorandum of Extension | 5 |
| EXHIBIT 2 | Grievance | 5 |
| EXHIBIT 3 | Grievance History | 5 |

| EMPLOYER EX. NO. | | ID. | EV. |
|---|---|---|---|
| EXHIBIT 1 | Bankruptcy Court Order and APA | | 5 |
| EXHIBIT 2 | Memorandum of Amendment and Assignment Agreement signed by the Union | | 5 |
| EXHIBIT 3 | email exchange between Andy Rodgers, John Hickey and Marlon Washington | 21 | 21 |
| EXHIBIT 4 | Spreadsheet | 25 | 26 |




E X H I B I T S, (Continued)


| EMPLOYER EX. NO. | | ID. | EV. |
|---|---|---|---|
| EXHIBIT 5 | email string; top email between Andy Rodgers and Daniel Friel | 30 | 33 |
| EXHIBIT 6 | email string; top email from Daniel Friel to Andrew Rodgers and Debra Owen dated 2/19/25 | 33 | 34 |

| UNION EX. NO. | | ID. | EV. |
|---|---|---|---|
| EXHIBIT 1 | Document entitled "July 2024 Membership List" | 59 | 60 |
| EXHIBIT 2 | September 2024 membership or head count report from Steward | 63 | 63 |
| EXHIBIT 3 | Document entitled "Headcount_Report_by_Union GS_SEIU - 12.10.24" | 63 | 64 |
| EXHIBIT 4 | October 2025 head count report | | 66 |
| EXHIBIT 5 | Document entitled "Head Count Report by Union September 2025" | 66 | 67 |
| EXHIBIT 6 | Document entitled "Summary of Missed Anniversary Increases" | | 69 |
| EXHIBIT 7 | Information Request | | 73 |
| EXHIBIT 8 | Document entitled "Pay Adjustment Since 10/1/24" | | 73 |


* * *



P R O C E E D I N G S

(Documents premarked as Joint Exhibits 1 to 3 and Employer Exhibits 1 to 2 in evidence)

ARBITRATOR GREENBAUM: Let's show the record open in the matter of arbitration between 1199SEIU United Healthcare Workers East and Boston Medical Center-South.

This case is being held under the auspices of the Labor Relations Connection. It has assigned it Grievance No. 328-25, described as "Articles 12.01, 24 and 26, Class Action-Anniversary Increases."

Let the record show that the Union is here being represented by Ian Russell and that the Medical Center is here being represented by Bob Morsilli and Ashley -- is it Krezmien? Do I have it correct?

MS. KREZMIEN: You have it correct.

ARBITRATOR GREENBAUM: And that Mark Greenbaum is presiding as Arbitrator.

I want to make a brief opening statement, because the case has arrived here by a somewhat unusual route. There have been two conference calls

Page 6

that have preceded the opening to today's hearing, and both of them were predicated on the Medical Center's claim that the grievance before me is not substantively arbitrable.

Its arbitrability claim is based upon the transaction that led to Boston Medical Center's acquisition of what is now known as "Boston Medical Center-South."

On a number of -- on a couple of occasions -- most recently this week -- the Employer moved to stay the arbitration. As it documented in certain emails, the Arbitrator denied those requests for a stay.

So we enter the proceeding at this point in this posture.

First, the Employer has properly preserved its objection to the question of substantive arbitrability.

Second, the Employer has a right under law to insist upon the resolution of that question by a court and not the Arbitrator.

Third, the Employer has recently invoked that right by filing an action in the United States District Court for the District of Massachusetts,

Page 7

effectively challenging the substantive arbitrability of the grievance.

I would note parenthetically that that action which was filed on March 10th did not request the courts to issue a stay of the proceedings. Hence, we will be entering the proceeding in an unusual posture.

The Arbitrator does not -- I repeat -- does not have any jurisdiction to determine the question of substantive arbitrability or to consider any evidence on that question. Thus, any award that I issue will be contingent upon -- depending on the direction the award goes, it will be contingent upon the resolution of the action in the United States District Court. And I just want to make clear that -- and this is probably about the 15th time this week -- I am fully cognizant on the limits of my authority. And those limits specifically do not include the ability to consider, resolve or otherwise rule upon the Employer's challenge to the Arbitrator's jurisdiction.

I will get to the issues in dispute before us in a moment. But Bob had indicated he wanted to say something at the outset of the hearing. I don't

Page 8

know if Ian does. So let me first hear from Bob, and then we'll go from there.

MR. MORSILLI: Thank you, Arbitrator Greenbaum. As you've noted --

ARBITRATOR GREENBAUM: Off the record.

(Discussion off the record)

MR. MORSILLI: Thank you, Arbitrator Greenbaum. As you indicated, we have previously objected to the substantive arbitrability of this matter and to your authority to hear this matter. We continue in those objections.

As you mentioned and as the Union is aware, Boston Medical Center filed an action in Federal District Court seeking declaratory judgment that the matter is not substantively arbitrable.

We've requested that the Arbitrator stay the arbitration proceeding on two separate occasions. You have denied our request on both occasions.

Further, you had stated previously that if Boston Medical Center elected not to participate in the arbitration hearing, you would proceed on an ex parte basis.

In light of these unfortunate

Page 9

circumstances, Boston Medical Center enters a so-called special appearance in this matter. In doing so, Boston Medical Center in no way waives its challenge to the Arbitrator's authority or to the substantive arbitrability of the matter. And its participation in this arbitration should not be interpreted as such a waiver by Boston Medical Center. Thank you.

ARBITRATOR GREENBAUM: Ian, anything you wish to say in response?

MR. RUSSELL: At this time just briefly, the Union's position is that the matter is substantively arbitrable, which the Union will take up in court as necessary. And I think the record in this matter will show that the matter is certainly substantively arbitrable and that the Union's grievance is challenging actions by BMC during the period of BMC's ownership of the Hospital.

ARBITRATOR GREENBAUM: It may show that, but it's going to show that to somebody else and not me.

Actually, I'm curious, though, which judge has the case been assigned to?

MR. MORSILLI: Sorokin, I think. I

Page 10

believe.

ARBITRATOR GREENBAUM: Okay. I was just curious.

MR. MORSILLI: Ashley, do I have that correct?

MS. KREZMIEN: I'd have to double-check.

MR. MORSILLI: Don't worry about it.

ARBITRATOR GREENBAUM: I was just curious. And I concur in the Employer's description of it's appearance. It is corrected as a "special appearance," and in no way should be construed -- its participation in the hearing of the merits should not be construed as waiving any objections to my jurisdiction.

All right, the issues in dispute are as follows:

The first issue, which is another arbitrability issue that is before me, is whether the grievance is procedurally arbitrable.

The second issue is the one on substance. And I'm going to ask -- we discussed this before the opening of the record. Each party has a slightly -- well, not "slightly" -- has a different formulation that in substance is not all that far apart.

Page 11

And so we have agreed that each party will read its formulation of the issue into the record and that I will formulate the issue substantively when I write the opinion. And that appeared to be agreeable to both parties.

And we would agree, by the way, just for the moment, that Issue No. 3 is, If the grievance is sustained in whole or in part, what shall be the remedy.

So the only issue in dispute, I believe, would be Issue 2. And of course, the resolution of Issue 2 depends upon the grievance being deemed procedurally arbitrable.

So with that qualification, Ian, can you please read the Union's proposed formulation of the issue into the record, please.

MR. RUSSELL: Yes. The Union's proposed issue -- second issue is, Has the Employer violated the Collective Bargaining Agreement by failing since October 1st, 2024 to pay the correct wages to employees who did not receive anniversary increases in September 2024.

ARBITRATOR GREENBAUM: And, Bob, would you please read the Medical Center's proposed

Page 12

formulation of the substantive issue.

MR. MORSILLI: You know, we'll just agree to the issue that the Union proposed.

ARBITRATOR GREENBAUM: Okay. Well, that made it easy. Okay.

We agreed beforehand that we would hear opening positions first on the question of -- excuse me, procedural arbitrability. The Employer has indicated that it has two brief witnesses on that. Once we have heard those, if the Union has any witnesses, we will hear those. We will then, you know, draw the curtain down on Act 1 of the proceedings, take a brief recess, and then we'll open with Act 2 on the merits.

So if I might, Bob -- by the way, just when it comes to introducing exhibits, to make it easier, propose an exhibit. If I don't hear an objection, it's in. If we need to show that both of you took a course in evidence and know how to build a foundation, we will do so. But if we don't have to do that, we'll all live happier lives by not having to do that.

So, Bob, if you would, please, would you present the Employer's opening statement on the

Page 13

question of procedural arbitrability.

MR. MORSILLI: Sure. Thank you very much.

So we believe the grievance is untimely; and therefore, it is not procedurally arbitrable. The facts are straightforward.

The Union alleges that Good Samaritan Medical Center, the predecessor to BMC-South, failed to implement anniversary wage increases prior to October 1, 2024, and that BMC-South violated the Collective Bargaining Agreement when it did not rectify Steward's -- Steward Good Samaritan's alleged violation upon assuming ownership on October 1, 2024.

Article 24 of the Collective Bargaining Agreement is the grievance in arbitration article.

Section 24.03 provides that a grievance must be presented in writing to the manager or department head within 20 working days from the date of the alleged violation of the contract. Group grievances, such as the present grievance, may be presented at Step 2 directly to the human resources department.

The claimed violation of the contract here is the alleged failure to implement anniversary wage

increases as provided in the Collective Bargaining Agreement.

That alleged failure occurred prior to October 1, 2024, prior to BMC-South's ownership of the facility. Yet, the Union did not file a grievance in this matter until April 2nd of 2025; at least six months later.

The evidence will establish that BMC-South clearly articulated its position that pursuant to an order issued by the United States Bankrupt Court for the Southern District of Texas and the Asset Purchase Agreement between St. Elizabeth's Medical Center and Good Samaritan Medical Center, as the sellers, and BMC Hospital Corporation, as the buyer, it did not assume any liabilities that Good Samaritan Medical Center may have occurred under the Collective Bargaining Agreement, and it would not rectify those alleged violations.

Specifically, the Union raised the issue to the Medical Center at the latest on January 15th of 2025. The following day, on January 16, 2025, the Medical Center placed the Union on written notice of its position. The Union did not file a grievance within 20 working days thereafter.



The evidence will also establish that the Union raised the issue again on January 21st and again in mid-February. And on both occasions, the Medical Center immediately responded and maintained its position. The Union did not file a grievance within 20 working days thereafter.

We fully anticipate the Union will assert a continuing violation theory of the case. We do not believe that the continuing violation theory applies in this case, as that is a legal argument. We anticipate addressing that issue in our post-hearing brief.

The facts will establish that the grievance is untimely. Therefore, the Medical Center requests that the grievance be dismissed in its entirety. Thank you.

ARBITRATOR GREENBAUM: Ian?

MR. RUSSELL: Bob is correct; the Union is taking the position that this is a continuing violation.

The violation at issue in this case as it relates to this particular grievance is not actions taken or not taken by Steward Hospital System in September of 2024. The actions grieved in this case



are BMC-South's failure to pay its employees the correct wages that are owed under the Collective Bargaining Agreement during the time of its ownership.

It is correct that the grievance in this matter was filed on April 2nd of 2025. At most, the timing of the filing of the grievance potentially limits the remedy available to the Union for the violations that occurred in this matter. As I say, it's a continuing violation. You will hear that the case relates to the pay rates for a group of employees who didn't receive anniversary increases in September of 2024.

Thereafter, each paycheck they received was incorrect, because it did not include the 2 percent increase they should have received on their anniversary date in September of 2024.

So each paycheck they received since then is a new violation of the Collective Bargaining Agreement. So the grievance that was filed in April of 2025 is timely. At the very least, it is timely as it relates to every paycheck they received within 20 days prior to the filing of the grievance and every paycheck they have received since the filing



of the grievance.

ARBITRATOR GREENBAUM: Does that conclude your opening of this issue?

MR. RUSSELL: Yes. I figure I'll go into more detail about the specifics of the alleged violation when I give an opening on the merits of the case.

ARBITRATOR GREENBAUM: Okay, understood.

Okay, Bob, your first witness on the question of procedural arbitrability.

MR. MORSILLI: I'm going to turn it over to Ashley.

MS. KREZMIEN: The Employer calls John Hickey as its first witness.

ARBITRATOR GREENBAUM: Just let the record reflect that I disclosed prior to the hearing that upon learning that Mr. Hickey would be a witness, I did disclose that he was a former student of the Arbitrator it's fair to say more years ago than either one of us care to count.

So with that, John, if you have a cellphone -- are you alone in your office at the moment, by the way?

THE WITNESS: I am.

ARBITRATOR GREENBAUM: Would you please take your cellphone and put it out of reach.
THE WITNESS: Sure.
ARBITRATOR GREENBAUM: This is the procedure I follow with everybody.
And I assume the parties would like the witnesses to be sworn; is that correct?
MR. MORSILLI: Yes, please. Oh, sorry.
ARBITRATOR GREENBAUM: Ashley?
MS. KREZMIEN: Yes.
ARBITRATOR GREENBAUM: John, would you please raise your right hand. Do you swear to tell the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
ARBITRATOR GREENBAUM: And do you swear that you will not seek or receive any assistance in the course of delivering your testimony?
THE WITNESS: Correct.
ARBITRATOR GREENBAUM: Okay, thank you.
Ashley, your witness.





JOHN HICKEY, Sworn
DIRECT EXAMINATION
BY MS. KREZMIEN:
Q. Will you please state your name for the record.
A. Sure. John Hickey.
Q. And will you please spell that for the stenographer.
A. Sure. J-O-H-N H-I-C-K-E-Y.
Q. Where are you currently employed?
A. At Boston Medical Center Health System.
Q. And how long have you worked for Boston Medical Center?
A. 11 and a half years.
Q. And what is your current role?
A. I am the vice president of employee and labor relations.
Q. And how long have you held that role?
A. Since 2023.
Q. And what are your job duties in that role?
A. So I oversee a team of employees who -- we have two books of business. One is managing the relationship with nine unions in 17 Collective Bargaining Agreements. And then we also manage



employee relations issues systemwide for both non-union and union employees.
ARBITRATOR GREENBAUM: Will this be, I would say, proposed Employer Exhibit 3?
MS. KREZMIEN: Yes. Sorry, I just wanted to confirm my screen was shared.
(Document marked as Employer Exhibit 3 for identification)
Q. I'm showing you what's proposed as Employer Exhibit 3.
ARBITRATOR GREENBAUM: Unless there's an objection, it's in. By the way, just for one second, I'm sorry. Just before the hearing, just to clarify the record, we agreed upon some joint exhibits and premarked Employer Exhibits. Those exhibits are deemed to be admitted and are part of the record.
I'm sorry, Ashley. Go ahead, please.
(Document marked as Employer Exhibit 3 in evidence)
BY MS. KREZMIEN:
Q. So, John, I'm showing you what's been marked as Employer Exhibit 3. Do you recognize this document?

Page 22

A. I do.
Q. So what is it?
A. This was an email exchange between Andy Rodgers from 1199 and myself and Marlon Washington regarding some legacy issues that employees were raising with them.
Q. Okay. Who is Andy Rodgers?
A. Andy is present here today. He is the administrative organizer for 1199SEIU. He's an employee of 1199.
Q. And who is Marlon Washington?
A. Marlon would be his leader, I believe. Marlon is a vice president of 1199. And we -- BMC Health System has had a long-standing relationship with him, even prior to the acquisition of the Steward hospitals.
Q. So I'm just going to walk you through the email and ask you to confirm a few details.
So when -- I'm looking at the bottom of the email chain, which appears to be the first email in the string. Will you please confirm the date and time that this email was sent and by whom.
A. Sure. So I received this email from Andy Rodgers on Wednesday, January 15th, 2025 at

Page 23

p.m.
Q. And in that email, you said he mentioned a couple of issues.
Did that include anniversary rates?
A. Correct.
Q. So I'm going to scroll to the next.
A. So this is an email from my response on the same day. And I included Helene Benedict. Helene is a senior director at Boston Medical Center who works on my team. She manages SEIU Collective Bargaining Agreements systemwide. So I just wanted to make sure she was included, as she ultimately manages these things.
We were willing to sit down and talk, but this was part of an ongoing conversation. And our experience had been that we would just get, like, very wide, generic commentary about issues.
And so we wanted to -- we're always willing to sit down and talk. But in order to construct it, we need to identify what we're talking about.
Q. So I'm going to scroll to the next email. And will you please confirm who sent the email --
A. So Andy Rodgers sent an email to Helene Benedict, Marlon Washington and I on Wednesday,

Page 24

January 15th, at 4:19 p.m.
Q. So I'm just going to move us along. And will you please confirm the sender and the date on this email.
A. Sure. This next email is from me to the same group on Thursday, January 16, 2025 at a.m.
Q. And I just want to draw your attention to this line here that says, "I need to be clear that we cannot fix issues that may have existed before 10/1."
What did you mean by that?
A. So this was in January of 2016. We had been clear with folks in meetings and in various forms and venues that we took the assets from the former Steward Health System as they existed -- all assets; employees being an asset -- as they were on 10/1/24.
We have a vote from our board of directors on what we're allowed to do. The APA is pretty clear. People were coming to us with just a myriad of issues going back extended periods of time, not only on pay rate issues, but on every imaginable issue.

Page 25

And so we needed to be really clear that we can fix 10/1/24 on, but we took people as they were on 10/1/24.
Q. Okay. You said "January 2016" --
A. I'm sorry, Thursday, January 16th of 2025.
Q. And so I also just want to scroll back down here to Page 3. And here it says -- if you could just read that line out for me; "Attached is a Excel" --
A. "...file showing some of the outstanding issues. This is the recent data from the last few days from a survey we sent out to all of the 1199SEIU workers."
MS. KREZMIEN: Okay. Thank you.
(Document marked as Employer Exhibit 4 for identification)
Q. So I'm showing you what I will propose is Employer Exhibit 4.
Do you recognize what this --
A. I do. I do.
Q. What is it?
A. So this was the spreadsheet -- when we had asked the Union to narrow down what is it we're talking about, then we got this, which was just,

again, a survey of the entire unit and just a large quantity of issues in a spreadsheet.

ARBITRATOR GREENBAUM: I've heard no objection. This is in as Employer 4.

MS. KREZMIEN: Thank you.

(Document marked as Employer's Exhibit 4 in evidence)

BY MS. KREZMIEN:

Q. And just to confirm, does this list anniversary pay increase as an issue on the spreadsheet?

A. Yes.

MS. KREZMIEN: Okay. I have no further questions, subject to redirect.

ARBITRATOR GREENBAUM: Ian?

CROSS EXAMINATION

BY MR. RUSSELL:

Q. So, John, I understand you had said that when you were communicating the issues, you did not believe issues could be addressed that existed prior to October 1st, 2024.

So I just want to make sure I understand that. So your position was that if someone had missed a pay increase, for example, the day before



the sale went through, that that could not be fixed by BMC going forward?

A. So that was not the scenario we were faced with. What we were faced with was a slippery slope of unending claims going back more than a year. If you look at that spreadsheet, people were talking about unpaid medical bills. People were talking about things that went back.

Today is the first time in this entire saga of this issue that we've heard we're only looking at September of 2024.

So I think to answer your question, if faced then with what you just said, the answer would be, Yes, we couldn't fix it, even if it was the day before, because it was a slippery slope, Ian. Who was I to determine 1 day, 8 days, 8 months, 8 years?

Q. So there was a grievance filed in this matter, right? It's now in the record as a joint exhibit, correct?

A. Yes.

Q. After that grievance was filed, did you meet with anybody from the Union about that grievance?

A. I've had so many meetings, I'm not sure if



I was specifically in a grievance meeting about it. So I'm a little unsure. I've had meetings with the Union about it, but I can't attach it to the specific grievance meeting.

Q. Are you aware of any grievance meeting that took place with the Union about this grievance that took place after the grievance was filed?

A. Again, I'm not trying to be cagey, but there's been a lot of meetings about it. So I don't know if it was specifically called a "grievance meeting" or not.

Q. Are you aware of any communications from yourself to the Union following the filing of the grievance asking for the time period that the grievance covered?

A. If it exists, I won't deny it. But I don't recall it off the top of my head. I don't recall it from memory.

MR. RUSSELL: I don't have any other questions.

ARBITRATOR GREENBAUM: Any redirect, Ashley?

MS. KREZMIEN: No.

ARBITRATOR GREENBAUM: Okay, thank you.



Your next witness, please.

MS. KREZMIEN: The Employer would like to call its next witness, Daniel Friel.

ARBITRATOR GREENBAUM: Danny, are you alone where you are, please?

THE WITNESS: Yes, I'm alone.

ARBITRATOR GREENBAUM: And if you would, as I asked John, if you have a cellphone in reach, would you put it out of reach. Thank you.

Would you please raise your right hand.

First, do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

ARBITRATOR GREENBAUM: And second, do you swear that you will not seek or receive any assistance in the course of delivering your testimony?

THE WITNESS: Yes.

ARBITRATOR GREENBAUM: Okay. Ashley, your witness.

DANIEL FRIEL, Sworn

DIRECT EXAMINATION

BY MS. KREZMIEN:

Q. Will you please state your name for the

Page 30

record.
A. Daniel Friel.
Q. Who is your current employer?
A. Boston Medical Center.
Q. And how long have you been employed at Boston Medical Center?
A. Since 2018.
Q. And what is your current job title?
A. Executive director, employee and labor relations.
Q. And how long have you held that title?
A. A little over a year.
Q. And what are your job duties in that role?
A. I work on a host of things; policies, relationships with the unions, grievances.
(Document marked as Employer Exhibit 5 for identification)
Q. So I'm showing you what is marked as proposed Employer Exhibit 5.
Do you recognize this document?
A. I do.
Q. What is it?
A. This is an email that I sent to Andy Rodgers.

Page 31

Q. This is the first chain in the string -- or first email in the chain.
Will you please confirm who sent this email and the date and to whom.
A. Emmanuel St. Jacques sent it on Thursday, October 17, 2024 to a GSMC_HRSupport email and Renee Puryear, Oliver, and Andy Rodgers of 1199.
Q. Who is Renee Puryear?
A. An employee of Good Samaritan/Boston Medical Center-South.
Q. And who is Olivia Gosselin?
A. She is an employee of Boston Medical Center.
ARBITRATOR GREENBAUM: Who is Emmanuel St. Jacques?
THE WITNESS: An employee of Boston Medical Center.
BY MS. KREZMIEN:
Q. And is Emmanuel St. Jacques a bargaining employee?
A. Yes.
Q. So can you please confirm who is on the second part of the email chain; the sender and the date and time.

Page 32

A. Yes. It's a Good Samaritan HR Support email; Friday, October 18, 2024 to Emmanuel St. Jacques. It looks like they cc'd themselves; Good Samaritan HR Support; Stephen Cappellini, who is a Boston Medical Center employee; Renee Puryear; Oliver Gosselin; and Andy Rodgers.
Q. And let's go through this one as well.
Can you confirm who sent the email and on what day and time?
A. Stephen Cappellini sent it Friday, October 18, 2024 to the Good Samaritan HR Support email, Emmanuel St. Jacques, Renee Puryear, Oliver Gosselin, and Andrew Rodgers.
Q. So will you please confirm who sent this email and on what day and time.
A. Andrew Rodgers sent it on Tuesday, January 21st, 2025 to Emmanuel St. Jacques and Daniel Friel.
Q. That's you, right?
A. Correct; that's me.
Q. And then will you please confirm who sent this email and the date and time.
A. Daniel Friel, I, sent that email on Tuesday, January 21, 2025 to Andy Rodgers.
Q. So I'm showing you what is going to be

Page 33

proposed Employer Exhibit 6 --
ARBITRATOR GREENBAUM: Employer 5 is in.
(Document marked as Employer Exhibit 5 in evidence)
ARBITRATOR GREENBAUM: Go ahead, please.
(Document marked as Employer Exhibit 6 for identification)
BY MS. KREZMIEN.
Q. So this is proposed Employer Exhibit 6. Do you recognize this document, Mr. Friel?
A. I do. It's an email.
Q. And let's just -- I would ask you to confirm --
A. Andrew Rodgers sent that email Thursday, February 13, 2025 to myself, Daniel Friel, and Debra Owen.
Q. Who is Debra Owen?
A. Debra Owen is a BMC employee and I believe a Union delegate as well.
Q. And who is Elise Vega?
A. An employee of Boston Medical Center.
Q. And is she a bargaining unit member?
A. Yes.
Q. And will you please confirm the date that

you sent your response and the time and to whom.
A. I sent that one Wednesday, February 19, 2025 to Andrew Rodgers and Debra Owen.
(Document marked as Employer Exhibit 6 in evidence)
MS. KREZMIEN: I have no further questions for you, Mr. Friel, subject to redirect.
ARBITRATOR GREENBAUM: Okay, thank you. Ian, questions?
MR. RUSSELL: Hopefully I'm sharing with you a document that I think came in as Employer Exhibit 5.
ARBITRATOR GREENBAUM: Which is, by the way, admitted and part of the record.
MR. RUSSELL: Right. I'm just trying to make sure I had the right document up. I know it came in.

CROSS EXAMINATION

BY MR. RUSSELL:
Q. Do you see here where -- and again, who is Stephen Cappellini?
A. Stephen Cappellini was an HR business partner for Boston Medical Center-South.
Q. And in his email, he writes, "I will get



this corrected for you."
Do you understand what he meant there?
A. I'm not entirely sure if it was the PTOs or what it was.
Q. Just scrolling down, the original email from Mr. St. Jacques addresses not receiving a pay increase on September 25th. Do you see that?
A. Yes.
Q. Okay. But you're not sure -- you're saying you're not sure what exactly Mr. Cappellini was referring to?
A. Whether that was for PTO or the wage, I'm not entirely sure.
Q. Do you have any understanding as to whether or not the PTO or the wage issue that was being raised by Mr. St. Jacques got addressed?
A. The wage issue got addressed by not being approved to be increased. I believe the PTO cash-outs was a work in progress.
Q. So there's a grievance that's been filed in this matter.
Did you have any involvement in discussions with the Union regarding the grievance that was filed on or about April 2nd, 2025?



A. I think similar to the testimony you heard earlier, I had a lot of discussion, so I'm not sure when and to whom all of those took place with. We met with their large committee at one point. We met with -- I responded to multiple people on this issue.
Q. But you don't know if you met with anybody from the Union directly related to the grievance that was filed in this matter; is that right?
A. I don't recall it if I did do it, if I did meet --
Q. And are you aware of any communications from yourself to the Union regarding this grievance?
A. I'm not sure, to be honest with you. If I sent emails after it or not, I'm not entirely sure.
Q. Am I correct that following the transfer of ownership of the Hospital in October of 2024, that following that, that the Union did attempt to address a variety of issues with you related to the way that employees were being paid?
A. Yes, they had reached out to us.
Q. Were they reaching out to you frequently about pay issues at that time?
A. Individuals were. The Union was, yes.



Q. Okay. And was BMC during that process addressing some of the concerns by adjusting the pay rates for some employees?
A. If folks' anniversary dates were in October of 2024 and we had missed it, if they were reaching out in November, you know, we were going back and adjusting those October 2024 dates.
Q. And am I correct that there were employees who were having pay issues that they had that they raised with BMC. They were getting addressed without grievances getting filed in some cases; is that right?
A. Yes, I believe so, yes.
MR. RUSSELL: I'd like to take a short caucus. And I suppose at this time I should ask if we have break-out rooms.
ARBITRATOR GREENBAUM: We don't, but we will very shortly. So hold on a second. So I will assign to your break-out room Andy and you. I'm not going to assign anybody to the Employer's -- well, yeah.
MR. MORSILLI: Is Danny still on the stand, or are you done, Ian?
MR. RUSSELL: I'm going to take a break

Page 38

before finishing.

ARBITRATOR GREENBAUM: If it's okay, Bob, do you want to be put in a break-out room?

MR. MORSILLI: Please. Obviously without Danny.

ARBITRATOR GREENBAUM: So just give me a moment, please.

(Pause)

ARBITRATOR GREENBAUM: So, Dan, you haven't been assigned. I'm going to open the rooms right now. And how about 11:05?

MR. RUSSELL: Sure.

ARBITRATOR GREENBAUM: Dan, you can feel free to get up, move around the country; just be back here by 11:05.

THE WITNESS: You got it. Thank you.

(Recess taken)

ARBITRATOR GREENBAUM: Back on the record.

Ian, do you have any further questions for the witness on cross examination?

MR. RUSSELL: I do not.

ARBITRATOR GREENBAUM: Ashley, do you have any redirect?

MS. KREZMIEN: I do.

Page 39

ARBITRATOR GREENBAUM: Okay.

REDIRECT EXAMINATION

BY MS. KREZMIEN:

Q. So I think you mentioned Mr. Cappellini worked at BMC. Did he work at BMC prior to the acquisition on October 1st?

A. He did.

Q. Okay. So what is his current status?

A. He is no longer with Boston Medical Center.

Q. Okay. Do you know how long he was with BMC?

A. He was with Boston Medical Center from October 1st through at least -- I believe it was this past summer; so the summer of 2025.

Q. Okay. So if his employment started in -- do you mean he started with BMC on October 1st, 2024?

A. He also came over from Steward.

Q. Okay. So he was what you would call a "legacy employee"?

A. Correct.

Q. And he's no longer employed?

A. Correct.

Q. Okay, thank you.

Page 40

I think you mentioned earlier that BMC addressed wage and other sorts of issues that arose after October 1st, 2024; is that correct?

A. The example that I gave was that if someone said, you know, in December of 2024 that, "Hey, I missed my anniversary increase last month," that's something that we would go back and look at; the prior missed step in that case.

Q. So to the extent that any corrections were made, were those corrections to fix issues that arose after October 1st, 2024?

A. That's correct.

MS. KREZMIEN: Okay, I have no further questions.

ARBITRATOR GREENBAUM: Any recross?

MR. RUSSELL: Yes.

RECROSS EXAMINATION

BY MR. RUSSELL:

Q. Just to make sure I understand -- I was trying to follow when you said Mr. Cappellini ended his employment at BMC. Did you say it was summer of last year?

A. Yeah, July of 2025; July or August of 2025.

Q. And as of October of 2024, he was an HR

Page 41

employee for BMC at BMC-South, right?

A. That is correct.

MR. RUSSELL: No other questions.

ARBITRATOR GREENBAUM: Does the Medical Center have any further witnesses on the question of procedural arbitrability?

MS. KREZMIEN: We do not.

ARBITRATOR GREENBAUM: Ian, does the Union have any witnesses on the question of procedural arbitrability?

MR. RUSSELL: I'm going to take another short 5-minute caucus.

ARBITRATOR GREENBAUM: You certainly may. You can go to the break-out rooms. So it's 11:11. 11:16?

MR. RUSSELL: All right.

ARBITRATOR GREENBAUM: And I think I will put Danny into the break-out room.

Ian, does the Union have any witnesses on the question of procedural arbitrability?

MR. RUSSELL: No.

ARBITRATOR GREENBAUM: So we're going to take a five- or six-minute break. We'll come back at 11:25.

Page 42

Off the record, if I might at this point.

(Recess taken)

ARBITRATOR GREENBAUM: Ian, the Union's opening statement, if you would, please.

MR. RUSSELL: Thank you. As you are aware, this case is about employees who are not being paid correctly by Boston Medical Center-South and who have not been paid correctly since the filing -- at least the filing of the grievance and for some period of time prior to that.

As recently as September of 2024, the Hospital was operated by Steward Healthcare. The Union has represented bargaining unit members of the Hospital for many years.

In 2019, it entered into a Collective Bargaining Agreement with Steward that covered the years 2019 to October of 2024.

In 2024, the Union and Steward extended that agreement through to October of 2025. You have in the record the Collective Bargaining Agreement with Steward, as well as the extension agreement that I'm referring to.

Effective October 1st, 2024, Boston Medical Center, BMC, took over ownership of the Hospital.

Page 43

At that time, BMC assumed the existing Collective Bargaining Agreement. My understanding is that there's no disagreement about that. BMC did not request specific changes to the Collective Bargaining Agreement, and none were made.

So the Collective Bargaining Agreement that you are interpreting is what's in the record, the 2019 to 2024 CBA, which was extended by the extension agreement to October 1st, 2025.

For purposes of this case, the primary relevant language in the Collective Bargaining Agreement is found in Article 12.

Pursuant to Article 12, there were initial wage increases in January of 2020. Following that, employees were to receive wage increases in the form of step increases on a wage scale. And under the Collective Bargaining Agreement, those increases are to be received on an employee's anniversary date.

Anniversary dates under the Collective Bargaining Agreement are the employee's date of hire, unless, pursuant to language in Article 12, an employee is promoted to a higher-paying position, at which point their anniversary date becomes the date of their promotion into that higher paid position.

Page 44

The extension agreement signed in 2024 extends all terms of the CBA and specifically states that anniversary date wage increases under Article 12 will continue through October 2025.

Again, ownership of the Hospital was transferred on October 1st, 2024.

Following the transfer of ownership and BMC's assumption of the Collective Bargaining Agreement, some employees noticed that they had not received their anniversary increases that were owed to them in September of 2024, which meant that they understood that at that time, they were not being paid correctly by BMC, because the 2 percent wage increase that they would have been owed was not reflected in the paychecks that they were receiving from BMC. And I say 2 percent because the distance between the steps on the scale are 2 percent. So what we're generally looking for here to see if someone received a step increase would be a 2 percent increase.

The Union raised this issue with BMC. However, rather than making an effort to make sure that their employees were being paid correctly, BMC eventually informed the Union that it was not going

Page 45

to do anything to correct the pay rates of these employees because an initial error, in their opinion, had occurred under Steward's ownership; that being the failure to provide an anniversary increase in September of 2024.

Because BMC indicated that it was not going to make any attempts to fix the pay rates -- and when I say "fix the pay rates," I mean to pay employees correctly under the existing Collective Bargaining Agreement that it had assumed -- the Union filed a grievance. And that's why we are here today.

The Union's position is that BMC violated the agreement that it assumed by failing to pay employees at the correct rate since it took ownership of the Hospital. And additionally, by failing to even look into the pay of these employees and simply responding that they were not going to do anything about it.

The Union will provide evidence in the form of bargaining unit lists that it has received from Steward and which it has received from BMC. These bargaining unit lists contain the names of employees, their anniversary dates in the form of

Page 46

either their date of hire or, if they changed positions, their most recent start date in the new position. These same lists also contain the pay rates being received by these employees.

In particular, what you're going to be shown are bargaining unit lists from -- initially from July of 2024 and September of 2024, both of which were received from Steward; and then bargaining unit lists from December of 2025, which was the first bargaining unit list with this information that the Union received from BMC after taking ownership of the Hospital.

Additionally, you'll see a list showing the pay rates of employees as of October of 2025. By looking at these bargaining unit lists, you will be able to see that there are a group of employees who would have been owed a 2 percent increase in September of 2024, but they did not receive it. And that 2 percent that they should have received has never been reflected in their pay going forward.

I do need to point out, when looking at these documents and what they show, you need to be aware that the extension agreement also included a 2 percent across the board increase that was to be

Page 47

paid on November 1st, 2024.

So going from the September 2024 list to the December of 2024 list, for these employees, generally you will see a 2 percent increase in their wages. That 2 percent increase does not reflect having received an anniversary increase. It only reflects having received the 2 percent across-the-board increase that was provided in November of 2024.

The only way that you would see that someone had received an anniversary increase would be if they had received a larger increase between the dates that we're talking about here. They would have had to have received at least 4 percent in order to show that they received an anniversary increase.

For example, you will see on these bargaining unit lists a bargaining unit member named Lynn Andrews. You'll see what her pay rate was in July of 2024. At that time, it was $32 an hour. Then you will see bargaining unit lists from September of 2024. It will show at the time she was still being paid at $32 an hour.

Then you will see the first list that was

Page 48

provided to the Union by BMC, which was provided in December of 2024. That list will show Ms. Andrews at that point in time was being paid $32.64. That's 2 percent more than she was previously receiving. That reflects that she received the across the board increase that was owed in November of 2024, but that she had not received a 2 percent increase in September of 2024.

The bargaining unit lists are going to show you the same information for a group of employees of around 25 employees. The Union will provide and the Union witnesses' will go through a chalk that it has put together, which essentially takes out the relevant information from these bargaining unit lists for this group of approximately 25 employees, that will show you what their pay rates were on specific dates as reflected on the different bargaining unit lists. And that's simply to provide a summary of what those documents show.

Overall, again, what they will show is that these employees did not receive an anniversary increase in September of 2024. And they will, again, show that this has not been reflected -- that it is reflected in the pay that they have received

Page 49

from BMC since taking ownership of the Hospital.

It is the Union's position that it is a violation of the Collective Bargaining Agreement for BMC to not be paying these employees at the rate that they are owed under the Collective Bargaining Agreement. A violation of the Collective Bargaining Agreement occurs each time an employee receives a paycheck that does not pay them at the rate that they are owed under the Collective Bargaining Agreement.

Again, BMC's only response to this has been to say that if they didn't receive an anniversary increase in September of 2024, BMC was not going to do anything about it. Their position is that if an employee lost that 2 percent at that time, they were never going to get that 2 percent back. That 2 percent never needs to be reflected in any paycheck they ever receive again, so long as they remain employed at Boston Medical Center.

BMC's response is that this is not substantively arbitrable. I understand that that is not the issue that is before you. The Union takes the position that it is substantively arbitrable, in that the Union's grievance addresses violations of

Page 50

the Collective Bargaining Agreement by BMC. It is a violation of the contract for BMC to not pay its employees at the pay rates they are owed. It's in violation of Article 12. It's in violation of related articles.

BMC assumed the Collective Bargaining Agreement at issue here. In doing so, it agreed to pay employees pursuant to the requirements of the Collective Bargaining Agreement. They are not doing so. With each paycheck that these employees receive, they are being paid incorrectly and in violation of the Collective Bargaining Agreement.

Very briefly, I will state that there is certainly nothing in the Collective Bargaining Agreement that takes the grievance that the Union filed outside of the realm of arbitration. The Union is alleging a violation of the wage language in the Collective Bargaining Agreement; the language that sets up the pay scale.

A large part -- I think many employees would think a primary part of the bargaining agreement relates to how they are paid. And when employees are not being paid correctly, when they are not being paid in alignment with the Collective

Page 51

Bargaining Agreement, that's a violation of the agreement. There is nothing in the sales agreement that says that BMC is not liable for violations of the Collective Bargaining Agreement related to employee pay that occur after it takes over ownership. There is nothing in the sales agreement that says that continuing violations are excluded from arbitration under this Collective Bargaining Agreement.

BMC's approach to this case is genuinely disappointing to the Union and to the employees who the Union represents. The parties should not be at arbitration or going to court over this matter. The parties should be working to ensure that the employees who work at the Hospital are paid at the rate that they are owed under the Collective Bargaining Agreement. That's not only good for the employees, good for the Union in its representation of its employees, but it would be good for the Hospital for its own employees to be shown that the Hospital cares enough about them and the work that they provide to pay them at the rate that they are owed.

In this matter, BMC has not ever really

Page 52

disputed whether or not individuals are being paid incorrectly. They are simply saying, "We're not even going to look at it if it is an issue that we believe is somehow outside of arbitration because of the sales agreement.

So from the Union's perspective, this case is very straightforward. There is a group of employees who are not being paid at the rates that they are owed under the Collective Bargaining Agreement. The grievance alleges that they are not being paid by BMC under the terms of the Collective Bargaining Agreement.

The Arbitrator should find that BMC has violated the Collective Bargaining Agreement by failing to pay these employees correctly, and those employees should be made whole.

ARBITRATOR GREENBAUM: Thank you. Ian, just one question for clarification. What about employees with anniversary dates prior to September 1 of '24? Did they all get adjusted or --

MR. RUSSELL: I don't think the Union can necessarily say that they have all been adjusted. I can say that this grievance is pursuing -- is alleging a violation related to employees who did

Page 53

not receive the anniversary increase in September of 2024.

ARBITRATOR GREENBAUM: The grievance is limited to September 1 anniversary dates; so between September 1 and September 30; is that correct?

MR. RUSSELL: Correct.

ARBITRATOR GREENBAUM: Bob, first, who will be presenting the opening on behalf of the Medical Center?

MR. MORSILLI: I will be. We are going to reserve the opening --

ARBITRATOR GREENBAUM: That was going to be my next question.

MR. MORSILLI: But to be clear, the first time the Union has ever said that this grievance is limited to anniversary increases that allegedly were not given in September of 2024 is today -- actually, I think we got the Union's exhibits yesterday, late yesterday afternoon. So I guess that was the first time we saw the chalk that said that.

The grievance does not say that. I'm not sure it matters from a substantive perspective. But that is new. Let's be very clear about that.

MR. RUSSELL: I would say that's not true

Page 54

and that that was stated in both of the conference calls related to this case, and also simply that BMC didn't meet with the Union when this grievance was filed.

MR. MORSILLI: I have no recollection of that being stated in the conference calls related to this case. I can go back and look at my notes, but I don't have any -- maybe you do, Mr. Arbitrator. I don't know.

ARBITRATOR GREENBAUM: I don't have the notes from the calls. I will say the only thing I -- the only date I remember being referenced in the conference calls was that the remedy being sought was from October 1 forward.

Let me confess, people, I'm fallible. I don't remember any discussion limiting the class, for lack of a better term, to those with anniversary dates to September '24. But the record will have to speak for itself.

Okay, Ian, am I correct in assuming that you're calling Andrew Rodgers as your witness?

MR. RUSSELL: Yes. And I would like to take just -- have a short caucus with him before putting him on; five minutes.

Page 55

ARBITRATOR GREENBAUM: Noontime?

MR. RUSSELL: Okay.

ARBITRATOR GREENBAUM: Does that work?

MR. RUSSELL: Yes.

(Recess taken)

ARBITRATOR GREENBAUM: Ian, you are calling Andrew Rodgers; am I correct?

MR. RUSSELL: Yes.

ARBITRATOR GREENBAUM: Andrew, are you alone where you are?

THE WITNESS: Yes.

ARBITRATOR GREENBAUM: And as I've asked the others, if you have a cellphone in reach, please put it out of reach.

THE WITNESS: Okay.

ARBITRATOR GREENBAUM: Would you please raise your right hand.

Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

ARBITRATOR GREENBAUM: And do you swear that you will not seek or receive any assistance in the course of delivering your testimony?

THE WITNESS: Yes.

Page 56

ARBITRATOR GREENBAUM: Thank you. Ian, your witness.

ANDREW RODGERS, Sworn

DIRECT EXAMINATION

By MR. RUSSELL.

Q. Good afternoon, Andy.

Do you currently work for Union 1199?

A. Yes, I do.

Q. And how long have you worked for the Union?

A. A little over two years now.

Q. About what was your start date with the Union?

A. Mid-January 2024.

Q. And what is your position in the Union?

A. I'm an administrative organizer.

Q. And is that the same position you held at the time that you were hired in January 2024?

A. Yes.

Q. As of January 2024, did you have any responsibility for Good Samaritan Hospital?

A. Yeah. Yeah, actually, it was my first assignment.

Q. What was your -- as an administrative organizer, what were your duties related to the Good

Page 57

Samaritan Bargaining Unit?

A. To help enforce the contract; make sure that the workers knew that I was there.

Q. So ownership of the Hospital transferred to Boston Medical Center in October of 2024; is that right?

A. Yes.

Q. Did you remain responsible as the administrative organizer for the bargaining unit at that location after the transfer?

A. Yes, I did.

Q. And are you currently still the administrative organizer for that bargaining unit?

A. Yes.

Q. Following the transfer of the Hospital to BMC's ownership, did the name of the Hospital change?

A. No, not at first. I forget when the name changed, but it stayed Good Samaritan Medical Center for a little while.

Q. But at some point, am I correct that the name changed?

A. Yes, to the BMC-South.

Q. What does the Hospital go by now?

Page 58

A. BMC-South.
Q. And as of -- I'm going to go back to the time when you started there. Who owned the Hospital as of January 2024?
A. Steward Healthcare.
Q. And during the time that you were working as the administrative organizer for this bargaining unit when Steward was in ownership, would they provide you with lists of the bargaining unit?
A. Yes. Monthly memberships lists or BMC calls them "headcount reports." So every month we would get one, yeah.
Q. And were those consistently provided to you every month by Steward?
A. No. Occasionally, they would miss a month. So we might get one in April and then we might not get one until June or something. But we were requesting them monthly.
Q. Okay. And then following BMC taking ownership of the Hospital, did you get similar member lists from BMC?
A. Yes, yup.
Q. The lists that you received from Steward, were they limited to the names of employees, or did

Page 59

they contain other information?
A. It shows the worker's title, their job title, how much they're making per hour. It shows how many hours a week they work and information like their home address and phone number and stuff like that. So it's pretty comprehensive.
MR. RUSSELL: Okay. I'm going to share on the screen a document that was provided by the Union to the Arbitrator and to the Hospital, which is --
ARBITRATOR GREENBAUM: This, I believe, would be Union Exhibit No. 1; is that correct?
MR. RUSSELL: Yes.
ARBITRATOR GREENBAUM: Okay.
(Document marked as Union Exhibit 1 for identification)
BY MR. RUSSELL:
Q. And this is labeled as "July 2024 Membership List." Do you see that in front of you, Andy?
A. Yes, yup.
Q. And what is your understanding of what this document is?
A. It's a list of all the 1199SEIU members at the time.

Page 60

ARBITRATOR GREENBAUM: Who was it prepared by?
THE WITNESS: This was prepared by someone in HR under Steward Healthcare. I'm not sure who exactly prepared it.
ARBITRATOR GREENBAUM: Okay. But it's a Steward document, is what I'm asking?
THE WITNESS: That's correct.
ARBITRATOR GREENBAUM: All right. This is in as Union 1.
(Document marked as Union Exhibit 1 in evidence)
MR. MORSILLI: So I would object to the -- I don't object to the admission of the document as something that the Union received. But we do object to the substance of the document if the witness can't testify of his own knowledge to anything about the substance of the document, because it wasn't prepared by the Union.
ARBITRATOR GREENBAUM: Well, he can testify as to his understanding of what it shows. Go ahead. Your point is noted.
BY MR. RUSSELL:
Q. On this document, Andy, where would you

Page 61

look to determine a bargaining unit member's anniversary date?
A. So we would go to the last hire date, which I think is Column J.
Q. Okay. Why would you go to the last hire date to determine the anniversary date?
A. Well, that's how we determine the anniversary date based on the contract. So a worker could have an original hire date -- usually the original hire date and the last hire date are the same, unless they got a different job, a different title. Maybe they moved from transporter to CNA or something, and that would show the date that they changed the job, right? And that would become their new anniversary date.
Q. And I believe you said that the document would also show the hourly rate for the employee. Where would you look at on the document for that?
A. Column Q. And it's different in each report. But, yeah, it's right there showing the hourly amount.
Q. When you say that it's different in each report, what do you mean?
A. Just that sometimes the hourly amount will

Page 62

be in a different column or instead of first name first and last name second, it will be reversed. You know, sometimes it just looks different. It's the same with BMC, too.

Q. Okay. In your experience with -- in your dealings with Steward, the hourly rate that was listed, was it your understanding that that was what Steward's understanding of what the hourly rate of the employee was?

MR. MORSILLI: Objection.

A. Yes.

ARBITRATOR GREENBAUM: Hold it. Bob?

MR. MORSILLI: The question asked the witness to testify to Steward's understanding of what the document -- what the specific information of the document was.

ARBITRATOR GREENBAUM: Rephrase.

BY MR. RUSSELL:

Q. What was your understanding in this document under Column Q of what was shown?

A. That was how much the workers were making, their hourly rate.

Q. And who at Steward would you receive this document from?

Page 63

A. From human resources.

MR. RUSSELL: I'm sharing a document that's been provided to the Hospital and the Arbitrator and is labeled as "Good Sam 9.2024 Membership."

ARBITRATOR GREENBAUM: We'll show this as Union 2 for either identification or admission.

(Document marked as Union Exhibit 2 for identification)

BY MR. RUSSELL:

Q. Andy, do you recognize this document?

A. Yes. It's the September 2024 membership or head count report from Steward.

ARBITRATOR GREENBAUM: Okay. This will be in as Union 2.

MR. MORSILLI: I have the same objection.

ARBITRATOR GREENBAUM: Same ruling. It's his understanding of what it shows.

(Document marked as Union Exhibit 2 in evidence)

ARBITRATOR GREENBAUM: Go ahead, Ian. This will be Union 3.

(Document marked as Union Exhibit 3 for identification)

Page 64

BY MR. RUSSELL:

Q. Andy, I'm showing you a document that's been provided to the parties and to the Arbitrator as "Headcount_Report_by_Union GS_SEIU - 12.10.24." Do you recognize that document?

A. Yes, yes. It's the first headcount report that we received from Boston Medical Center for Good Samaritan.

Q. And who at Boston Medical Center provided this?

A. I believe it was labor relations. I don't know if it was -- who it was exactly. It may have been Helene or Daniel. I'm not sure.

ARBITRATOR GREENBAUM: Okay. This is in as Union 3. Again, the witness' testimony is limited to his understanding of what it shows.

(Document marked as Union Exhibit 3 in evidence)

ARBITRATOR GREENBAUM: Go ahead.

BY MR. RUSSELL:

Q. Andy, does this document show the compensation being received by employees?

A. Yes, it does.

Q. And where does it show that?

Page 65

A. Right under Column AO; wherever the mouse is there.

Q. Okay. Has anybody from BMC ever indicated to you that the hourly rates on the bargaining member list that they shared with you are incorrect?

A. No.

Q. Now, here on this column under AF, "Original Hire Date," it does appear for everybody that it lists "10/1/24." Do you see that?

A. Yes, I do.

Q. What's your understanding of why they all list -- the original hire date for all the employees on this list is 10/1/24?

A. I believe what we were told is that it has to do with Chronos or the way that -- the system that they use. So that has caused confusion amongst the workers. But, yeah, that's the reasoning because it's when BMC took over.

MR. RUSSELL: Okay. I'm sharing a document that's been shared and is labeled as "Headcount_Report_by_South SEIU October 2025."

ARBITRATOR GREENBAUM: This will be Union 4, I hope? And again, the same ruling; his understanding of what it shows.

Page 66

(Document marked as Union
Exhibit 4 in evidence)
BY MR. RUSSELL:
Q. Andy, do you recognize this document?
A. Yes, yup, I do. It's exactly what you said it is. It's the October 2025 head count report that was sent to me from Boston Medical Center.
Q. Does this document also show the compensation received by employees, the hourly rate?
A. Yes. Yes.
Q. What is that?
A. Column AQ, it looks like, and also AO.
Q. And who did you receive this from?
A. From labor relations. Somebody in labor relations, I'm pretty sure.
MR. RUSSELL: This is a document that was sent just a little while ago. I want to make sure that the Hospital received it.
MR. MORSILLI: We did.
ARBITRATOR GREENBAUM: This is Union 5.
(Document marked as Union
Exhibit 5 for identification)
BY MR. RUSSELL:
Q. All right, Andy, I'm showing you a document

Page 67

that's been shared that is titled "Head Count Report by Union September 2025." Do you see that?
A. Yes, I do.
Q. And what is this document?
A. It's exactly that. It's the head count report for September 2025 sent to us from Boston Medical Center.
Q. And does this, again, list the compensation rate for employees?
A. Yes, Column AQ.
ARBITRATOR GREENBAUM: This is in as Union 5. Let the record show that the Arbitrator has, in fact, received his copy from Amanda.
(Document marked as Union
Exhibit 5 in evidence)
BY MR. RUSSELL:
Q. Andy, I am sharing a document that has been shared that's called, "Summary of Missed Anniversary Increases."
ARBITRATOR GREENBAUM: This will be Union 6.
MR. MORSILLI: We would object to this document.
ARBITRATOR GREENBAUM: Okay. And the basis

Page 68

thereof?
MR. MORSILLI: It's not a business record. It was created purely for this arbitration. It's a chalk, right?
MR. RUSSELL: Yes. The Union is presenting it as a chalk.
MR. MORSILLI: To the extent that it shows the -- well, it's just not a business record.
ARBITRATOR GREENBAUM: I'll mark it as Union 6. It's a chalk. I will let the witness testify as to what it shows. I mean, I hope I'm correct here. Am I correct that there is no factual dispute that there is some group of employees who hit an anniversary date pre-October 1 that did not get the anniversary increase? Is there any dispute about that fact?
MR. MORSILLI: I don't know how we could definitively know that, since we did not operate the Hospital prior to October 1 of 2024.
ARBITRATOR GREENBAUM: Okay, so noted. All right. Let me ask this question: Am I correct that the data that is shown on this chalk is derived from the prior exhibits?
MR. RUSSELL: Yes.

Page 69

ARBITRATOR GREENBAUM: All right. With the limitation so noted, it's admitted.
(Document marked as Union
Exhibit 6 in evidence)
ARBITRATOR GREENBAUM: Okay, go ahead.
BY MR. RUSSELL:
Q. Andy, did you put together this document?
A. Yes, I did.
Q. The information on this document, where does that information come from?
A. It comes from the monthly head count reports that we received from both Steward and Boston Medical Center.
Q. Okay. So am I correct that means where it says the 7/2024 rate, those rates were taken from the July 2024 list that was received from Steward?
A. Yes, that's correct.
Q. And the 9/2024 rates come from the September 2024 list that was provided by Steward?
A. Yes, that's right.
Q. And the 12/2024 rate comes from the head count list that was provided in December of 2024 from BMC?
A. Correct.

Page 70

Q. And where it says "Wage Increases 9.24 to 12.24," how was that column created?
A. So in November of 2024, there was an across-the-board of 2 percent for all --
Q. I'm not asking you, necessarily, about the factual underpinnings of what raises people might have increased.
When you put this together, how did you get the information that is shown there?
A. I just calculated the increase, if there was an increase, and showed the percentage for the increase.
Q. Okay. So that would show your understanding of the -- your calculation of the percentage increase from their 9/24 pay rate to their 12/24 pay rate?
A. Yes.
Q. And the information in Column K, "9/25 Rate," where does that information come from?
A. It's from the head count report sent to us from Boston Medical Center.
Q. For September 2025?
A. Correct.
Q. And the 10/25 rate; that comes from, am I

Page 71

correct, the October 2025 head count list from BMC?
A. That is correct.
Q. Okay. And again, how did you put together Column M, which is "Wage Increase 9/25 to 10/25"?
A. The same way I did with the other ones. I just calculated what the percentage was for the increase.
Q. Okay.
ARBITRATOR GREENBAUM: Just one second. I am going to hold the record open maybe a week to give the Employer the opportunity to challenge any of the entries.
MR. MORSILLI: So it does raise an interesting question, because we got this document late yesterday afternoon --
ARBITRATOR GREENBAUM: I know.
MR. MORSILLI: -- which then looks at five other spreadsheets. And there's lots of potential cross examination here that we would not have an opportunity to effectively do.
ARBITRATOR GREENBAUM: Let's deal with that when we finish the direct.
MR. MORSILLI: Okay.
ARBITRATOR GREENBAUM: I understand your

Page 72

point.
MR. MORSILLI: Thank you.
ARBITRATOR GREENBAUM: Please continue.
BY MR. RUSSELL:
Q. Andy, you referenced -- I believe you were about to reference your understanding of some type of wage increase that was provided in November of 2024.
What is your understanding of whether or not there was a wage increase provided to members of the BMC-South Bargaining Unit in November of 2024?
A. It seems that a majority of the workers received the 2 percent increase that was agreed upon in November of 2024 with, like, very few exceptions. I mean, I haven't come across many who did not get it.
Q. And was that November of 2024 wage increase -- was that separate from any anniversary increases under the Collective Bargaining Agreement?
A. Yes.
MR. RUSSELL: And I would be looking to enter -- I hadn't -- I know I provided this as well. There was an information request, where --
ARBITRATOR GREENBAUM: Okay, that's right.

Page 73

We can mark that as Union 7.
MR. RUSSELL: So Union 7 would be the request?
ARBITRATOR GREENBAUM: Yes.
(Document marked as Union Exhibit 7 in evidence)
MR. RUSSELL: And then I would also be looking to enter, as my understanding of the response to that, is a document called -- that I received from BMC called "Pay Adjustment Since 10/1/24."
ARBITRATOR GREENBAUM: We can mark that as Union 8.
(Document marked as Union Exhibit 8 in evidence)
MR. RUSSELL: I don't have specific questions for this witness about it. I was just looking to enter it.
ARBITRATOR GREENBAUM: They're both in.
MR. RUSSELL: Okay.
BY MR. RUSSELL:
Q. Andy, you filed the grievance that's at issue in this case, correct?
A. Yes.

Q. At any point after filing the grievance, did anybody from Steward indicate to you that they made any attempts to look into --
ARBITRATOR GREENBAUM: I think you mean BMC.
MR. RUSSELL: Sorry, yes.
BY MR. RUSSELL:
Q. After you provided the grievance to BMC, did anybody from BMC tell you that they were taking any actions to look into whether or not employees had received anniversary increases while working for Steward?
A. No, not that I can recall. I mean -- yeah.
Q. After you filed the grievance, did anybody from Steward -- excuse me, I keep doing that.
After you filed the grievance, did anybody from BMC specifically request any information from you related to the grievance?
A. No.
Q. After you filed the grievance, did anybody from BMC indicate to you that the grievance was being denied because BMC believed anyone at issue had received an anniversary increase under Steward?
MR. MORSILLI: Objection. The whole line



of questioning is leading.
ARBITRATOR GREENBAUM: Slightly, but I'll let this one go, and then be careful.
A. I apologize, could you repeat the question? I'm sorry.
Q. Well, let me ask you this. There is a document in the record which is an email from Helene Benedict stating why BMC is denying the grievance, right? You're aware of that?
ARBITRATOR GREENBAUM: You have to say "yes" or "no."
A. Yes. Yes, I am.
Q. Outside of that email from Ms. Benedict, did you receive any other explanation from BMC as to why the grievance was being denied?
A. Yes. So Helene and I had weekly check-ins and many conversations.
Q. I'm not asking you if you had any other conversations with her.
I'm asking, other than the reasons given in the email for denying the grievance, did you receive -- which were that it was not arbitrable -- did you receive any other explanation for why the grievance was being denied?



A. No.
MR. RUSSELL: I'm going to take a short break just to go through my own notes, and then I may be done with my direct.
ARBITRATOR GREENBAUM: So the Employer can go to his break-out room.
Andrew, you have to stay here. And you are not to have any contact with Ian during the break.
Ian, how long would you like, please?
MR. RUSSELL: I think I just need five minutes.
ARBITRATOR GREENBAUM: Okay, let's make it -- I'll give it 7, to 12:55.
MR. RUSSELL: Okay.
(Recess taken)
ARBITRATOR GREENBAUM: Ian, do you have any additional questions for the witness on direct?
MR. RUSSELL: I do not.
ARBITRATOR GREENBAUM: Okay. Now I think I know what happens next. Let me see if I can guess here.
The Hospital does not feel it's in a position to complete its cross examination today because it just received the data that might be



relevant yesterday; is that correct?
MR. MORSILLI: You know, I think that is correct. We were talking about that in our caucus. And it may be that I have no questions about the data or it may be that I have two hours of questions about the data.
What I do know is that there's one spreadsheet that was created that cross-references five spreadsheets that are very large. And I'm not suggesting that all of the data in the spreadsheets is relevant, but a fair number of it may be.
ARBITRATOR GREENBAUM: So now let me ask this question. And by the way, if I'm asking this question, I know it may sound like a question from somebody who is a complete idiot, but you'll forgive me; you've known me long enough to know that's true.
Is it possible that we could reserve your cross examination for Andrew until a second day, but the Hospital would otherwise present its testimony today? In other words, I'm trying to make the most use of the hearing day.
MR. MORSILLI: I understand. I'm just not comfortable with that. Because again, I go back to I don't know what I don't know.

Page 78

ARBITRATOR GREENBAUM: And that's why I said the question was idiotic.

MR. RUSSELL: Can I just say -- obviously the Arbitrator is going to rule on how they're going to rule on their ability to cross-examine. I don't really see the spreadsheets as being an issue that is -- in terms of the numbers that they show, being particularly ripe for cross examination, though they may be very right for argument in a brief. If they're saying that they don't show a 2 percent increase or lack thereof, that's going to be based on numbers; not in a cross examination of Andy.

MR. MORSILLI: Well, Ian, as you can imagine, I appreciate your commentary on my cross examination, but I disagree.

ARBITRATOR GREENBAUM: I mean, the wrinkle here, of course, is that, in fact, BMC does not, quote, know what happened pre-October 1.

I'm not thrilled about this, to say the least -- I mean, I don't mean any ill will. I'm just saying I was hoping we could avoid going to a second day. But that doesn't look like it's going to be the case.

So we're going to have to schedule Day 2.

Page 79

The only thing I'm going to ask -- well, no, never mind. I was going to make another stupid suggestion, but I think I'll just keep my mouth shut at this point.

Let's look at our calendars, folks.

Let the record reflect that the Arbitrator cannot at this point question the fact that the Hospital has not had the opportunity to examine all of the relevant data that was in the sheets. It obviously contains information that is material to the factual question in this case as to whether there was a failure to pay the anniversary step increases, subject to all the other defenses.

And so I reluctantly am going to grant the Hospital's request for a second day, at which these issues -- that would give it the time to deal with these issues in a timely fashion.

And I understand that it's over the Union's objection. The Arbitrator is not thrilled with it, but it's the only way to go.

Off the record.

(Discussion off the record)

ARBITRATOR GREENBAUM: We are going to adjourn, as previously indicated. And after much

Page 80

work trying to coordinate complicated calendars, we have agreed that the second day of hearing in this case will be May 15th, 2026; once again, 10:00 in the morning. And once again, it will be held virtually.

Andrew, since you are still on the witness stand, there are limits on your ability to communicate with Ian. And I'm kind of following, if I can -- the instruction that I'm going to give is I'm going to follow the parameters from a recent Supreme Court decision.

You are not, under any circumstances, to discuss the subject matter of this case, your testimony, or anything related to it with Ian between now and May 15th.

If, however, matters extraneous to this case arise, then at that point, you and Ian may be in communication.

Ian, you looked uncomfortable with my ruling.

MR. RUSSELL: I mean, I'm being put in a very difficult position, where my main staff representative, I'm being told I can't speak to, not just about his testimony --

Page 81

ARBITRATOR GREENBAUM: No, that's not what I said.

MR. RUSSELL: You said I can't speak to him about the case until May 15th.

ARBITRATOR GREENBAUM: Actually, you're right. It's only his testimony that you can't speak -- under the Supreme Court decision that I'm thinking about, you can discuss matters relating to the case, but not his testimony. And you can discuss any other matters that pertain to his work at BMC-South. So the only prohibited area is his testimony at this hearing.

Does that work for the Employer, I hope? I'm taking my lead from the Supreme Court.

MR. MORSILLI: Yeah. I mean, I think it is his testimony, his direct testimony, and also what he may be encountering on cross examination.

ARBITRATOR GREENBAUM: Obviously, yes. I think that was implicit. But that's a good clarification.

Andrew, do you have any questions?

THE WITNESS: No.

ARBITRATOR GREENBAUM: Okay. Then let me say first, Jane, thank you very much.

THE COURT REPORTER: You're welcome.

ARBITRATOR GREENBAUM: Happy spring. Let's hope that the weather improves. And I hope some of you get to celebrate opening day next week. It is a religious holiday. And we'll see you May 15th.

(Whereupon, the hearing was adjourned at 1:09 p.m.)



C E R T I F I C A T E

I, Jane M. Werner, Registered Merit Reporter, do hereby certify that the foregoing transcript, Volume I, is a true and accurate transcription of my stenographic notes taken on Friday, March 20, 2026.




Jane M. Werner
Registered Merit Reporter

\- - - -

**0**

**02109** 1:17
**02116** 1:20

**1**

**1** 1:1 3:12,17 4:9 5:3,4 12:12 13:9,13 14:4 27:16 52:20 53:4,5 54:14 59:11,15 60:10 60:12 68:14,19 78:18
**10/1** 24:11
**10/1/24** 4:19 24:18 25:2,3 65:9,13 73:11
**10/25** 70:24 71:4
**10:00** 80:3
**10:19** 2:6
**10th** 1:16 7:4
**11** 20:14
**1199** 22:4,10,13 31:7 56:7
**1199seiu** 1:8 5:7 22:9 25:13 59:23
**11:05** 38:11,15
**11:11** 41:14
**11:16** 41:15
**11:25** 41:24
**12** 43:12,13,21 44:4 50:4
**12.01** 1:4 5:12
**12.10.24** 4:13
**12.10.24.** 64:4
**12.24** 70:2
**12/2024** 69:21
**12/24** 70:16
**12:55** 76:13
**13** 33:15
**15th** 7:16 14:20 22:24 24:1 80:3,15 81:4 82:5
**16** 14:21 24:6
**16th** 25:5
**17** 20:23 31:6
**18** 32:2,11
**19** 34:2
**1:09** 82:7
**1st** 11:20 26:21 39:6,13,16 40:3,11 42:23 43:9 44:6 47:1

**2**

**2** 1:16 3:13,18 4:10 5:4 11:11 11:12 12:14 13:21 16:15 44:13,16,17,19 46:17,19,23 47:4,5,7 48:4,7 49:15,16,16 63:6,8,14,19 70:4 72:13 78:10,24
**2/19/25** 4:6
**20** 2:5 3:4,4 13:18 14:24 15:6 16:23 83:6
**2016** 24:13 25:4
**2018** 30:7
**2019** 42:15,17 43:8
**2020** 43:14
**2023** 20:19
**2024** 4:9,10 11:20,22 13:9 13:13 14:4 15:24 16:13,17 26:21 27:11 31:6 32:2,11 36:17 37:5,7 39:17 40:3,5 40:11,24 42:11 42:17,18,23 43:8 44:1,6,11 45:5 46:7,7,18 47:1,2,3,9,20 47:22 48:2,6,8 48:22 49:13 53:2,17 56:13 56:17,19 57:5 58:4 59:17 63:11 68:19 69:16,19,22 70:3 72:8,11 72:14,17
**2025** 4:14,15 14:6,21,21 16:6,21 22:24 24:6 25:5 32:17,23 33:15 34:3 35:24 39:14 40:23,23 42:19 43:9 44:4 46:9,14 65:21 66:6 67:2,6 70:22 71:1
**2026** 2:5 80:3 83:6
**21** 3:21,21 32:23
**21st** 15:2 32:17
**24** 1:4 5:12 13:14 52:20 54:18
**24.03** 13:16
**25** 3:22 48:11 48:15
**25th** 35:7
**26** 1:4 3:22 5:12
**28623** 83:9
**29** 3:6
**2nd** 14:6 16:6 35:24

**3**

**3** 3:14,20 4:12 5:3 11:7 21:4,8 21:10,20,23 25:7 63:21,23 64:15,18
**30** 4:4 53:5
**32** 47:20,23
**32.64.** 48:3
**328-25** 1:4 5:11
**33** 4:4,6
**34** 3:6 4:6
**39** 3:6

**4**

**4** 3:22 4:14 25:16,18 26:4 26:7 47:14 65:23 66:2
**40** 3:6
**4:19** 24:1
**4th** 1:20

**5**

**5** 3:12,13,14,17 3:19 4:3,15 30:17,19 33:2 33:4 34:12 41:12 66:20,22 67:12,15
**56** 3:8
**59** 4:9

**6**

**6** 4:5,16 33:1,7 33:9 34:5 67:21 68:10 69:4
**60** 4:9
**617.367.0025** 1:22
**617.367.7200** 1:18
**63** 4:11,11,13
**64** 4:13
**66** 4:14,15
**67** 4:15
**69** 4:17

**7**

**7** 4:18 73:1,2,6 76:13
**7/2024** 69:15
**73** 4:18,19
**75** 1:20

**8**

**8** 4:19 27:16,16 27:16 73:13,15
**83** 1:1

**9**

**9.2024** 63:4
**9.24** 70:1
**9/2024** 69:18
**9/24** 70:15
**9/25** 70:18 71:4

**a**

**a.m.** 2:6 24:7
**ability** 7:19 78:5 80:7
**able** 46:16
**accurate** 83:4
**acquisition** 6:7 22:15 39:6
**act** 12:12,14
**action** 1:4 5:12 6:23 7:4,14 8:13
**actions** 9:17 15:22,24 74:10
**actually** 9:22 53:17 56:21 81:5
**additional** 76:17
**additionally** 45:16 46:13
**address** 36:19 59:5
**addressed** 26:20 35:16,17 37:10 40:2
**addresses** 35:6 49:24
**addressing** 15:11 37:2
**adjourn** 79:24
**adjourned** 82:7
**adjusted** 52:20 52:22
**adjusting** 37:2 37:7
**adjustment** 4:19 73:10
**administrative** 22:9 56:15,23 57:9,13 58:7
**admission** 60:14 63:6
**admitted** 21:16 34:14 69:2
**af** 65:7
**afternoon** 53:19 56:6 71:15
**ago** 17:19 66:17
**agree** 11:6 12:2
**agreeable** 11:5
**agreed** 11:1 12:6 21:14 50:7 72:13 80:2
**agreement** 3:19 11:19 13:10,15 14:2,12,17 16:3,20 42:16 42:19,20,21 43:2,5,6,9,12 43:17,20 44:1 44:9 45:10,14 46:23 49:3,6,7

49:10 50:1,7,9 50:12,15,18,22 51:1,2,2,4,6,9 51:17 52:5,10 52:12,14 72:19
**agreements** 20:24 23:11
**ahead** 21:18 33:5 60:21 63:20 64:19 69:5
**alignment** 50:24
**alleged** 13:12 13:19,24 14:3 14:18 17:5
**allegedly** 53:16
**alleges** 13:6 52:10
**alleging** 50:17 52:24
**allowed** 24:20
**amanda** 2:1 67:13
**amendment** 3:18
**amount** 61:21 61:24
**andrew** 2:1 3:7 4:5 32:13,16 33:14 34:3 54:21 55:7,9 56:3 76:7 77:18 80:6 81:21
**andrews** 47:19 48:2
**andy** 3:20 4:4 22:3,7,8,23 23:23 30:23 31:7 32:6,23 37:19 56:6 59:19 60:24 63:10 64:2,21 66:4,24 67:17 69:7 72:5 73:22 78:12
**anniversary** 1:4 4:17 5:12 11:21 13:8,24 16:12,17 23:4 26:10 37:4 40:6 43:18,19 43:23 44:3,10 45:4,24 47:6 47:11,15 48:21 49:12 52:19 53:1,4,16 54:17 61:2,6,8 61:15 67:18 68:14,15 72:18 74:11,23 79:12
**answer** 27:12 27:13
**anticipate** 15:7 15:11
**anybody** 27:22 36:7 37:20 65:3 74:2,9,14 74:16,20
**ao** 65:1 66:12
**apa** 3:17 24:20
**apart** 10:24
**apologize** 75:4
**appear** 65:8
**appearance** 9:2 10:10,11
**appearances** 1:14
**appeared** 1:12 11:4
**appears** 22:20
**applies** 15:9
**appreciate** 78:14
**approach** 51:10
**approved** 35:18
**approximately** 48:15
**april** 14:6 16:6 16:20 35:24 58:16
**aq** 66:12 67:10
**arbitrability** 6:5,18 7:2,10 8:9 9:5 10:18 12:8 13:1 17:10 41:6,10 41:20
**arbitrable** 6:4 8:15 9:13,16 10:19 11:13 13:4 49:21,23 75:22
**arbitration** 1:6 5:6 6:11 8:17 8:22 9:6 13:15 50:16 51:8,13 52:4 68:3
**arbitrator** 1:13 5:5,20,21 6:12 6:21 7:8 8:3,5 8:7,16 9:9,19 10:2,8 11:23 12:4 15:17 17:2,8,15,19 18:1,4,9,11,16 18:20 21:3,11 26:3,15 28:21 28:24 29:4,7 29:14,19 31:14 33:2,5 34:8,13 37:17 38:2,6,9 38:13,18,22 39:1 40:15 41:4,8,13,17,22 42:3 52:13,17 53:3,7,12 54:8 54:10 55:1,3,6 55:9,12,16,21 56:1 59:9,10 59:13 60:1,6,9 60:20 62:12,17

63:3,5,13,16,20 64:3,14,19 65:22 66:20 67:11,12,20,24 68:9,20 69:1,5 71:9,16,21,24 72:3,24 73:4 73:12,19 74:4 75:2,10 76:5 76:12,16,19 77:12 78:1,4 78:16 79:6,19 79:23 81:1,5 81:18,23 82:2
**arbitrator's** 7:21 9:4
**area** 81:11
**argument** 15:10 78:9
**arose** 40:2,11
**arrived** 5:23
**article** 13:14,15 43:12,13,21 44:3 50:4
**articles** 1:4 5:11 50:5
**articulated** 14:9
**ashley** 1:20 5:17 10:4 17:12 18:9,21 21:18 28:22 29:19 38:22
**ashley.krezm...** 1:22
**asked** 25:23 29:8 55:12 62:13
**asking** 28:14 60:7 70:5 75:18,20 77:13
**assert** 15:7
**asset** 14:11 24:17
**assets** 24:15,17
**assign** 37:19,20
**assigned** 5:10 9:23 38:10
**assignment** 3:19 56:22
**assistance** 18:17 29:16 55:22
**assume** 14:15 18:6
**assumed** 43:1 45:10,14 50:6
**assuming** 13:12 54:20
**assumption** 44:8
**attach** 28:3
**attached** 25:8
**attempt** 36:18
**attempts** 45:7 74:3
**attention** 24:8
**august** 40:23
**auspices** 5:9
**authority** 7:18 8:10 9:4
**available** 16:8
**avoid** 78:21
**award** 7:11,13
**aware** 8:12 28:5,12 36:12 42:5 46:23 75:9

**b**

**b** 3:10 4:1
**back** 24:22 25:6 27:5,8 37:6 38:15,18 40:7 41:23 49:16 54:7 58:2 77:23
**bankrupt** 14:10
**bankruptcy** 3:17
**bargaining** 11:19 13:10,14 14:1,17 16:3 16:19 20:24 23:11 31:19 33:22 42:13,16 42:20 43:2,5,6 43:11,17,20 44:8 45:10,21 45:23 46:6,9 46:10,15 47:18 47:18,21 48:9 48:14,18 49:3 49:5,6,9 50:1,6 50:9,12,14,18 50:21 51:1,4,8 51:17 52:9,12 52:14 57:1,9 57:13 58:7,9 61:1 65:4 72:11,19
**based** 6:5 61:8 78:11
**basis** 8:23 67:24
**behalf** 53:8
**believe** 10:1 11:10 13:3 15:9 22:12 26:20 33:18 35:18 37:13 39:13 52:4 59:10 61:16 64:11 65:14 72:5
**believed** 74:22
**benedict** 2:2 23:8,24 75:8 75:13
**better** 54:17
**bills** 27:7
**bmc** 9:17 13:7 13:9 14:4,8,14

16:1 22:13 27:2 33:18 37:1,10 39:5,5 39:11,16 40:1 40:21 41:1,1 42:24 43:1,3 44:13,16,21,23 45:6,13,22 46:11 48:1 49:1,4,13 50:1 50:2,6 51:3,24 52:11,13 54:2 57:23 58:1,10 58:19,21 62:4 65:3,18 69:23 71:1 72:11 73:10 74:5,8,9 74:17,21,22 75:8,14 78:17 81:11
**bmc's** 9:18 44:8 49:11,20 51:10 57:16
**board** 24:19 46:24 47:8 48:5 70:4
**bob** 5:16 7:23 8:1 11:23 12:15,23 15:18 17:9 38:2 53:7 62:12
**books** 20:22
**boston** 1:9,16 1:20 5:7 6:6,7 8:13,21 9:1,3,7 20:11,12 23:9 30:4,6 31:9,12 31:16 32:5 33:21 34:23 39:9,12 42:7 42:23 49:19 57:5 64:7,9 66:7 67:6 69:13 70:21
**bottom** 22:19
**break** 37:16,19 37:24 38:3 41:14,18,23 76:3,6,8
**brief** 5:22 12:9 12:13 15:12 78:9
**briefly** 9:11 50:13
**build** 12:19
**business** 20:22 34:22 68:2,8
**buyer** 14:14

**c**

**c** 5:1 20:9 83:1 83:1
**cagey** 28:8
**calculated** 70:10 71:6
**calculation** 70:14
**calendars** 79:5 80:1
**call** 29:3 39:19
**called** 9:2 28:10 67:18 73:9,10
**calling** 54:21 55:6
**calls** 5:24 17:13 54:2,6,11,13 58:11
**cappellini** 32:4 32:10 34:21,22 35:10 39:4 40:20
**care** 17:20
**careful** 75:3
**cares** 51:21
**case** 5:9,23 9:23 15:8,10 15:21,24 16:11 17:7 40:8 42:6 43:10 51:10 52:6 54:2,7 73:23 78:23 79:11 80:3,13 80:17 81:4,9
**cases** 37:11
**cash** 35:19
**caucus** 37:15 41:12 54:23 77:3
**caused** 65:16
**cba** 3:12 43:8 44:2
**cc'd** 32:3
**celebrate** 82:4
**cellphone** 17:22 18:2 29:8 55:13
**center** 1:9 5:8 5:16 6:8 8:13 8:21 9:1,3,8 13:7 14:13,13 14:16,20,22 15:4,14 20:11 20:13 23:9 30:4,6 31:10 31:13,17 32:5 33:21 34:23 39:9,12 41:5 42:7,24 49:19 53:9 57:5,19 64:7,9 66:7 67:7 69:13 70:21
**center's** 6:3,6 11:24
**certain** 6:12
**certainly** 9:15 41:13 50:14
**certify** 83:3
**chain** 22:20 31:1,2,23
**chalk** 48:12 53:20 68:4,6 68:10,22
**challenge** 7:20 9:4 71:11

**challenging** 7:1 9:17
**change** 57:17
**changed** 46:1 57:19,22 61:14
**changes** 43:4
**check** 10:6 75:16
**chronos** 65:15
**circumstances** 9:1 80:12
**claim** 6:3,5
**claimed** 13:23
**claims** 27:5
**clarification** 52:18 81:20
**clarify** 21:14
**class** 1:4 5:12 54:16
**clear** 7:15 24:9 24:14,21 25:1 53:14,23
**clearly** 14:9
**cna** 61:12
**cognizant** 7:17
**collective** 11:19 13:10,14 14:1 14:17 16:2,19 20:23 23:10 42:15,20 43:1 43:4,6,11,17,19 44:8 45:9 49:3 49:5,6,9 50:1,6 50:9,12,14,18 50:24 51:4,8 51:16 52:9,11 52:14 72:19
**column** 61:4,19 62:1,20 65:1,7 66:12 67:10 70:2,18 71:4
**come** 41:23 69:10,18 70:19 72:15
**comes** 12:16 69:11,21 70:24
**comfortable** 77:23
**coming** 24:21
**commentary** 23:17 78:14
**committee** 36:4
**communicate** 80:8
**communicating** 26:19
**communication** 80:18
**communicati...** 28:12 36:12
**compensation** 64:22 66:9 67:8
**complete** 76:23 77:15
**complicated** 80:1
**comprehensive** 59:6
**concerns** 37:2
**conclude** 17:2
**concur** 10:9
**conference** 5:24 54:1,6,13
**confess** 54:15
**confirm** 21:6 22:18,21 23:22 24:3 26:9 31:3 31:22 32:8,14 32:20 33:13,24
**confusion** 65:16
**connection** 1:3 5:10
**consider** 7:10 7:19
**consistently** 58:13
**construct** 23:19
**construed** 10:11,13
**contact** 76:8
**contain** 45:23 46:3 59:1
**contains** 79:10
**contingent** 7:12 7:13
**continue** 8:11 44:4 72:3
**continued** 4:1
**continuing** 15:8,9,19 16:10 51:7
**contract** 13:19 13:23 50:2 57:2 61:8
**conversation** 23:15
**conversations** 75:17,19
**coordinate** 80:1
**copy** 67:13
**corporation** 14:14
**correct** 5:18,19 10:5 11:20 15:18 16:2,5 18:7,19 23:5 27:19 32:19 36:16 37:8 39:21,23 40:3 40:12 41:2 45:1,15 53:5,6 54:20 55:7 57:21 59:11 60:8 68:12,12 68:21 69:14,17 69:24 70:23 71:1,2 73:23 77:1,3
**corrected** 10:10 35:1

**corrections** 40:9,10
**correctly** 42:7 42:8 44:13,23 45:9 50:23 52:15
**count** 4:11,14 4:15 17:20 63:12 66:6 67:1,5 69:11 69:22 70:20 71:1
**country** 38:14
**couple** 6:9 23:3
**course** 11:11 12:19 18:18 29:16 55:23 78:17
**court** 3:17 6:21 6:24 7:15 8:14 9:14 14:10 51:13 80:11 81:7,14 82:1
**courts** 7:5
**covered** 28:15 42:16
**created** 68:3 70:2 77:8
**cross** 3:2 26:16 34:18 38:20 71:19 76:23 77:8,18 78:5,8 78:12,14 81:17
**curious** 9:22 10:3,8
**current** 20:15 30:3,8 39:8
**currently** 20:10 56:7 57:12
**curtain** 12:12

**d**

**d** 3:1 5:1
**dan** 38:9,13
**daniel** 2:2 3:5 4:4,5 29:3,21 30:2 32:17,22 33:15 64:13
**danny** 29:4 37:22 38:5 41:18
**data** 25:11 68:22 76:24 77:5,6,10 79:9
**date** 13:18 16:17 22:21 24:3 31:4,24 32:21 33:24 43:18,20,23,23 44:3 46:1,2 54:12 56:11 61:2,3,6,6,8,9 61:10,10,13,15 65:8,12 68:14
**dated** 4:6
**dates** 37:4,7 43:19 45:24 47:13 48:17 52:19 53:4 54:18
**day** 14:21 23:8 26:24 27:14,16 32:9,15 77:18 77:21 78:22,24 79:15 80:2 82:4
**days** 13:18 14:24 15:6 16:23 25:12 27:16
**deal** 71:21 79:16
**dealings** 62:6
**debra** 4:6 33:15 33:17,18 34:3
**december** 40:5 46:9 47:3 48:2 69:22
**decision** 80:11 81:7
**declaratory** 8:14
**deemed** 11:12 21:16
**defenses** 79:13
**definitively** 68:18
**delegate** 33:19
**delivering** 18:18 29:16 55:23
**denied** 6:12 8:18 74:22 75:15,24
**deny** 28:16
**denying** 75:8 75:21
**department** 13:18,22
**depending** 7:12
**depends** 11:12
**derived** 68:22
**described** 5:11
**description** 10:9
**detail** 17:5
**details** 22:18
**determine** 7:9 27:16 61:1,6,7
**different** 10:23 48:17 61:11,11 61:19,22 62:1 62:3
**difficult** 80:22
**direct** 3:2 20:2 29:22 56:4 71:22 76:4,17 81:16
**direction** 7:13
**directly** 13:21 36:8
**director** 23:9 30:9
**directors** 24:19

**disagree** 78:15
**disagreement** 43:3
**disappointing** 51:11
**disclose** 17:18
**disclosed** 17:16
**discuss** 80:13 81:8,10
**discussed** 10:21
**discussion** 8:6 36:2 54:16 79:22
**discussions** 35:22
**dismissed** 15:15
**dispute** 7:22 10:15 11:10 68:13,15
**disputed** 52:1
**distance** 44:16
**district** 6:24,24 7:15 8:14 14:11
**document** 4:9 4:12,15,16,19 21:7,19,24 25:15 26:6 30:16,20 33:3 33:6,10 34:4 34:11,16 59:8 59:14,22 60:7 60:11,14,16,18 60:24 61:16,18 62:15,16,20,24 63:2,7,10,18,22 64:2,5,17,21 65:19 66:1,4,8 66:16,21,24 67:4,14,17,23 69:3,7,9 71:14 73:5,9,14 75:7
**documented** 6:11
**documents** 5:2 46:22 48:19
**doing** 9:3 50:7 50:9 74:15
**double** 10:6
**draw** 12:12 24:8
**duties** 20:20 30:13 56:24

**e**

**e** 3:1,10 4:1 5:1 5:1 20:9 83:1,1
**earlier** 36:2 40:1
**easier** 12:16
**east** 1:8 5:7
**easy** 12:5
**effective** 42:23
**effectively** 7:1 71:20
**effort** 44:22
**ehrenberg** 1:15
**either** 17:20 46:1 63:6
**elected** 8:21
**elise** 33:20
**elizabeth's** 14:12
**email** 3:20 4:3 4:3,5,5 22:3,18 22:20,20,22,23 23:2,7,21,22,23 24:4,5 30:23 31:2,3,6,23 32:2,8,11,15,21 32:22 33:11,14 34:24 35:5 75:7,13,21
**emails** 6:12 36:15
**emmanuel** 31:5 31:14,19 32:2 32:12,17
**employed** 20:10 30:5 39:22 49:19
**employee** 20:16 21:1 22:10 30:9 31:9,12 31:16,20 32:5 33:18,21 39:20 41:1 43:22 49:7,15 51:5 61:17 62:9
**employee's** 43:18,20
**employees** 11:21 16:1,12 20:21 21:2 22:5 24:17 36:20 37:3,8 42:6 43:15 44:9,23 45:2,9 45:15,17,24 46:4,14,16 47:3 48:10,11 48:15,21 49:4 50:3,8,10,20,23 51:11,15,18,19 51:20 52:8,15 52:16,19,24 58:24 64:22 65:12 66:9 67:9 68:13 74:10
**employer** 1:21 3:16 4:2 5:3 6:10,16,19,22 11:18 12:8 17:13 21:4,7,9 21:15,19,23 25:15,18 26:4 29:2 30:3,16 30:19 33:1,2,3 33:6,9 34:4,11 71:11 76:5 81:13

**employer's** 7:20 10:9 12:24 26:6 37:20
**employment** 39:15 40:21
**encountering** 81:17
**ended** 40:20
**enforce** 57:2
**ensure** 51:14
**enter** 6:14 72:22 73:8,18
**entered** 42:15
**entering** 7:6
**enters** 9:1
**entire** 26:1 27:9
**entirely** 35:3,13 36:15
**entirety** 15:15
**entitled** 4:9,12 4:15,16,19
**entries** 71:12
**error** 45:2
**esq** 1:16,19,20
**essentially** 48:13
**establish** 14:8 15:1,13
**ev** 3:16 4:2,8
**eventually** 44:24
**everybody** 18:5 65:8
**evid** 3:11
**evidence** 5:4 7:11 12:19 14:8 15:1 21:20 26:7 33:4 34:5 45:20 60:12 63:19 64:18 66:2 67:15 69:4 73:6,15
**ex** 3:11,16 4:2,8 8:22
**exactly** 35:10 60:5 64:12 66:5 67:5
**examination** 20:2 26:16 29:22 34:18 38:20 39:2 40:17 56:4 71:19 76:23 77:18 78:8,12 78:15 81:17
**examine** 78:5 79:8
**example** 26:24 40:4 47:17
**excel** 25:9
**exceptions** 72:14
**exchange** 3:20 22:3
**excluded** 51:7
**excuse** 12:7 74:15
**executive** 30:9
**exhibit** 3:12,13 3:14,17,18,20 3:22 4:3,5,9,10 4:12,14,15,16 4:18,19 12:17 21:4,8,10,20,23 25:16,18 26:7 27:19 30:17,19 33:1,4,7,9 34:5 34:12 59:11,15 60:12 63:8,19 63:23 64:18 66:2,22 67:15 69:4 73:6,15
**exhibits** 1:2 5:3 5:4 12:16 21:15,15,16 53:18 68:23
**existed** 24:10 24:16 26:20
**existing** 43:1 45:9
**exists** 28:16
**experience** 23:16 62:5
**explanation** 75:14,23
**extended** 24:22 42:18 43:8
**extends** 44:2
**extension** 3:12 42:21 43:9 44:1 46:23
**extent** 40:9 68:7
**extraneous** 80:16

**f**

**f** 83:1
**faced** 27:3,4,13
**facility** 14:5
**fact** 67:13 68:16 78:17 79:7
**facts** 13:5 15:13
**factual** 68:12 70:6 79:11
**failed** 13:7
**failing** 11:19 45:14,17 52:15
**failure** 13:24 14:3 16:1 45:4 79:12
**fair** 17:19 77:11
**fallible** 54:15
**far** 10:24
**fashion** 79:17
**february** 15:3 33:15 34:2
**federal** 8:13

**feel** 38:13 76:22
**figure** 17:4
**file** 14:5,23 15:5 25:10
**filed** 7:4 8:13 16:6,20 27:17 27:21 28:7 35:20,24 36:9 37:11 45:11 50:16 54:4 73:22 74:14,16 74:20
**filing** 6:23 16:7 16:23,24 28:13 42:8,9 74:1
**find** 52:13
**finish** 71:22
**finishing** 38:1
**first** 6:16 8:1 10:17 12:7 17:9,14 22:20 27:9 29:11 31:1,2 46:10 47:24 53:7,14 53:19 56:21 57:18 62:1,2 64:6 81:24
**five** 41:23 54:24 71:17 76:10 77:9
**fix** 24:10 25:2 27:14 40:10 45:7,8
**fixed** 27:1
**floor** 1:16,20
**folks** 24:14 37:4 79:5
**follow** 18:5 40:20 80:10
**following** 14:21 28:13 36:16,18 43:14 44:7 57:15 58:19 80:8
**follows** 10:16
**foregoing** 83:3
**forget** 57:18
**forgive** 77:15
**form** 43:15 45:20,24
**former** 17:18 24:16
**forms** 24:15
**formulate** 11:3
**formulation** 10:23 11:2,15 12:1
**forward** 27:2 46:20 54:14
**found** 43:12
**foundation** 12:20
**free** 38:14
**frequently** 36:22
**friday** 2:5 32:2 32:10 83:6
**friel** 2:2 3:5 4:4 4:5 29:3,21 30:2 32:17,22 33:10,15 34:7
**front** 59:18
**fully** 7:17 15:7
**further** 8:20 26:13 34:6 38:19 40:13 41:5

**g**

**g** 5:1
**generally** 44:18 47:4
**generic** 23:17
**genuinely** 51:10
**getting** 37:10 37:11
**give** 17:6 38:6 71:11 76:13 79:16 80:9
**given** 53:17 75:20
**go** 8:2 17:4 21:18 32:7 33:5 40:7 41:14 48:12 54:7 57:24 58:2 60:21 61:3,5 63:20 64:19 69:5 75:3 76:3,6 77:23 79:20
**goes** 7:13
**going** 9:20 10:21 17:11 22:17 23:6,21 24:2,22 27:2,5 32:24 37:6,20 37:24 38:10 41:11,22 44:24 45:6,18 46:5 46:20 47:2 48:9 49:13,16 51:13 52:3 53:10,12 58:2 59:7 71:10 76:2 78:4,4,11 78:21,22,24 79:1,2,14,23 80:9,10
**good** 13:6,11 14:13,15 31:9 32:1,3,11 51:17,18,19 56:6,20,24 57:19 63:4 64:7 81:19
**gosselin** 31:11 32:6,13
**grant** 79:14
**greenbaum** 1:13 5:5,20,21 8:4,5,8 9:9,19 10:2,8 11:23 12:4 15:17

17:2,8,15 18:1 18:4,9,11,16,20 21:3,11 26:3 26:15 28:21,24 29:4,7,14,19 31:14 33:2,5 34:8,13 37:17 38:2,6,9,13,18 38:22 39:1 40:15 41:4,8 41:13,17,22 42:3 52:17 53:3,7,12 54:10 55:1,3,6 55:9,12,16,21 56:1 59:10,13 60:1,6,9,20 62:12,17 63:5 63:13,16,20 64:14,19 65:22 66:20 67:11,20 67:24 68:9,20 69:1,5 71:9,16 71:21,24 72:3 72:24 73:4,12 73:19 74:4 75:2,10 76:5 76:12,16,19 77:12 78:1,16 79:23 81:1,5 81:18,23 82:2
**grievance** 1:4 3:13,14 5:11 6:3 7:2 9:17 10:19 11:7,12 13:3,15,16,20 14:6,23 15:5 15:13,15,22 16:5,7,20,23 17:1 27:17,21 27:23 28:1,4,5 28:6,7,10,14,15 35:20,23 36:8 36:13 42:9 45:11 49:24 50:15 52:10,23 53:3,15,21 54:3 73:22 74:1,8,14,16,18 74:20,21 75:8 75:15,21,24
**grievances** 13:20 30:15 37:11
**grieved** 15:24
**group** 13:19 16:11 24:6 46:16 48:10,15 52:7 68:13
**gs** 4:13 64:4
**gsmc** 31:6
**guess** 53:19 76:20

**h**

**h** 1:19 3:10 4:1 20:9,9
**half** 20:14
**hand** 18:12 29:10 55:17
**happened** 78:18
**happens** 76:20
**happier** 12:21
**happy** 82:2
**head** 4:11,14 4:15 13:18 28:17 63:12 66:6 67:1,5 69:11,21 70:20 71:1
**headcount** 4:12 58:11 64:4,6 65:21
**health** 20:11 22:14 24:16
**healthcare** 1:8 5:7 42:12 58:5 60:4
**hear** 8:1,10 12:6,11,17 16:10
**heard** 12:10 26:3 27:10 36:1
**hearing** 6:1 7:24 8:22 10:12 15:11 17:16 21:13 77:21 80:2 81:12 82:6
**held** 2:5 5:9 20:18 30:11 56:16 80:4
**helene** 2:2 23:8 23:8,23 64:13 75:7,16
**help** 57:2
**hey** 40:5
**hickey** 2:3 3:3 3:21 17:14,17 20:1,6
**higher** 43:22,24
**hire** 43:21 46:1 61:3,5,9,10,10 65:8,12
**hired** 56:17
**history** 3:14
**hit** 68:14
**hold** 37:18 62:12 71:10
**holiday** 82:5
**home** 59:5
**honest** 36:14
**hope** 65:23 68:11 81:13 82:3,3
**hopefully** 34:10
**hoping** 78:21
**hospital** 9:18 14:14 15:23 36:17 42:12,14 42:24 44:5 45:16 46:12 49:1 51:15,20

51:21 56:20 57:4,15,16,24 58:3,20 59:9 63:3 66:18 68:19 76:22 77:19 79:8
**hospital's** 79:15
**hospitals** 22:16
**host** 30:14
**hour** 47:20,23 59:3
**hourly** 61:17 61:21,24 62:6 62:8,22 65:4 66:9
**hours** 59:4 77:5
**hr** 32:1,4,11 34:22 40:24 60:4
**hrsupport** 31:6
**human** 13:21 63:1

**i**

**ian** 1:16 5:15 8:1 9:9 11:14 15:17 26:15 27:15 34:9 37:23 38:19 41:8,19 42:3 52:17 54:20 55:6 56:2 63:20 76:8,9 76:16 78:13 80:8,14,17,19
**identification** 21:8 25:16 30:17 33:7 59:15 63:6,8 63:23 66:22
**identify** 23:20
**idiot** 77:15
**idiotic** 78:2
**imaginable** 24:23
**imagine** 78:14
**immediately** 15:4
**implement** 13:8 13:24
**implicit** 81:19
**improves** 82:3
**include** 7:19 16:15 23:4
**included** 23:8 23:12 46:23
**incorrect** 16:15 65:5
**incorrectly** 50:11 52:2
**increase** 16:16 26:10,24 35:7 40:6 44:14,19 44:20 45:5 46:17,24 47:4 47:5,6,8,11,12 47:16 48:6,7 48:22 49:13 53:1 68:15 70:10,11,12,15 71:4,7 72:7,10 72:13,18 74:23 78:11
**increased** 35:18 70:7
**increases** 1:4 4:17 5:13 11:21 13:8 14:1 16:12 43:14,15,16,17 44:3,10 53:16 67:19 70:1 72:19 74:11 79:13
**index** 1:2
**indicate** 74:2 74:21
**indicated** 7:23 8:8 12:9 45:6 65:3 79:24
**individuals** 36:24 52:1
**information** 4:18 46:11 48:10,14 59:1 59:4 62:15 69:9,10 70:9 70:18,19 72:23 74:17 79:10
**informed** 44:24
**initial** 43:13 45:2
**initially** 46:6
**ins** 75:16
**insist** 6:20
**instruction** 80:9
**interesting** 71:14
**interpreted** 9:7
**interpreting** 43:7
**introducing** 12:16
**invoked** 6:22
**involvement** 35:22
**issue** 7:5,12 10:17,18,20 11:2,3,7,10,11 11:12,16,18,18 12:1,3 14:19 15:2,11,21 17:3 24:24 26:10 27:10 35:15,17 36:6 44:21 49:22 50:7 52:3 73:23 74:22 78:6
**issued** 14:10
**issues** 7:22 10:15 21:1 22:5 23:3,17

24:10,22,23 25:11 26:2,19 26:20 36:19,23 37:9 40:2,10 79:16,17

**j**

**j** 20:9 61:4
**jackson** 1:19
**jacksonlewis....** 1:21,22
**jacques** 31:5,15 31:19 32:3,12 32:17 35:6,16
**jane** 2:8 81:24 83:2,10
**january** 14:20 14:21 15:2 22:24 24:1,6 24:13 25:4,5 32:16,23 43:14 56:13,17,19 58:4
**job** 20:20 30:8 30:13 59:2 61:11,14
**john** 2:3 3:3,21 17:13,21 18:11 20:1,6 21:22 26:18 29:8
**joint** 3:10 5:2 21:14 27:18
**judge** 9:22
**judgment** 8:14
**july** 4:9 40:23 40:23 46:7 47:20 59:17 69:16
**june** 58:17
**jurisdiction** 7:9 7:21 10:14

**k**

**k** 20:9 70:18
**keep** 74:15 79:3
**kind** 80:8
**knew** 57:3
**know** 8:1 12:2 12:12,19 28:10 34:16 36:7 37:6 39:10 40:5 54:9 62:3 64:12 68:17,18 71:16 72:22 76:20 77:2,7 77:14,16,24,24 78:18
**knowledge** 60:17
**known** 6:7 77:16
**krezmien** 1:20 3:4,6 5:17,19 10:6 17:13 18:10 20:3 21:5,21 25:14 26:5,8,13

28:23 29:2,23 31:18 33:8 34:6 38:24 39:3 40:13 41:7

**l**

**labeled** 59:17 63:4 65:20
**labor** 1:3 5:10 20:17 30:9 64:11 66:14,14
**lack** 54:17 78:11
**language** 43:11 43:21 50:17,18
**large** 26:1 36:4 50:20 77:9
**larger** 47:12
**late** 53:18 71:15
**latest** 14:20
**law** 6:19
**lead** 81:14
**leader** 22:12
**leading** 75:1
**learning** 17:17
**led** 6:6
**legacy** 22:5 39:20
**legal** 15:10
**lewis** 1:19
**liabilities** 14:15
**liable** 51:3
**liberty** 1:16
**light** 8:24
**limitation** 69:2
**limited** 53:4,16 58:24 64:15
**limiting** 54:16
**limits** 7:17,18 16:8 80:7
**line** 24:9 25:8 74:24
**list** 4:9 26:9 46:10,13 47:2 47:3,24 48:2 59:18,23 65:5 65:12,13 67:8 69:16,19,22 71:1
**listed** 62:7
**lists** 45:21,23 46:3,6,9,15 47:18,21 48:9 48:15,18 58:9 58:10,21,23 65:9
**little** 28:2 30:12 56:10 57:20 66:17
**live** 12:21
**lives** 12:21
**location** 57:10
**long** 20:12,18 22:14 30:5,11 39:10 49:18

56:9 76:9 77:16
**longer** 39:9,22
**look** 27:6 40:7 45:17 52:3 54:7 61:1,18 74:3,10 78:22 79:5
**looked** 80:19
**looking** 22:19 27:10 44:18 46:15,21 72:21 73:8,18
**looks** 32:3 62:3 66:12 71:17
**lost** 49:15
**lot** 28:9 36:2
**lots** 71:18
**lrc** 2:1
**lrussell** 1:17
**lynn** 47:19

**m**

**m** 2:8 71:4 83:2 83:10
**ma** 1:16,20
**made** 12:5 40:10 43:5 52:16 74:3
**main** 80:22
**maintained** 15:4
**majority** 72:12
**make** 5:22 7:15 12:16 23:12 26:22 34:16 40:19 44:22 45:7 57:2 66:17 76:12 77:20 79:2
**making** 44:22 59:3 62:21
**manage** 20:24
**manager** 13:17
**manages** 23:10 23:13
**managing** 20:22
**marc** 1:13
**march** 2:5 7:4 83:6
**mark** 5:20 68:9 73:1,12
**marked** 21:7 21:19,23 25:15 26:6 30:16,18 33:3,6 34:4 59:14 60:11 63:7,18,22 64:17 66:1,21 67:14 69:3 73:5,14
**marlon** 3:21 22:4,11,12,13 23:24
**massachusetts** 6:24
**material** 79:10
**matter** 1:6 5:6 8:10,10,15 9:2 9:5,12,15,15 14:6 16:6,9 27:18 35:21 36:9 51:13,24 80:13
**matters** 53:22 80:16 81:8,10
**mean** 24:12 39:16 45:8 61:23 68:11 72:15 74:4,13 78:16,20,20 80:21 81:15
**means** 69:14
**meant** 35:2 44:11
**medical** 1:9 5:8 5:16 6:2,6,7 8:13,21 9:1,3,7 11:24 13:7 14:12,13,16,20 14:22 15:4,14 20:11,13 23:9 27:7 30:4,6 31:10,12,16 32:5 33:21 34:23 39:9,12 41:4 42:7,23 49:19 53:8 57:5,19 64:7,9 66:7 67:7 69:13 70:21
**meet** 27:22 36:11 54:3
**meeting** 28:1,4 28:5,11
**meetings** 24:14 27:24 28:2,9
**member** 33:22 47:18 58:21 65:5
**member's** 61:1
**members** 42:13 59:23 72:10
**membership** 4:9,10 59:18 63:4,11
**memberships** 58:10
**memorandum** 3:12,18
**memory** 28:18
**mentioned** 8:12 23:2 39:4 40:1
**merit** 2:8 83:2 83:11
**merits** 10:12 12:14 17:6
**met** 36:4,4,7
**mid** 15:3 56:13
**mind** 79:2
**minute** 41:12 41:23
**minutes** 54:24 76:11

**missed** 4:17 26:24 37:5 40:6,8 67:18
**moment** 7:23 11:7 17:23 38:7
**month** 40:6 58:11,14,15
**monthly** 58:10 58:18 69:11
**months** 14:7 27:16
**morning** 80:4
**morsilli** 1:19 5:17 8:3,7 9:24 10:4,7 12:2 13:2 17:11 18:8 37:22 38:4 53:10,14 54:5 60:13 62:10,13 63:15 66:19 67:22 68:2,7,17 71:13,17,23 72:2 74:24 77:2,22 78:13 81:15
**mouse** 65:1
**mouth** 79:3
**move** 24:2 38:14
**moved** 6:11 61:12
**multiple** 36:5
**myriad** 24:21

**n**

**n** 3:1 5:1 20:9
**name** 20:4 29:24 57:16,18 57:22 62:1,2
**named** 47:18
**names** 45:23 58:24
**narrow** 25:23
**necessarily** 52:22 70:5
**necessary** 9:14
**need** 12:18 23:20 24:9 46:21,22 76:10
**needed** 25:1
**needs** 49:17
**never** 46:20 49:16,17 79:2
**new** 16:19 46:2 53:23 61:15
**nine** 20:23
**non** 21:2
**noontime** 55:1
**note** 7:3
**noted** 8:4 60:22 68:20 69:2
**notes** 54:7,11 76:3 83:5
**notice** 14:22
**noticed** 44:9
**november** 37:6 47:1,9 48:6 70:3 72:7,11 72:14,17
**number** 6:9 59:5 77:11
**numbers** 78:7 78:12

**o**

**o** 5:1 20:9
**object** 60:13,14 60:15 67:22
**objected** 8:9
**objection** 6:17 12:17 21:12 26:4 62:10 63:15 74:24 79:19
**objections** 8:11 10:13
**obviously** 38:4 78:3 79:10 81:18
**occasionally** 58:15
**occasions** 6:10 8:18,19 15:3
**occur** 51:5
**occurred** 14:3 14:16 16:9 45:3
**occurs** 49:7
**october** 4:14 11:20 13:9,12 14:4 26:21 31:6 32:2,10 36:17 37:4,7 39:6,13,16 40:3,11,24 42:17,19,23 43:9 44:4,6 46:14 54:14 57:5 65:21 66:6 68:14,19 71:1 78:18
**office** 17:22
**oh** 18:8
**okay** 10:2 12:4 12:5 17:8,9 18:20 22:7 25:4,14 26:13 28:24 29:19 34:8 35:9 37:1 38:2 39:1,8,10 39:15,19,24 40:13 54:20 55:2,15 58:19 59:7,13 60:6 61:5 62:5 63:13 64:14 65:3,19 67:24 68:20 69:5,14 70:13 71:3,8 71:23 72:24 73:20 76:12,14

76:19 81:23
**oliver** 31:7 32:6 32:12
**olivia** 31:11
**once** 12:10 80:3 80:4
**ones** 71:5
**ongoing** 23:15
**open** 5:6 12:14 38:10 71:10
**opening** 5:22 6:1 10:22 12:7 12:24 17:3,6 42:4 53:8,11 82:4
**operate** 68:18
**operated** 42:12
**opinion** 11:4 45:3
**opportunity** 71:11,20 79:8
**order** 3:17 14:10 23:19 47:15
**organizer** 22:9 56:15,24 57:9 57:13 58:7
**original** 35:5 61:9,10 65:8 65:12
**outs** 35:19
**outset** 7:24
**outside** 50:16 52:4 75:13
**outstanding** 25:10
**overall** 48:20
**oversee** 20:21
**owed** 16:2 44:10,14 46:17 48:6 49:5,9 50:3 51:16,23 52:9
**owen** 4:6 33:16 33:17,18 34:3
**own** 51:20 60:17 76:3
**owned** 58:3
**ownership** 9:18 13:12 14:4 16:4 36:17 42:24 44:5,7 45:3,16 46:12 49:1 51:6 57:4 57:16 58:8,20

**p**

**p** 5:1
**p.c.** 1:19
**p.m.** 23:1 24:1 82:7
**page** 25:7
**pages** 1:1
**paid** 36:20 42:6 42:8 43:24 44:13,23 47:1 47:23 48:3 50:11,22,23,24 51:15 52:1,8 52:11
**parameters** 80:10
**parenthetically** 7:3
**park** 1:20
**part** 11:8 21:16 23:15 31:23 34:14 50:20,21
**parte** 8:23
**participants** 1:12
**participate** 8:21
**participation** 9:6 10:12
**particular** 15:22 46:5
**particularly** 78:8
**parties** 11:5 18:6 51:12,14 64:3
**partner** 34:23
**party** 10:22 11:1
**past** 39:14
**pause** 38:8
**pay** 4:19 11:20 16:1,11 24:23 26:10,24 35:6 36:23 37:2,9 45:1,7,8,8,14 45:17 46:3,14 46:20 47:19 48:16,24 49:8 50:2,3,8,19 51:5,22 52:15 70:15,16 73:10 79:12
**paycheck** 16:14 16:18,22,24 49:8,17 50:10
**paychecks** 44:15
**paying** 43:22 49:4
**pc** 1:15
**people** 24:21 25:2 27:6,7 36:5 54:15 70:6
**percent** 16:15 44:13,16,17,20 46:17,19,24 47:4,5,7,14 48:4,7 49:15 49:16,17 70:4 72:13 78:10
**percentage** 70:11,15 71:6
**period** 9:18 28:14 42:10
**periods** 24:22
**perspective** 52:6 53:22

**pertain** 81:10
**phone** 59:5
**place** 28:6,7 36:3
**placed** 14:22
**plaza** 1:20
**please** 11:15,16 11:24 12:23 18:1,8,12 20:4 20:7 21:18 22:21 23:22 24:3 29:1,5,10 29:24 31:3,22 32:14,20 33:5 33:24 38:4,7 42:4 55:13,16 72:3 76:9
**point** 6:14 36:4 42:1 43:23 46:21 48:3 57:21 60:22 72:1 74:1 79:4 79:7 80:17
**policies** 30:14
**position** 9:12 14:9,23 15:5 15:19 26:23 43:22,24 45:13 46:3 49:2,14 49:23 56:14,16 76:23 80:22
**positions** 12:7 46:2
**possible** 77:17
**post** 15:11
**posture** 6:15 7:7
**potential** 71:18
**potentially** 16:7
**pre** 68:14 78:18
**preceded** 6:1
**predecessor** 13:7
**predicated** 6:2
**premarked** 5:2 21:15
**prepared** 60:1 60:3,5,19
**present** 2:1 12:24 13:20 22:8 77:19
**presented** 13:17,21
**presenting** 53:8 68:5
**preserved** 6:16
**president** 20:16 22:13
**presiding** 5:21
**pretty** 24:20 59:6 66:15
**previously** 8:8 8:20 48:4 79:24
**primary** 43:10 50:21
**prior** 13:8 14:3 14:4 16:23 17:16 22:15 26:20 39:5 40:8 42:10 52:19 68:19,23
**probably** 7:16
**procedural** 12:8 13:1 17:10 41:6,9 41:20
**procedurally** 10:19 11:13 13:4
**procedure** 18:5
**proceed** 8:22
**proceeding** 6:14 7:6 8:17
**proceedings** 7:5 12:13
**process** 37:1
**progress** 35:19
**prohibited** 81:11
**promoted** 43:22
**promotion** 43:24
**properly** 6:16
**propose** 12:17 25:17
**proposed** 11:15 11:17,24 12:3 21:4,9 30:19 33:1,9
**provide** 45:4,20 48:11,18 51:22 58:9
**provided** 14:1 47:8 48:1,1 58:13 59:8 63:3 64:3,9 69:19,22 72:7 72:10,22 74:8
**provides** 13:16
**pto** 35:12,15,18
**ptos** 35:3
**purchase** 14:12
**purely** 68:3
**purposes** 43:10
**pursuant** 14:9 43:13,21 50:8
**pursuing** 52:23
**puryear** 31:7,8 32:5,12
**put** 18:2 29:9 38:3 41:18 48:13 55:14 69:7 70:8 71:3 80:21
**putting** 54:24
**pyle** 1:15
**pylerome.com** 1:17

**q**

**qualification** 11:14

**quantity** 26:2
**question** 6:17 6:20 7:9,11 12:7 13:1 17:10 27:12 41:5,9,20 52:18 53:13 62:13 68:21 71:14 75:4 77:13,14,14 78:2 79:7,11
**questioning** 75:1
**questions** 26:14 28:20 34:6,9 38:19 40:14 41:3 73:17 76:17 77:4,5 81:21
**quote** 78:18

**r**

**r** 5:1 83:1
**raise** 18:12 29:10 55:17 71:13
**raised** 14:19 15:2 35:16 37:10 44:21
**raises** 70:6
**raising** 22:6
**rate** 24:23 45:15 47:19 49:4,8 51:16 51:22 61:17 62:6,8,22 66:9 67:9 69:15,21 70:15,16,19,24
**rates** 16:11 23:4 37:3 45:1 45:7,8 46:4,14 48:16 50:3 52:8 65:4 69:15,18
**rather** 44:22
**reach** 18:2 29:8 29:9 55:13,14
**reached** 36:21
**reaching** 36:22 37:5
**read** 11:2,15,24 25:8
**really** 25:1 51:24 78:6
**realm** 50:16
**reasoning** 65:17
**reasons** 75:20
**recall** 28:17,17 36:10 74:13
**receive** 11:21 16:12 18:17 29:15 43:15 46:18 48:21 49:12,18 50:11 53:1 55:22 62:23 66:13 75:14,22,23
**received** 16:14 16:16,18,22,24 22:23 43:18 44:10,19 45:21 45:22 46:4,8 46:11,19 47:6 47:7,11,12,14 47:15 48:5,7 48:24 58:23 60:15 64:7,22 66:9,18 67:13 69:12,16 72:13 73:10 74:11,23 76:24
**receives** 49:7
**receiving** 35:6 44:15 48:4
**recent** 25:11 46:2 80:10
**recently** 6:10 6:22 42:11
**recess** 12:13 38:17 42:2 55:5 76:15
**recognize** 21:23 25:19 30:20 33:10 63:10 64:5 66:4
**recollection** 54:5
**record** 5:6,14 8:5,6 9:14 10:22 11:2,16 17:15 20:5 21:14,17 27:18 30:1 34:14 38:18 42:1,20 43:7 54:18 67:12 68:2,8 71:10 75:7 79:6,21,22
**recross** 3:2 40:15,17
**rectify** 13:11 14:18
**redirect** 3:2 26:14 28:21 34:7 38:23 39:2
**reference** 72:6
**referenced** 54:12 72:5
**references** 77:8
**referring** 35:11 42:22
**reflect** 17:16 47:5 79:6
**reflected** 44:15 46:20 48:17,23 48:24 49:17
**reflects** 47:7 48:5
**regarding** 22:5 35:23 36:13
**registered** 2:8 83:2,11

**related** 36:8,19 50:5 51:4 52:24 54:2,6 56:24 74:18 80:14
**relates** 15:22 16:11,22 50:22
**relating** 81:8
**relations** 1:3 5:10 20:17 21:1 30:10 64:11 66:14,15
**relationship** 20:23 22:14
**relationships** 30:15
**relevant** 43:11 48:14 77:1,11 79:9
**religious** 82:5
**reluctantly** 79:14
**remain** 49:18 57:8
**remedy** 11:9 16:8 54:13
**remember** 54:12,16
**renee** 31:6,8 32:5,12
**repeat** 7:8 75:4
**rephrase** 62:17
**report** 4:11,12 4:14,15 61:20 61:23 63:12 64:4,6 65:21 66:6 67:1,6 70:20
**reporter** 2:8 82:1 83:3,11
**reports** 58:11 69:12
**representation** 51:18
**representative** 80:23
**represented** 5:15,16 42:13
**represents** 51:12
**request** 4:18 7:4 8:18 43:4 72:23 73:3 74:17 79:15
**requested** 8:16
**requesting** 58:18
**requests** 6:12 15:14
**requirements** 50:8
**reserve** 53:11 77:17
**resolution** 6:20 7:14 11:11
**resolve** 7:19
**resources** 13:21 63:1
**responded** 15:4 36:5
**responding** 45:18
**response** 9:10 23:7 34:1 49:11,20 73:9
**responsibility** 56:20
**responsible** 57:8
**reversed** 62:2
**right** 6:19,23 10:15 18:12 27:18 29:10 32:18 34:15,16 36:9 37:12 38:10 41:1,16 55:17 57:6 60:9 61:14,20 65:1 66:24 68:4,21 69:1 69:20 72:24 75:9 78:9 81:6
**ripe** 78:8
**robert** 1:19
**robert.morsilli** 1:21
**rodgers** 2:1 3:7 3:21 4:4,5 22:4 22:7,24 23:23 30:24 31:7 32:6,13,16,23 33:14 34:3 54:21 55:7 56:3
**role** 20:15,18 20:20 30:13
**rome** 1:15
**room** 37:19 38:3 41:18 76:6
**rooms** 37:16 38:10 41:14
**route** 5:24
**rule** 7:20 78:4,5
**ruling** 63:16 65:23 80:20
**russell** 1:16 3:4 3:6,8 5:15 9:11 11:17 15:18 17:4 26:17 28:19 34:10,15 34:19 37:14,24 38:12,21 40:16 40:18 41:3,11 41:16,21 42:5 52:21 53:6,24 54:22 55:2,4,8 56:5 59:7,12 59:16 60:23 62:18 63:2,9 64:1,20 65:19 66:3,16,23 67:16 68:5,24 69:6 72:4,21 73:2,7,16,20,21 74:6,7 76:2,10

76:14,18 78:3 80:21 81:3

**s**

**s** 3:10 4:1 5:1
**saga** 27:9
**sale** 27:1
**sales** 51:2,6 52:5
**sam** 63:4
**samaritan** 13:6 14:13,16 31:9 32:1,4,11 56:20 57:1,19 64:8
**samaritan's** 13:11
**saw** 53:20
**saying** 35:9 52:2 78:10,21
**says** 24:9 25:7 51:3,7 69:15 70:1
**scale** 43:16 44:17 50:19
**scenario** 27:3
**schedule** 78:24
**screen** 21:6 59:8
**scroll** 23:6,21 25:6
**scrolling** 35:5
**second** 6:19 10:20 11:18 21:13 29:14 31:23 37:18 62:2 71:9 77:18 78:22 79:15 80:2
**section** 13:16
**see** 1:2 34:20 35:7 44:18 46:13,16 47:4 47:10,17,19,21 47:24 59:18 65:9 67:2 76:20 78:6 82:5
**seek** 18:17 29:15 55:22
**seeking** 8:14
**seems** 72:12
**seiu** 4:13 23:10 64:4 65:21
**sellers** 14:14
**sender** 24:3 31:23
**senior** 23:9
**sent** 22:22 23:22,23 25:12 30:23 31:3,5 32:8,10,14,16 32:20,22 33:14 34:1,2 36:15 66:7,17 67:6 70:20
**separate** 8:17 72:18
**september** 4:10 4:15 11:22 15:24 16:13,17 27:11 35:7 42:11 44:11 45:5 46:7,18 47:2,22 48:8 48:22 49:13 52:19 53:1,4,5 53:5,17 54:18 63:11 67:2,6 69:19 70:22
**sets** 50:19
**share** 59:7
**shared** 21:6 65:5,20 67:1 67:18
**sharing** 34:10 63:2 65:19 67:17
**sheets** 79:9
**short** 37:14 41:12 54:23 76:2
**shortly** 37:18
**show** 5:5,14 9:15,19,20 12:18 46:22 47:15,22 48:2 48:9,16,19,20 48:23 61:13,17 63:5 64:21,24 66:8 67:12 70:13 78:7,10
**showed** 70:11
**showing** 21:9 21:22 25:10,17 30:18 32:24 46:13 61:20 64:2 66:24
**shown** 46:6 51:20 62:20 68:22 70:9
**shows** 59:2,3 60:21 63:17 64:16 65:24 68:7,11
**shut** 79:3
**signature** 83:9
**signed** 3:19 44:1
**similar** 36:1 58:20
**simply** 45:18 48:18 52:2 54:2
**sit** 23:14,19
**six** 14:7 41:23
**slightly** 10:22 10:23 75:2
**slippery** 27:4 27:15
**slope** 27:4,15
**somebody** 9:20 66:14 77:15
**somewhat** 5:23
**sorokin** 9:24

**sorry** 18:8 21:5 21:13,18 25:5 74:6 75:5
**sorts** 40:2
**sought** 54:14
**sound** 77:14
**south** 1:9 5:8 6:8 13:7,9 14:8 31:10 34:23 41:1 42:7 57:23 58:1 65:21 72:11 81:11
**south's** 14:4 16:1
**southern** 14:11
**speak** 54:19 80:23 81:3,7
**special** 9:2 10:10
**specific** 28:4 43:4 48:17 62:15 73:16
**specifically** 7:18 14:19 28:1,10 44:2 74:17
**specifics** 17:5
**spell** 20:7
**spreadsheet** 3:22 25:22 26:2,11 27:6 77:8
**spreadsheets** 71:18 77:9,10 78:6
**spring** 82:2
**square** 1:16
**st** 14:12 31:5,14 31:19 32:2,12 32:17 35:6,16
**staff** 80:22
**stand** 37:22 80:7
**standing** 22:14
**start** 46:2 56:11
**started** 39:15 39:16 58:3
**state** 20:4 29:24 50:13
**stated** 8:20 54:1,6
**statement** 5:22 12:24 42:4
**states** 6:23 7:14 14:10 44:2
**stating** 75:8
**status** 39:8
**stay** 6:11,13 7:5 8:16 76:7
**stayed** 57:19
**stenographer** 20:8
**stenographic** 83:5
**step** 13:21 40:8 43:16 44:19 79:12
**stephen** 32:4,10 34:21,22
**steps** 44:17
**steward** 4:11 13:11 15:23 22:16 24:16 39:18 42:12,16 42:18,21 45:22 46:8 58:5,8,14 58:23 60:4,7 62:6,23 63:12 69:12,16,19 74:2,12,15,23
**steward's** 13:11 45:3 62:8,14
**straightforward** 13:5 52:7
**string** 4:3,5 22:21 31:1
**student** 17:18
**stuff** 59:5
**stupid** 79:2
**subject** 26:14 34:7 79:13 80:13
**substance** 10:20,24 60:16 60:18
**substantive** 6:17 7:1,10 8:9 9:5 12:1 53:22
**substantively** 6:4 8:15 9:13 9:16 11:3 49:21,23
**suggesting** 77:10
**suggestion** 79:3
**summary** 4:16 48:19 67:18
**summer** 39:14 39:14 40:21
**support** 32:1,4 32:11
**suppose** 37:15
**supreme** 80:11 81:7,14
**sure** 13:2 18:3 20:6,9 22:23 23:12 24:5 26:22 27:24 34:16 35:3,9 35:10,13 36:2 36:14,15 38:12 40:19 44:22 53:22 57:2 60:4 64:13 66:15,17
**survey** 25:12 26:1
**sustained** 11:8
**swear** 18:12,16 29:11,15 55:18 55:21

**sworn** 18:7 20:1 29:21 56:3
**system** 15:23 20:11 22:14 24:16 65:15
**systemwide** 21:1 23:11

**t**

**t** 3:10 4:1 83:1 83:1
**take** 9:13 12:13 18:2 37:14,24 41:11,23 54:23 76:2
**taken** 15:23,23 38:17 42:2 55:5 69:15 76:15 83:5
**takes** 48:13 49:22 50:15 51:5
**talk** 23:14,19
**talking** 23:20 25:24 27:6,7 47:13 77:3
**team** 20:21 23:10
**tell** 18:12 29:11 55:18 74:9
**term** 54:17
**terms** 44:2 52:11 78:7
**testify** 60:17,20 62:14 68:11
**testimony** 18:18 29:17 36:1 55:23 64:15 77:19 80:14,24 81:6 81:9,12,16,16
**texas** 14:11
**thank** 8:3,7 9:8 13:2 15:16 18:20 25:14 26:5 28:24 29:9 34:8 38:16 39:24 42:5 52:17 56:1 72:2 81:24
**theory** 15:8,9
**thereof** 68:1 78:11
**thing** 54:11 79:1
**things** 23:13 27:8 30:14
**think** 9:14,24 27:12 34:11 36:1 39:4 40:1 41:17 50:20,21 52:21 53:18 61:4 74:4 76:10,19 77:2 79:3 81:15,19
**thinking** 81:8
**third** 6:22
**thrilled** 78:19 79:19
**thursday** 24:6 25:5 31:5 33:14
**time** 7:16 9:11 16:3 22:22 24:22 27:9 28:14 31:24 32:9,15,21 34:1 36:23 37:15 42:10 43:1 44:12 47:20,22 48:3 49:7,15 53:15 53:20 56:17 58:3,6 59:24 79:16
**timely** 16:21,21 79:17
**timing** 16:7
**title** 30:8,11 59:2,3 61:12
**titled** 67:1
**today** 22:8 27:9 45:12 53:17 76:23 77:20
**today's** 6:1
**together** 48:13 69:7 70:8 71:3
**told** 65:14 80:23
**took** 12:18 24:15 25:2 28:6,7 36:3 42:24 45:15 65:18
**top** 4:3,5 28:17
**transaction** 6:6
**transcript** 83:4
**transcription** 83:5
**transfer** 36:16 44:7 57:10,15
**transferred** 44:6 57:4
**transporter** 61:12
**true** 53:24 77:16 83:4
**truth** 18:13,13 18:14 29:11,12 29:12 55:18,19 55:19
**trying** 28:8 34:15 40:20 77:20 80:1
**tuesday** 32:16 32:23
**turn** 17:11
**two** 5:24 8:17 12:9 20:22 56:10 77:5
**type** 72:6

**u**

**ultimately** 23:12
**uncomfortable** 80:19
**under** 5:9 6:19 14:16 16:2 43:16,19 44:3 45:3,9 49:5,9 51:8,16 52:9 52:11 60:4 62:20 65:1,7 72:19 74:23 80:12 81:7
**underpinnings** 70:6
**understand** 26:18,22 35:2 40:19 49:21 71:24 77:22 79:18
**understanding** 35:14 43:2 59:21 60:21 62:7,8,14,19 63:17 64:16 65:11,24 70:14 72:6,9 73:8
**understood** 17:8 44:12
**unending** 27:5
**unfortunate** 8:24
**union** 1:17 3:19 4:7,12,15 5:14 8:12 9:13 12:3 12:10 13:6 14:5,19,22,23 15:2,5,7,18 16:8 21:2,2 25:23 27:22 28:3,6,13 33:19 35:23 36:8,13,18,24 41:8,19 42:13 42:18 44:21,24 45:11,20 46:11 48:1,11,12 49:22 50:15,17 51:11,12,18 52:21 53:15 54:3 56:7,9,12 56:14 59:8,11 59:14 60:10,11 60:15,19 63:6 63:7,14,18,21 63:22 64:4,15 64:17 65:22 66:1,20,21 67:2,11,14,20 68:5,10 69:3 73:1,2,5,13,14
**union's** 9:12,16 11:15,17 42:3 45:13 49:2,24 52:6 53:18 79:18
**unions** 20:23 30:15
**unit** 26:1 33:22 42:13 45:21,23 46:6,9,10,15 47:18,18,21 48:9,14,18 57:1,9,13 58:8 58:9 61:1 72:11
**united** 1:8 5:7 6:23 7:14 14:10
**unpaid** 27:7
**unsure** 28:2
**untimely** 13:3 15:14
**unusual** 5:24 7:7
**use** 65:16 77:21
**usually** 61:9

**v**

**variety** 36:19
**various** 24:14
**vega** 33:20
**venues** 24:15
**vice** 20:16 22:13
**videoconfere...** 1:12
**violated** 11:18 13:9 45:13 52:14
**violation** 13:12 13:19,23 15:8 15:9,20,21 16:10,19 17:6 49:3,6 50:2,4,4 50:12,17 51:1 52:24
**violations** 14:18 16:9 49:24 51:3,7
**virtually** 80:5
**volume** 1:1 83:4
**vote** 24:19

**w**

**wage** 13:8,24 35:12,15,17 40:2 43:14,15 43:16 44:3,13 50:17 70:1 71:4 72:7,10 72:17
**wages** 11:20 16:2 47:5
**waiver** 9:7
**waives** 9:3
**waiving** 10:13
**walk** 22:17
**want** 5:22 7:15 24:8 25:6 26:22 38:3 66:17

**wanted** 7:23 21:5 23:11,18
**washington** 3:21 22:4,11 23:24
**way** 9:3 10:11 11:6 12:15 17:23 21:12 34:14 36:20 47:10 65:15 71:5 77:13 79:20
**we've** 8:16 27:10
**weather** 82:3
**wednesday** 22:24 23:24 34:2
**week** 6:10 7:17 59:4 71:10 82:4
**weekly** 75:16
**welcome** 82:1
**wells** 2:1
**went** 27:1,8
**werner** 2:8 83:2,10
**wide** 23:17
**willing** 23:14 23:18
**wish** 9:10
**witness** 3:2 17:9,14,17,24 18:3,15,19,21 29:1,3,6,13,18 29:20 31:16 38:16,20 54:21 55:11,15,20,24 56:2 60:3,8,16 62:14 64:15 68:10 73:17 76:17 80:6 81:22
**witnesses** 12:9 12:11 18:7 41:5,9,19 48:12
**words** 77:20
**work** 30:14 35:19 39:5 51:15,21 55:3 56:7 59:4 80:1 81:10,13
**worked** 20:12 39:5 56:9
**worker** 61:8
**worker's** 59:2
**workers** 1:8 5:7 25:13 57:3 62:21 65:17 72:12
**working** 13:18 14:24 15:6 51:14 58:6 74:11
**works** 23:10
**worry** 10:7
**wrinkle** 78:16
**write** 11:4
**writes** 34:24
**writing** 13:17
**written** 14:22

**x**

**x** 1:5,11 3:1,10 4:1

**y**

**y** 20:9
**yeah** 37:21 40:23 56:21,21 58:12 61:20 65:17 74:13 81:15
**year** 27:5 30:12 40:22
**years** 17:19 20:14 27:16 42:14,17 56:10
**yesterday** 53:18,19 71:15 77:1
**yup** 58:22 59:20 66:5

**z**

**zoom** 1:12 2:5

Pages: 1-113

THE LABOR RELATIONS CONNECTION, INC.

Grievance No. 328-25, Articles 12.01, 24 and 26

Class Action - Anniversary Increases

*******************************************

In the Matter of Arbitration between:

1199SEIU UNITED HEALTH CARE WORKERS EAST

and

BOSTON MEDICAL CENTER (SOUTH)

*******************************************

ARBITRATOR: MARC GREENBAUM

marcgreenbaum@msn.com

MONDAY, JUNE 22, 2026

DAY 2

(All participants appeared via zoom videoconferencing)

A P P E A R A N C E S

MATTHEW FREEMAN, ESQ.
ASHLEY KREZMIEN, ESQ.
Jackson Lewis, P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
matthew.freeman@jacksonlewis.com
Ashley.krezmien@jacksonlewis.com
Counsel for the Employer

IAN O. RUSSELL, ESQ.
Pyle Rome Ehrenberg, PC
2 Liberty Square, 10th Floor
Boston, MA 02109
irussell@pylerome.com
Counsel for the Union

ALSO PRESENT:
Amanda Wells
Helene Benedict
Scott Matthews



I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANDY RODGERS | | | | |
| (By Mr. Freeman) | 6 | | 49 | |
| (By Mr. Russell) | | 41 | | |
| SCOTT MATTHEWS | | | | |
| (By Mr. Russell) | 53 | | | |
| (By Mr. Freeman) | | 61 | | |
| LAURIE MCBRIDE | | | | |
| (By Mr. Russell) | 67 | | | |
| (By Mr. Freeman) | | 79 | | |
| HELENE BENEDICT | | | | |
| (By Mr. Russell) | 96 | | | |

UNION EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Union 9 | November 2023 Membership List | 48 |
| Union 10 | Direct Deposit Statement | 56 |
| Union 11 | Payroll Stub | 59 |
| Union 12 | Payroll Stub | 60 |
| Union 13 | Payroll Stub | 69 |
| Union 14 | Payroll Stub | 72 |
| Union 15 | Email Chain | 75 |




P R O C E E D I N G S

ARBITRATOR: Let's show the record open in Day 2 of the arbitration hearing between 1199SEIU United Healthcare Workers East and Boston Medical Center (South). Case is being held under the auspices of the Labor Relations Connection.

It has assigned a Docket Number 328-25, and it is described as Arts 12.01, 24 & 26, Class Action - Anniversary Increases. As was true the last time, the Union is here being represented by Ian Russell. Today, however, the Medical Center is being represented by Matt Freeman, who is replacing Bob Morsilli, and Ashley Krezmien as co-counsel. Marc Greenbaum is presiding as arbitrator, and as is obvious, a stenographic transcript is being created.

Let the record show that we adjourned last time with the Medical Center having reserved Mr. Rogers' cross-examination, he was placed under appropriate instruction. We all assume that those have been complied with. So, I'm not going to worry about it.



So, at this point, we're going to recall -- well, not recall. Mr. Rodgers, you're still on the stand, you're still under oath, and Sue, I believe you have the full, witness's full name and spelling from the day one transcript, and if you need it, I'll just have him do it again.

COURT REPORTER: I can get the transcript at the end. I don't have it yet, but I will get it.

ARBITRATOR: Okay, fine. All right. Okay, so Mr. Rodgers, you're up. You know, just a very quick, not even admonition suggestion, it's likely that Matt will be asking you, or Matt or Ashley, I'm not sure who's doing the cross, will be asking you some questions that call for a yes or no answer, and since you're a human being, you're going to want to say yes with a comma after and start explaining. Don't. Just answer the yes or no. Ian has the opportunity for redirect, and that's where we can put in the stuff that you would put in after the comma. Is that okay?

MR. RODGERS: Yes.

ARBITRATOR: Okay. Matt or Ashley, your witness.

MR. FREEMAN: Thank you, Marc.

CONTINUED CROSS EXAMINATION
BY MR. FREEMAN:

Q Good morning. It's going to be me, obviously. Good morning, Mr. Rodgers.
A Good morning.
Q Hi, I'm Matt Freeman. Just want to introduce myself. And if I smile every time I say your name, that's nothing personal. I was just a big fan of the Land of Make Believe as a kid.
I'm going to ask you some questions, and I wanted to start going back to the, I think it's easiest to work off of that chalk document that you created, so it's Union 6, and I'm going to put that up on my screen, and we can look at that. Let me make sure that works.
ARBITRATOR: Yes.
Q So Mr. Rodgers, this is the chalk Union 6 you testified about on direct. So, on the different columns, I wanted to start with just kind of understanding what we have here. So obviously A



and B, last name, first name, job title, and then column D, last hire date. My understanding from your direct was that you derived those dates from the other spreadsheets that you had received, or the Union had received, I should say, from Steward. Is that accurate?
A Yes.
Q Okay. And same thing with the rate, so you have 7/20/24, so July 2024 rate, 9/20/24, that's September 2024, and then 12/20/24 being December rate. All of those columns, those rates were all derived from -- well, no, let me ask you that.
Were those derived from the same or different spreadsheets?
A Each month is from a different spreadsheet, and December 2024 is the first BMC headcount report that we received.
Q Perfect. Okay. And then you have kind of the wage increase that you calculated based on the columns E, F, and G, I'm assuming in column H, right? Like that's a percentage increase between E and G?
A Well, between F and G.
Q Sorry, F and G, yeah. Well, E and F are pretty



much the same, right?
A Yeah.
Q But you calculated between F and G, got it, to get H, okay. And am I correct that your position, or what you articulated on direct, at least, is that between that period of September 2024 to December 2024 there should have been two, two percent increases, one in November by virtue of that extension agreement, and then one by virtue of application of the collective bargaining agreement; is that correct?
ARBITRATOR: You have to answer yes or no.
A I'm sorry, my Wi-Fi just dropped out for a second. Yes, that's correct.
Q Okay. So when determining the application of the contract part of it -- well, let me back up. Sorry.
The extension agreement I just mentioned, I'm assuming you reviewed that document in doing these calculations and coming up with a spreadsheet. Did you?
A Yes.
Q Okay. And then the collective bargaining



agreement, did you review that document?
A Yes.
Q Okay. Any particular section do you recall that you reviewed of the collective bargaining agreement?
A Under wages, the anniversary increase.
Q Okay. So I'm going to stop sharing this document for a second. I'm going to pull up the collective bargaining agreement itself, which is Joint Exhibit 1, I think. Yes.
Okay. So I'm going to go to -- can you everybody see this okay?
ARBITRATOR: Yes.
Q I'm going to do a quick scroll down to 12, which is the compensation and overtime section. So you mentioned the, I can't remember the words you used, but the wage section of the contract, is it Article 12 that we're talking about?
A That's correct, yes.
Q Okay. And so I'm looking at Article 12. When you took a look at this, and you came up with the concept that workers should have received a two percent increase by operation of the contract, separate from the two percent increase under the

Page 10

extension agreement, but just under the contract, did you determine that all of the employees on your chalk should have received a two percent base wage increase under the contract on their anniversary date in September 2024?
A Yes.
Q Okay. So I just want to draw your attention to this section I'm looking at here, which is additional increases on anniversary dates during January 1, 2020 through December 31, 2024; do you see that heading?
A Yes.
Q Okay. So if I look in this section, it has this kind of chart; do you see that, the chart, the table?
A Yes.
Q Okay. And I note that there's sort of the columns here, distance from experience step, and then it has five plus four, three, two, one, and then step movement year one, and then year two, year three, year four, year five.
Under each of them, there's some twos and some ones. Do you have an understanding as to what all that means?

Page 11

A Yes. Yeah.
Q Could you tell us your understanding?
A Sorry, you were breaking up a little bit. I can.
Q Can you tell us what your understanding is?
A Sure. So, when they first ratified the contract, there were workers who were not where they were supposed to be, and they were just either underpaid and had to catch up. And so the intent, I believe, was that some workers would receive four percent increases until they got caught up --
Q All right. So underpaid --
A -- caught up closer to their coworkers.
MR. FREEMAN: Sorry, did he break up for everybody in there or was that just me?
ARBITRATOR: Yes and no. Why don't you repeat the answer?
Q Yeah, maybe repeat it.
A Sure. So, when this contract was first ratified, there were a lot of workers that were underpaid compared to their coworkers, so this was intended to create some equity. So some workers would receive two pay increases, or four percent, I should say, until they were caught up.

Page 12

Q Okay.
MR. FREEMAN: I think we got that enough, Marc. He could repeat it if you want, but --
ARBITRATOR: Well, let me try this, Matt. Not anything wrong with your question, but I guess I ought to understand it. So, let me see if I'm understanding the table correctly. Let's take a worker with five-plus years of experience on their anniversary date. In year one of the contract, is it they move two steps, or two percent? In other words, what is that two -- when it says step movement, year one, is the two represent two steps or percentages?
MR. RODGERS: The two represents two steps.
ARBITRATOR: Okay. So in each year of the contract, that person would -- people with five years got two step increases on their anniversary dates. In contrast, a rookie, somebody in their first year, advanced one step for the first four years, and then two steps in year five; am I understanding that correctly?
MR. RODGERS: Yes.

Page 13

MR. RUSSELL: Marc, I don't want there to be any misleading. I think just looking at the column on the far left, it's not about their years of experience. It's called -- it's labeled distance from experience, which I can explain the concept. I know the question is not coming to me, but I just want to -- it sounded like you were basing it on the idea that there was just five years of service, but it's actually what's called distance from experience.
ARBITRATOR: Okay. That's fair enough. I should have read it that way. Let's put it this way, I now understand everything but the first column, but the first column is more easily explainable. So, Matt, you can go ahead.
MR. FREEMAN: Yeah, perfect. So, yeah, that's a great lead-in. Thanks.
Q Distance from experience step, Mr. Rodgers. So experience step, what does that refer to, if you know?
A Sure. So either -- on the scale, there are 20 steps, and so if somebody has 10 years of experience, then they would be at step 10.
Q Okay. And when you say experience, what's

Page 14

experience? We'll look at the scale in a minute, but what's experience?
A How many years of experience they have doing that type of work.
Q Okay. Is that like years of experience concept defined in the contract?
A I'm not sure of the exact language. I know that they also go by registration and certification, depending on the job title.
Q Okay. So let me -- I'm going to scroll up a little bit, so this is the beginning of Article 12. So I'm going to direct your attention to the paragraph that's kind of in the middle of the page. It starts, "The parties also agreed that each position."
Do you see that?
A Yes.
Q Can you take a minute? Just, you don't have to read it out loud, just read it to yourself, and then let me know when you've read it.
A Okay. All right.
Q Really, okay. That's pretty good, That's fast.
So I'm reading this, and it has that, you'll see at the very end, right, in quotes, the

Page 15

word experience, but it looks like, to your point, right, it has a couple different things. It has, in the very middle of the paragraph, says "For non-technical and business office clerical and/or service positions, years of relevant experience will be determined by the workers Steward hire date."
Do you see that?
A (No audible response.)
ARBITRATOR: Was that a yes, Mr. Rodgers?
A Yes.
Q Okay. So you've got one class group of employees, positions, I'll say, whose years of relevant experience are determined by the workers Steward hire date, would you agree with that statement?
A Yes.
Q And then you have a second group of workers in this next sentence in professional technical roles and licensed trades, and you have a different definition of experience for the those categories of employees. Would you agree with that?

Page 16

A Yes.
Q And that one is either the licensure certification, or experience in an equivalent position. Do you see that?
A Yes.
Q This is the preceding two definitions will each be referred to herein as experience. Do you see that?
A Yes, I do.
Q So, when you kind of have your experience column in your chart, did you, because when I read this, I've actually got the part in the parentheses that says, "The preceding two definitions," right before that is sub A and sub B, correct?
A Yes.
Q I mean, those are just there. So when you were using that term experience in your chart, were you using just the A and B, or were you also alternatively using that first part for non-technical and business office clerical?
MR. RUSSELL: I'm going to object on a few grounds. One, the document that he's referring to does not list experience. So when he's asking Andy about columns listed as

Page 17

experience, they don't -- that's not on the document.
MR. FREEMAN: Sorry. Let me go -- Sorry, Ian.
ARBITRATOR: Well, it says experience step.
MR. RUSSELL: No, it doesn't. It says date of -- it just says date, which was their last -- I don't think he said was their experience date.
ARBITRATOR: Wasn't it distance from experience?
MR. RUSSELL: I mean, I understand that he's being asked questions about the spreadsheet that he put together as a chalk, which is Union Exhibit 6. The columns do not have any of that -- there's nothing on there that says experience.
ARBITRATOR: Okay. I thought he was talking about the chart in the contract.
MR. FREEMAN: No, that's a fair point. I can clarify that. Thank you, Ian.
Q Okay. So let me go back to my exhibit here. Okay, sorry, Mr. Rodgers. Ian was right.
So, I guess my question is, from your

Page 18

understanding, when we talked about experience in the chart in the contract that we were looking at, distance from experience step, I am correct that your understanding is experience refers back to kind of these definitions in this new section that we were looking at that defines experience; is that fair? I'm not talking about your chalk at all at the moment, just the contract, just your interpretation of the contract.
A Could you repeat the first part of it? It just broke up.
Q Sorry, yeah. Distance from experience, when we talk about experience step in the chart that we were looking at in the contract, that word experience is defined in this section -- earlier paragraph in Article 12 that we were looking at, where it has the definition experience. Do you agree with that?
A Yes.
Q Okay. All right. So then you had mentioned the scale, okay. So I want to, what I've done here is, and I just want to make sure everybody's okay with this. It just makes it easier to go through it. Is I've just extracted the scale, we'll call

Page 19

it the wage grid, I think is what it's called in the contract, I'm going to show that to you, from the collective bargaining agreement, so that we can look at two things at the same time, and also said I can move between these a little bit quicker. So let me get my share back up.
All right, there we go. Okay. All right. So we've got that, and then we should have the scale, which should move over here, and then can everybody see all of these things? Look at my technological savvy. Okay, can we see both of those documents at the moment?
ARBITRATOR: Yes.
MR. FREEMAN: Is the great wage grid large enough for everybody to see it?
ARBITRATOR: Yes.
MR. RUSSELL: Yes.
Q All right. So just going to direct your attention again to the collective bargaining agreement on the left side of your screen. The contract, I'll just represent at the moment to move this along a little bit, has a couple of different wage grids. To figure out which wage grid applies at Good Samaritan, the former Good

Page 20

Samaritan Medical Center, did you use the collective bargaining agreement?
A Well -- the document --
MR. RUSSELL: I'm going to object again. The document Andy put together does not have a reference to the wage scale. It just shows the wages that they were provided, the wages that they were earning, according to documents received from Steward, and then from BMC.
MR. FREEMAN: Okay.
Q So Mr. Rodgers, did you use this wage grid at all in your analysis?
A I didn't have to. I mean, that was also --
Q Sorry. Why didn't you have to?
A Well, there had been a lot that happened. So there was an agreement between Steward and the union for the two percent increases to happen, and that made the scale, it just changed the scale.
So we had a new Excel spreadsheet, but also, like, the wages didn't exactly line up. So somebody with 10 years of experience wouldn't necessarily be getting exactly what it says, or

Page 21

it would be off by, like, you know, just wasn't perfect.
Q Well, yeah. Didn't you say, though, that you were looking to determine the two percent that employees should have received in September of 2024, you were looking at movement on the step scale, or this wage grid, weren't you?
A I was looking at the workers' actual current rate of pay and basing it off of that.
Q I thought your testimony was that the movement, the difference between each step on this wage grid was two percent and that's where you got the two percent. Is that wrong?
A I'm sorry. Could you repeat it again? I just couldn't hear the first part.
Q Yeah, no problem. I thought you had testified that the two percent that you came up with for September 2024 for anniversary increases was based on the idea that if an employee moves from one step to the next on this grid, that's equivalent to a two percent increase; is that correct?
A Yeah. Yes.
Q Yes, okay. So you must have used the grid to

figure that out, right?
A No. So we just worked off of their current rate of pay. Because oftentimes they didn't have a place on the grid, because even to this day, people aren't necessarily on a step at all, like their rate is just in between steps.
Q Okay. So when Steward has a --
A -- hardly just received a two percent increase every September. I'm sorry.
Q So people just got a two percent increase every September, regardless of where they were on the wage grid?
A If their anniversary date was in September.
Q Okay. So on the in the contract -- wait a minute. And you know this based on what?
A Well, based on workers, talking with workers and just seeing historical data from head count reports.
Q Talking to -- do you remember what workers specifically you talked to about this?
A I'm sorry, you're breaking up again. I'm very sorry.
Q No problem.
MR. RUSSELL: I'm going to object to



relevancy here. I mean, what the Union has presented is that people received no increase in September of 2024. To the extent that the hospital is -- I mean, I'm not sure what exactly they're addressing, like what percentage increase there should have been. I mean, the fact is the basis of the Union's case, and what Andy presented, is that in September of 2024 these employees got zero, they got nothing, and they did get a two percent increase related to the MOU, which was given to every employee.

So I'm not sure what specifically the relevance is to their years of experience, or the wage scale itself.

MR. FREEMAN: Sure. So it's the premise that employees should have got a two percent increase in September based on their anniversary. I'm trying to figure out what the basis for that assumption is.

MR. RUSSELL: I mean, BMC --

MR. FREEMAN: Which is obviously relevant.

MR. RUSSELL: -- two percent increase to them in September of 2020 and September of



2025, so presumably BMC knew the basis for that.

MR. FREEMAN: Yeah, but that's not the issue, right. The issue is whether or not they were entitled to an increase in September 2024. Our position is that it's not arbitrable, and et cetera, et cetera. But if we're going to be looking at that, I think looking into what that --

ARBITRATOR: Actually, Matt, let me just -- I want to rule on the objection. I want to hear the dialog. At least as of the last hearing, the Medical Center's position was that they had no idea what happened. So I'm still to this moment not sure what your view on the merits of the case is, and that's making it hard for me to rule.

MR. FREEMAN: Oh. So the Union would certainly have to establish some basis that employees were entitled to a two percent increase in September 2024 to show that there was a violation of the contract, right?

ARBITRATOR: Well, I think so, yeah.

MR. FREEMAN: I'm just getting to that. I don't -- I don't know that they satisfy that.



So that's what I'm asking about.

MR. RUSSELL: I mean, the contract says everybody gets an anniversary increase. If you want to argue --

ARBITRATOR: The witness has testified -- let's try this. The witness has testified that his view, as I understand the witness's testimony, his view that the employees were entitled to an anniversary, to an ink -- sorry, let me try this in English.

His view that they were entitled to an increase over and above the one called for in the MOU was based on his understanding of the anniversary step provision to the contract. So now, having said that, I guess, you know, if you're going to ask him, who did he talk to, the question is to me, did they contribute to his understanding of the contract, or what was the source of his understanding.

MR. FREEMAN: Exactly.

ARBITRATOR: Okay. If you'll repack it, if you -- let me put it this way. I understand Ian's objection. If you can repackage your questions to get to that point, I will

Page 26

overrule the objection.
MR. FREEMAN: Yeah, thank you. So, yeah, I'm asking about the basis for the testimony that workers were entitled to a two percent increase on their anniversary in September 2024. And I believe the witness said that he spoke to employees to learn information about that. And so I had asked which employees he spoke to.
ARBITRATOR: Okay. So let me ask this question, if I can. Mr. Rodgers, when you were referring to your conversations with employees, I presume at Good Sam, as was then called, was that as to the operation of the contract or whether they got the increase?
MR. RODGERS: I'm very sorry, could you repeat the second part? I just broke up on me again.
ARBITRATOR: Okay. When you said that you spoke with -- let me try this. When you say that you spoke with various employees about this issue, what was the substance of those conversations, what were they about?
MR. RODGERS: So I think, I don't know

Page 27

if this would be helpful for me to explain kind of the whole thing from the very beginning, but, you know --
ARBITRATOR: It probably will be, but try answering my question, okay. Here's where we --
MR. RUSSELL: I'm sorry, my objection is really, I think at this point in time, if we're talking about Andy's discussions with people, is like, is the hospital wants to argue that the contract does not require that employees get an anniversary increase, or did not require that they get an anniversary increase on September 2024. That's really based on the contract language itself, and not Andy's conversation with employees.
ARBITRATOR: Okay, I understand. This is what I'm asking. Okay. Your objection may or may not be a good one. This is what I'm asking.
Matt asked you about which employees you had certain conversations that you referenced in your previous answer, and who they were, correct?
MR. RODGERS: Yes.

Page 28

ARBITRATOR: Okay. My question to you is, when you were referring to those conversations, what was their subject matter?
MR. RODGERS: It was about their annual anniversary increase. We knew that Steward was leaving and BMC was coming in, so they were already concerned about what was going to happen, and there's a long history of having problems. So we, I talked to almost every person, all the members there, and we had membership meetings --
ARBITRATOR: I understand. But what did you -- was it -- did you get it or not, or was it something about how does the contract operate?
MR. RODGERS: It was just about that they're owed their annual increase they get every September.
ARBITRATOR: Okay. All right. Matt, take it from there. I mean, if it goes to the question whether they got it or not, goes to the merits. So, go ahead.
Q So you had conversations with every employee in the bargaining unit did you say?
A Well, a majority of them. We had something

Page 29

called pay verification days, where everybody came down, a lot, hundreds of workers, so we could try to correct any sort of pay issue. And we got things pretty good at, you know, by the time we were done, people were getting their anniversary increases the way they're supposed to.
So they would talk to human resources, usually a month or two in advance, to make sure that they knew their anniversary annual increase was coming up, and they're owed their increase. So people started, you know, that's why I was talking to everybody, because there were a lot of problems when I first showed up.
Q And when was that when you first showed up, and started meeting with employees?
A Sure. It was in January of, what was it, 2024, when I first showed up at the hospital there.
ARBITRATOR: Andy, I have to ask this. Did you just look at a document to refresh your recollection? Mr. Rodgers, did you just -- before answering that, did you look at the document or were you just looking down?
MR. RODGERS: Oh, I'm looking at the

Page 30

screen that's being shared.
ARBITRATOR: Okay, that's all I needed to know. Thank you.
Q All right. So January 2024, and at that point employees were -- did they have complaints at that point that they weren't getting the increases they were supposed to be getting?
A Could you say the first part again? I'm very sorry, I couldn't hear it.
Q No problem. January 2024, you said you started having these meetings with employees that you're describing, right?
A Mm-hmm.
Q Yes?
A Yes.
Q Sorry, for the court reporter. And so at that point, when you were having meetings in January 2024, were employees complaining to you about not getting the increases they were entitled to?
A Yes, that's correct.
Q Okay. So while Steward was still operating this hospital, you were dealing with employees complaining about not getting their appropriate increases; is that correct?

Page 31

A Yes.
Q Okay. And it sounds like you're saying some of those employees were saying that they had gotten increases in the past, but weren't getting them currently; is that roughly accurate?
A I'm sorry. Would it make sense for me to try to call in on the phone to get a better audio?
ARBITRATOR: You know something, I think it would --
Q Whatever helps you hear us would be great, yeah.
A Let me try to do that right now.
(Off the record)
ARBITRATOR: Matt, why don't you pose your question to the witness again?
MR. FREEMAN: Sure. And I think maybe, why don't we sort of start over on this line of testimony, maybe this connection had a little bit of an issue. Is that okay with everybody if I just go back to where I started?
ARBITRATOR: Yes.
BY MR. FREEMAN:
Q So, Mr. Rodgers, where I started with this was, your testimony on direct, you had indicated that you had determined that you would have expected

Page 32

employees to have received two, two percent increases, between July and December 2024. Do I have that right?
A Yes, yes, that's correct.
Q And one of those two percent increases was because of operation of the memorandum of agreement, extension agreement, we're calling it, between Steward and the Union, correct?
A Correct, yes.
Q And the other two percent increase was by virtue of operation of the collective bargaining agreement, correct?
A Yes, that's correct.
Q But the collective bargaining agreement doesn't say workers get a two percent increase on their anniversary date, correct?
MR. RUSSELL: Objection. The contract speaks for itself, as does the MOU, which also references the anniversary increases.
ARBITRATOR: Okay. I understand the contract speaks for itself. I'll let it go on this one. Go ahead.
Q Let's do it that way. So, I have the contract up on the screen, and I'm happy to scroll to

Page 33

wherever you want. If you could direct us to where in the contract it talks about the two percent increase that you've determined employees were entitled to, that would be helpful. Up, down, just let me know how you want me to scroll. I'll make it bigger too, hopefully.
MR. RUSSELL: I mean, I think BMC needs to make clear, are they trying to take the position that there's no anniversary increase owed, or that it's not a two percent increase owed on the anniversary? Because the record is that the BMC provided anniversary increases itself. The contract refers to the anniversary increases in multiple places. I don't really know what point is trying to be made here.
MR. FREEMAN: I mean, the case is about whether or not these employees were entitled to an increase --
MR. RUSSELL: An increase.
MR. FREEMAN: -- in September 2024 of two percent. So whether or not the contract has language that entitles them to a two percent increase at all, I think is something we're certainly able to explore.

ARBITRATOR: Let me just say this --
MR. RUSSELL: You can explore of the witness but you're taking the position --
ARBITRATOR: Ian, do you mind? Give me the grace of being nominally in charge.
MR. RUSSELL: Okay.
ARBITRATOR: Just based on my understanding, the Union's claim is that they were entitled to an anniversary increase, you know, which the witness appears to have equated to two percent. Okay. So are you trying to figure out where he got the two percent from or where he got the anniversary increase from?
MR. FREEMAN: Both.
ARBITRATOR: All right. So let me ask, Mr. Rodgers, you've used two phrases here. You've used the term anniversary increase, and you've referred to two percent. Which is which?
MR. RODGERS: Well, so what I had seen was that every year two percent is what the anniversary increase was. And in the past there were workers who received four percent, but by the time I got there, I don't think there was anybody that was getting four percent because



that was the intent of that language. It was supposed to be four percent in the beginning of that contract to help get people up. So I didn't see anybody who had four percent increases on their anniversary at that point. I just saw two percent.
And in between steps, on the wage grid, on the scale there, it's two percent. And so that's typically generally what we saw, and how everybody referred to it.
ARBITRATOR: All right.
Q Okay. So but the part where you said that some people got four percent, then they get two percent, and then everybody got two percent. Those percent increases that you're saying that you saw, where did you see that?
A In headcount reports sent by Steward.
Q So those reports, like the ones that are the Union exhibits?
A I believe so, yeah.
Q All right. Now, I just want to direct your attention to, because you mentioned this concept of the four percent. So I want to direct your attention back to the collective bargaining



agreement. So we're looking at the first full paragraph on this page. "Workers who are below the scale shall receive an increase of four percent per year until they reach the bottom step of the range."
Do you see that?
A Yes.
Q Is that consistent with what you were talking about, about some people getting four percent increases; do you know?
A Well, I knew that that had happened. So when I showed up at that point, it was towards the end of the contract, and I talked with human resources at the time, nobody, it seemed like nobody was getting four percent. And what we saw was the paragraph just below that there where workers were seeing a two percent increase. So --
Q Well, the paragraph --
A -- two percent was just -- I'm sorry, maybe it's the second one.
Q Well, the second -- workers who have -- this is what I want to ask about. So, that's good. So, workers who have fewer than 20 years of



experience, and whose rate is above their experience step, shall receive a two percent lump sum bonus on their first regular payday following their anniversary date, and shall remain on that step on the scale till their years of experience are equal to that step number.
Do you see that?
A I do see that, yes.
Q Were you aware of that language when you were kind of completing your analysis here?
A Yes.
Q All right. Did you look into that at all to see where people were on the scale and if they were above their experience step rate? Did you do an analysis into that issue?
A Yes, yes.
Q Okay. Can you tell us what you looked at for that?
A Yeah. So we had a separate grievance over this, because this is dealing with the first year of ratification. And -- so we had a separate grievance, because workers who were usually getting a two percent increase were given a lump sum, and they were supposed to be given a two

percent increase. We worked it out. It was headed to arbitration, and I think we finally got to an agreement. For this situation, I wasn't thinking too much about this, because it's really intended for the beginning of the contract, the first year of the contract.
Q Okay. So this paragraph has to do with just the first year of the contract?
A Yes, that's my understanding. I'm pretty sure, yeah.
Q Okay. So it says -- oh, hang on. All right.
So see on this page here, where it says, "Initial wage increases in January of 2020?"
A Yes.
Q All right. And then on the heading we were under, "Additional increases on anniversary dates during January 1, 2020 through December 31, 2024?"
A Yes.
Q All right. So the way I see this, there's this initial increase section here on this page, and then there's like the subsequent increases after that following. Would you agree with that



interpretation?
ARBITRATOR: I think the contract speaks for itself.
MR. FREEMAN: Okay. All right. Fair enough.
Q Okay. So, testimony, just to make sure we got it clear on this, in terms of this idea of a potential two percent lump sum bonus, instead of an increase for people who are getting paid above the scale, you didn't take that in consideration at all in your analysis; is that correct?
A That's correct.
Q Okay. So follow up question. Is it possible that Steward paid any of these people on your list on your chalk a two percent lump sum bonus in lieu of an increase in September 2024; is it possible?
A Well, anything is possible. Right?
Q All right.
MR. FREEMAN: Can we go off the record?
ARBITRATOR: Yes.
(Brief Recess)
ARBITRATOR: Let's go back on the record. Matt, it's still your witness on



cross-examination.
MR. FREEMAN: Thank you.
BY MR. FREEMAN:
Q Mr. Rodgers, I'm going to pull back up this exhibit briefly. So, just based on your testimony just now, is it -- am I accurate in saying that when you kind of determine this idea that there should be a two percent increase in September 2024, you did not look at specifically what grade each of the employees was at, and what years of service experience they had, and where they should be on the scale, like you didn't use the scale for your analysis at all it sounds like; is that accurate?
A Yeah, that's accurate.
Q Okay. And then I wanted to just look at the chalk one more time. Well, no guarantees, but I think one more time, briefly. So on this, the last hire date, I think, came from the -- I can't, I apologize, I can't remember the name of the document that Union received from Steward, correct?
A Yeah, the headcount reports.
Q Okay. Do you know -- do you know whether



Steward, to determine kind of that experience issue, I just want to know if you know this, did Steward use any date relative to when an employee began their employment or was hired by Steward versus how long they've been employed at the hospital? Do you know if they just differentiated between the two?
A Well, I don't know what Steward did exactly. I don't know if they did, to be honest.
Q Okay.
MR. FREEMAN: No further questions.
ARBITRATOR: Okay. Ian, do you have any redirect?
MR. RUSSELL: Yes. I might need to take, I might need to step away briefly before finishing it.
ARBITRATOR: That's fine.
MR. RUSSELL: Give me one second here.

REDIRECT EXAMINATION
BY MR. RUSSELL:
Q Am I sharing the that same chalk, Union 6?
ARBITRATOR: It looks like it from here.

Page 42

Q Andy, you can see that screen. So now looking here, there was a question about, looking at column D, which I believe you said was first -- or last hire date, right?
A Yes, that's right.
Q All right. Now the employee listed here, the top one, Lynn Andrews, the date listed there is September 15, 1986, right?
A Yes.
Q As far as you know, is 1986 before Steward operated Good Samaritan Hospital?
A Yes, that's correct.
Q All right. Now, am I correct that according to the screen, looking at M, column M, that your chalk shows that these employees, that not all employees, but some of, but most of the employees received a two percent increase that showed up between September 2025 and October 2025, right?
A That's correct.
MR. FREEMAN: '24.
MR. RUSSELL: No. 2025, for K&L.
MR. FREEMAN: Sorry. Thank you.
Q What is your understanding of why those employees received, would have received increases at that time?
A It's their September anniversary increase, so they were given their annual increase.
Q Okay. And that was -- who is that increase provided by, what entity?
A Boston Medical Center. BMC, Boston Medical Center.
Q South. And column H, again, that shows the total increase, am I correct that that shows the total increase in wages based on the headcount documents that you've received, both from Steward and BMC. So the total increase that employees on this list would receive between July of 2024 and December of 2024?
A Yes, that's correct.
Q Okay. I'm trying to share the --
MR. RUSSELL: Am I sharing the extension, what we're calling the extension agreement, MOU?
MR. FREEMAN: I believe you are.
Q Okay. So, Andy, am I correct that under this, there was a two percent, based on the first bullet point, there was a two percent across the board increase provided to employees on May 1,

Page 43 (continued above)

Page 44

2024 under this; is that correct?
A Yes.
Q Then there was another two percent across the board increase provided pursuant to this MOU on November 1, 2024; is that right?
A Yes, that's correct.
Q Am I correct that bullet point three also indicates that step progression was to continue through the life of the collective bargaining agreement?
ARBITRATOR: Contract speaks for itself.
A Yes.
MR. RUSSELL: I'm going to take a short break, caucus, I guess.
ARBITRATOR: Okay. It's 11:25. Tell me when you want to come back.
MR. RUSSELL: Give me till 11:35. I just need to pull together a document, potentially.
ARBITRATOR: That's fine. Okay. So Mr. Rodgers, you need to stay here. Everybody else can go to their breakout rooms, and we will reunite at 11:35.

Page 45

(Brief Recess)
ARBITRATOR: Ian, it's your witness on redirect.
BY MR. RUSSELL:
Q Andy, I'm sharing again what's in the record as Union Exhibit 6, which is what we're calling the chalk that you made. All right.
In columns A and B, there's a list of names, right?
A Yes.
Q Do you recall if any of the employees listed there contacted you in relation to receiving or not receiving an anniversary increase in September of 2024?
A Yes.
Q All right. Can you remember which of those employees contacted you to the best of your memory?
A Well, I know Scott Matthews had reached out to me. Laurie McBride stayed in touch with me. Emma Shanks, I think Christine Green also, and Karen Burns. So a handful of them.
Q Okay. To the best of your recollection, what is it that they were reaching out to you about? What

Page 46

were they communicating to you on this issue?
A So some had reached out to me beforehand, saying that their anniversary date was coming up in September, and that they were concerned about getting it because of the history there. So they had cc'd me on emails to human resources. And some reached out to me months later, saying that they never got their September increase.
Q Did any of those employees indicate to you that they had received a lump sum payment in September of 2024?
A No.
MR. RUSSELL: I had sent a document to, I think, Matt and Ashley would have received it, and I'm not sure --
ARBITRATOR: Amanda sent it to me.
MR. FREEMAN: We have it, too.
ARBITRATOR: So this would be Union 7 for identification, I believe.
MR. RUSSELL: This will be a good point to check that, because I thought I might have -- I just want to make sure I've got my numbering right, because I had sent some documents in with --

Page 47

MS. KREZMIEN: It's Union 8.
ARBITRATOR: Union 8, okay. Let's make this Union 8 for identification and --
MS. KREZMIEN: I'm sorry, 9.
ARBITRATOR: 9? 9, okay.
MR. RUSSELL: Yes. I think Union 8 was -- Union 7 was an information request, and Union 8 was an attachment to that.
ARBITRATOR: Sue, if you remind me, I will forward that to you.
COURT REPORTER: Okay.
MR. RUSSELL: What is easier for everybody? I had sent documents that I would potentially go through with my other witnesses that I had numbered, starting from nine. We can just renumber those, or --
ARBITRATOR: Let's re-number those. Let's treat them in the sequence in which they're coming in.
MR. RUSSELL: Okay.
ARBITRATOR: So this is Union 9 for identification, correct?
MR. RUSSELL: Yes.

Page 48

(Whereupon, Union 9, was marked for identification.)

Q Andy, I'm showing you a document that's entitled November 2023 Membership List GSMC. Take a look at that document, please.
A Okay.
Q All right. Do you recognize that document?
A Yes.
Q And what is that document?
A It's a headcount report from Steward. It looks like all the other headcount reports that we would get, and yeah.
Q Okay. What's your understanding about how this was -- well, I guess, was this document received from Steward?
A Yes.
Q Okay. What's your understanding of how it was received by the Union?
A Every month they email it to the Union. So every month they would send us a copy of the headcount report, just showing who is actively working.
Q Okay.
MR. RUSSELL: I would move this in as

Page 49

Union Exhibit 9.
ARBITRATOR: Any objection?
MR. FREEMAN: This is a document that Mr. Rodgers received from Steward Healthcare, on that basis, no objection.
ARBITRATOR: Okay, it's in.
MR. RUSSELL: I don't have any additional questions for Mr. Rodgers.
ARBITRATOR: Any recross?
MR. FREEMAN: Yes, sir.

RECROSS EXAMINATION
BY MR. FREEMAN:
Q Mr. Rodgers, you testified about this earlier, so I wanted to see if you happen to know about the timing of when Steward Hospital took control over Good Samaritan Medical Center, it was called at the time. Do you happen to know when that was?
A I don't know the exact date. I think it was the early 2000s, I think.
Q Okay. All right. And then you just testified about this -- well, let me get it, your chalk. And I think you mentioned five particular employees on that list that you recall speaking

Page 50

to about the fact that they said they didn't get an increase in September 2024.

Am I correct in assuming you did not have conversations with the rest of the employees on that list?

A I just don't remember their names exactly. So I didn't talk to all of those people, you know. I talked to some of them, I talked to a handful of them.

Q A handful, okay. And you said that some of those employees expressed concern about getting the increase in September because of the history there. What was your understanding what you meant the history there; what is that?

A That they would constantly make mistakes and workers would have to follow up to get their anniversary date increase.

Q Steward was making mistakes on whether or not they were making people's increases; is that accurate?

A Yes.

Q Okay. And then you were asked if any of the workers on your chalk list told you that they got a lump sum payment, and you said no. Did you ask

Page 51

any of them if they had received a lump sum in lieu of the increase?

A No. Nobody ever talked about lump sum payments, or --

Q My question was, you didn't ask them, did you?

A No.

Q Okay.

MR. FREEMAN: I have no further questions.

ARBITRATOR: Okay. Mr. Rodgers, I think you're done. You could probably -- I would suggest at this point hanging up your phone and just staying here on the grid. If we need to recall you, you can come back in by phone.

MR. RODGERS: Okay.

ARBITRATOR: Okay. Ian, am I correct that you're going to call Mr. Matthews as your next witness?

MR. RUSSELL: Yeah. I do need a little bit of time in a breakout room first.

ARBITRATOR: Okay. So 11:45. How long?

MR. RUSSELL: Five minutes.

ARBITRATOR: He says five. I'm going

Page 52

to say eight. 11:53.

(Brief Recess)

ARBITRATOR: I take it you're calling Mr. Matthews as your next witness?

MR. RUSSELL: Yes.

ARBITRATOR: Mr. Matthews, good morning. We haven't met face to face. I'm Marc Greenbaum. Are you alone where you are, sir?

MR. MATTHEWS: Yes, sir.

ARBITRATOR: Okay. And if you have a cell phone, would you please put it out of reach?

MR. MATTHEWS: Yes.

ARBITRATOR: Okay, thank you. And then once you've done that, okay. Would you please raise your right hand? I'm going to give you two oaths.

SCOTT MATTHEWS, DULY SWORN

ARBITRATOR: Okay, would you please, even though it's right there, please state and -- put your hand down and relax. If you got water, don't be afraid to take it. I want you to be comfortable. It's not the dentist chair.

Page 53

If you would please state and spell your name for the record, please.

MR. MATTHEWS: Scott David Matthews, S-c-o-t-t, D-a-v-i-d, M-a-t-t-h-e-w-s.

ARBITRATOR: Ian, your witness.

DIRECT EXAMINATION

BY MR. RUSSELL:

Q Good -- barely still morning, Mr. Matthews.

A Good morning.

Q Do you currently work at the hospital that is now called BMC South?

A Yes, I do.

Q And how long have you worked at that hospital under whatever it's been called?

A September of 2009.

Q Okay. As of September of 2009 who was -- do you know what, like, corporate entity was operating the hospital?

A Yes. We were Caritas Christi at that point.

Q Okay. At some point ownership transfer to Steward Healthcare?

A It did, I believe, in 2010.

Q Okay. And what's your current job title?

Page 54

A My current title is Inventory Receiving Specialist Shipping and Receiving Lead.
Q And how long have you been in that position?
A Six years.
Q Okay. All right. And so you are -- you aware of what an anniversary increase is under the collective bargaining agreement?
A Yes.
Q And what's your understanding of what it is?
A That on our anniversary, because everybody's anniversary is different, obviously, but on our anniversary, we were to receive a two percent increase. That's what the contract called for.
Q That's your understanding?
A Yes.
Q Okay. In September of 2024, did you receive an anniversary increase?
A No, I did not.
Q And in September of 2024, did you receive a lump sum payment from Steward?
A No, I did not.
Q As far as you're aware, have you ever received the anniversary increase that you understood you were owed in September of 2024?

Page 55

A No. Not for 2024, no.
Q Following BMC taking over the hospital, and the hospital becoming BMC South, at some point after that happened, did you receive an anniversary increase from BMC?
A No.
Q I'm not asking about your 20 -- so, did you --
ARBITRATOR: You meant for 24; is that correct?
MR. RUSSELL: Let me ask it this way.
Q Did you receive an anniversary increase from BMC in 2025?
A Yes.
Q And when in 2025 did you receive it?
A It would have hit the first full pay period after my anniversary, which is the 21st, so it would have put it into October is when the first --
Q When you said the 21st, of what month is your anniversary?
A September. I'm sorry, September. It's always the first full pay period after your anniversary.
Q Okay. It's your understanding is that you did receive an anniversary increase from BMC that would have shown up in the first pay period of

Page 56

October 2025?
A Yes.
Q And what's your understanding of the amount that that increase was?
A Two percent.
Q All right. I'm going to share the screen here. I'm sharing what I emailed to people as Union Exhibit 9.
ARBITRATOR: So this would now be Union 10 for identification.

(Whereupon, Union 10, was marked for identification.)

Q Scott, can you see the document that's on the screen here?
A Yes, I can.
Q Okay. Do you recognize that document?
A Yes, I do.
Q What is it?
A This is a copy of my payroll stub from Steward Good Samaritan.
Q Okay. And looking at the document, can you tell what period of time that pay statement covered?

Page 57

A This was --
Q And if it's too small, I can try and --
A 9/12 -- 9/1 of '24 to 9/14 of '24.
Q Okay.
MR. RUSSELL: Move this in as Union 10.
ARBITRATOR: Any objection, Matt?
MR. FREEMAN: No objection. Can I get ward hear for a second?
ARBITRATOR: Yes.
MR. FREEMAN: Hi, Mr. Matthews. I'm just going to ask you a question or two about this document. Okay?
MR. MATTHEWS: Okay.
MR. FREEMAN: I'm just looking at it. Bear with me for a second.
MR. RUSSELL: If you make it bigger, and just some of it goes off the screen, but --
MR. FREEMAN: So am I correct that this would be kind of the pay period that's a week before your anniversary date?
MR. MATTHEWS: Yes.
MR. FREEMAN: Does it have on here your wage rate?
MR. MATTHEWS: Yes, on the lower left

corner, it says 2018.
MR. FREEMAN: Perfect. Okay. All right. No further questions, no objections.
ARBITRATOR: Union 10 is in. Sue, you should have copies of all these, I sent them to you.
COURT REPORTER: Yes, I received your email. Thank you.
Q I'm now sharing what was originally sent as Union 10, which I guess we're calling Union 11 for ID. Scott, do you see that document?
A Yes, I do.
Q Do you recognize that document?
A Yes, I do.
Q And what is that document?
A This is a payroll stub from the end of August of 2024.
Q Okay. Who's that pay statement from?
A It's from Steward Good Samaritan Medical Center.
Q Okay.
A To me.
MR. RUSSELL: I move this in as Union 11.
MR. FREEMAN: No objection.



ARBITRATOR: Okay, it's in.

(Whereupon, Union 11, was marked for identification.)

Q Scott, I am sharing what was sent to everyone as Union Exhibit 11, which is now Union 12 for ID. Do you see the document?
A Yes, I do.
Q Okay. And do you recognize that document?
A Yes, I do.
Q And what is that document?
A This is a payroll stub from Boston Medical Center when they first took over us, and the pay date, pay period is 10/27/24 -- 10/13 to 10/27.
Q Okay. And this was sent to you?
A Yes. Well, we print these out off the computer. They're not sent to us.
Q Okay. Well, so how is it that you receive it?
A I have to sign into my work day on BMC site, and I can print out my payroll records from there.
Q Okay.
MR. RUSSELL: I move this in as Union 12.



ARBITRATOR: So let me ask this question since it's a new document. Is there anywhere in this document that reflects your pay rate?
MR. MATTHEWS: Yes. It's on here somewhere. I was just looking for it.
MR. RUSSELL: If you look, Scott, it says regular.
MR. MATTHEWS: Oh, yeah.
MR. RUSSELL: Then if you move over to the right.
ARBITRATOR: That was what I was looking for. Thank you. All right, please proceed.

(Whereupon, Union 12, was marked for identification.)

MR. RUSSELL: Is it in?
ARBITRATOR: Any objection, Matt?
MR. FREEMAN: No.
ARBITRATOR: Okay. It's in.
MR. RUSSELL: All right. I don't have any other questions for this witness.



ARBITRATOR: Okay. Matt, you have any questions for the witness?
MR. FREEMAN: Yes.

CROSS EXAMINATION

BY MR. FREEMAN:
Q Hi, Mr. Matthews.
A Hi.
Q Are you familiar with the wage grid that's in the collective bargaining agreement, that is -- do you know what I'm talking about?
A Yes.
Q Yeah.
A I've seen it, yes.
Q Do you happen to know what grade you are?
A Right now, I believe I'm a grade 10.
Q Grade 10?
A I believe.
Q Do you know what you were in 2024?
A No, I do not.
Q Okay. Did you change to grade 10 recently?
A Yes, a few years ago.
Q Few years, okay. So back in September 2024 -- actually, can we -- let me look at something real

Page 62

quick. Bear with me one second. Sorry. I was just checking to see if it had a job title on the pay stubs we're looking at, but I don't see one.

Can you get more than a few years ago? I'm just trying to figure out if in 2024 if you were in the materials aid job title, or if you were in this inventory specialist job title you currently hold?

A '24, I would have been in the materials aid.
Q Okay. So do you know what grade materials aid is?
A Nine.
Q Nine, okay.
A The lowest.
Q Okay. And then you said that you did not get a lump sum payment in September 2024, correct?
A No, I did not.
Q Did you look at your pay stubs after that sort of one that we just looked at, that pay period right before September 21st, did you look at the subsequent pay stubs to check?
A Yes.
Q Okay. You don't happen to have those, do you?
A Can you repeat that?

Page 63

Q You don't have those available by any chance, do you?
A I have July and August of that year of '24.
Q It would have to be after, right, it would be like September or after.
A I only have that one from September -- from October that's part of the evidence here today.
Q Okay. Did Steward ever pay you off cycle from payroll --
A No.
Q -- in your history? Never?
A No.
Q Okay. In May 2024 you received an increase, correct?
A I do not know.
Q You don't recall. Okay, fair enough. All right.

Prior to September 2024, do you remember whether you were on or above scale on the grid, whether your pay was higher than or equal to what the scale said it should be?

A It wasn't higher than. It was equal, or if anything, less than.
Q It was equal to or less than, okay. And then what about after May 2024, do you have a

Page 64

recollection if that changed? Did you go over scale ever?

A No.
Q Are you certain of that, or do you not recall?
A I'm pretty certain that I never went over scale.
Q Okay, all right.

MR. FREEMAN: Just give me five minutes in a caucus.

ARBITRATOR: Yes. Okay. Mr. Matthews, you have to stay here. How about, it's 12:12. 12:20?

MR. FREEMAN: Yeah, great.

ARBITRATOR: Actually, before we go, Ian, if you've got another witness that you're planning to call, this might be a good time to summons him or her. Just so you know, my thinking, or lack thereof, I thought we would try and complete the Union's case, take a lunch break, and then hear the hospital case. Does that all make sense to everybody?

MR. RUSSELL: Sure, yeah. We'll reach out to the other person, who I think should be fairly close by.

ARBITRATOR: Matt, does that work for

Page 65

the hospital as well?

MR. FREEMAN: Yes.

ARBITRATOR: Okay. So I'll see you all back here at 12:20, except Mr. Matthews, you stay. You've got to kill your camera and your mic. I don't care what you do in the next eight minutes, except don't talk to anybody about your testimony.

MR. MATTHEWS: Yes, sir.

(Brief Recess)

ARBITRATOR: Back on the record. Still your witness, right, Ian?

MR. RUSSELL: No. Matt was taking a break before asking --

ARBITRATOR: That's right. I'm sorry. My apologies. Go ahead.

MR. FREEMAN: I have no further questions.

ARBITRATOR: Okay. So, Mr. Matthews, you are now free to roam about the country. Now you're planning to call Laurie McBride. Can we begin with that testimony now?

MR. RUSSELL: I need five minutes in the breakout room.

ARBITRATOR: Okay. Let me first assign -- okay, it's 12:28. We'll come back at 12:35.
(Brief Recess)
ARBITRATOR: I take it, Ian, you are calling Ms. McBride?
MR. RUSSELL: Yes.
ARBITRATOR: So Miss McBride, I know that you're alone where you are, because I can see that, and I know that you're on your iPhone, so I'm not going to ask you to put it away. So, if you would please raise your right hand.

LAURIE MCBRIDE, DULY SWORN

ARBITRATOR: Would you please state and spell your name for the record, please? And you can put your hand down.
MS. MCBRIDE: Laurie A. McBride, Laurie Ann McBride.
ARBITRATOR: Spelling, please.
MS. MCBRIDE: L-a-u-r-I-e, A-n-n, McBride, M-c-b-r-I-d-e.
ARBITRATOR: Ian, your witness.



DIRECT EXAMINATION
BY MR. RUSSELL:
Q Good afternoon, Laurie. Do you currently work at BMC South?
A Yes.
Q Okay. And before it was BMC -- well, before it was BMC South, it was Good Samaritan Hospital, correct?
A Correct.
Q And how long have you worked at Good Samaritan Hospital?
A Twenty years.
Q Twenty years. And what is your current job title?
A I am a cardiac exercise technician.
Q And how long have you been in that position?
A Twenty years.
Q Twenty years. Do you have an understanding of what an anniversary date is under the collective bargaining agreement?
A Yes. The -- yeah.
Q I didn't mean to interrupt you.
A Yes. I started September 2005.
Q Okay. So your anniversary date, as far as you're aware, is in September, and you started in 2025 - - 2005?
A Correct.



Q Okay. Did you receive an anniversary wage increase in September of 2024?
A I did not.
Q In September of 2024, did you receive a lump sum payment from Steward?
A I did not.
Q Following September of 2024, did you ever receive the anniversary increase that you were owed in September of 2024?
A No.
Q Did you receive an anniversary increase from BMC in September of 2025?
A Yes.
Q And what was the percent increase that you received in September of 2025?
A Two percent.
Q All right. I am going to try and share the screen here. I'm sharing a document that was sent to the parties as Union 13.
ARBITRATOR: So this would be Union 14, correct?
MR. RUSSELL: I don't think I skipped a



number -- so it might --
ARBITRATOR: Did we skip a number somewhere?
MR. RUSSELL: Well, no. I had sent Union 12. I'm going to what I sent as Union 13 first. So let me just -- oh, shoot. In terms of the numbering, the last one was Union 12. So the numbering on this one is correct. I believe it would be --
ARBITRATOR: This is 13 for identification.
MR. RUSSELL: Yes.

(Whereupon, Union 13, is marked for identification.)

ARBITRATOR: Ian, by the way, is this among the group that you had previously sent to Amanda?
MR. RUSSELL: Yes. I sent this on Thursday last week.
ARBITRATOR: Okay, fine. Thank you.
Q Laurie, it may be difficult, especially looking on your phone, but can you see the document

that's on the screen?
A I can.
Q I'll try and zoom in a bit to make it easier.
A Yes.
Q Okay. All right. I'm just going to scroll down through it. Do you recognize this document?
A Yes.
Q And can you describe to me what this document is?
A These are my pay stubs.
Q Okay. So are these pictures of physical pay stubs?
A Yes.
Q Okay. And who did you receive these pay stubs from?
A Steward Good Samaritan Hospital.
Q Okay. And looking at these documents, and tell me if you need me to scroll down -- actually, tell me, am I correct that there are two documents that are showing in this picture?
A Yes.
Q Okay. So are those two different pay statements?
A Yes.
Q Okay. So looking at the top, can you -- again, if you need me to zoom in more, I will, but



looking at that top part of the document, the top pay statement, can you say what -- can you determine what period of time that's for?
A If you zoom in a little it I can. I believe that's 6/20/2024.
Q Okay. Are we looking --
A Or is it 8/20? They asked for June to October.
Q Okay. And you don't have the copy with you right now, do you?
A I do not.
ARBITRATOR: Ian, how about this, can you point out on that stub where the date is, and then we can say the document speaks for itself?
MR. RUSSELL: Yeah, I mean -- I can -- on the top right hand corner, there's a period end, and I can read a date.
MR. FREEMAN: Yeah, well, it says 7/20/24.
A Okay. I can't see it on my phone.
MR. FREEMAN: That's okay.
Q So I have 7/20/24. And then scrolling down, the next document, that same area, where it says period end, to me it looks like 8/17/2024.
ARBITRATOR: That's what it looks like



to me.
MR. FREEMAN: Yeah, I agree.
MR. RUSSELL: Okay.
ARBITRATOR: And I think we can both agree, based on the last testimony, that the rate she was paid is in the lower left hand corner.
MR. RUSSELL: Correct. So I would move this in as Union 13.
MR. FREEMAN: No objection.
ARBITRATOR: Okay, that's in.
Q Okay. I'm sharing now what was sent as Union Exhibit 14.
ARBITRATOR: And this is now still 14.
MR. RUSSELL: Correct.

(Whereupon, Union 14, was marked for identification.)

Q All right. Laurie, can you see this document?
A Yes.
Q And what is it?
A It's my pay stubs from Good Samaritan Hospital.
Q Okay. And as with the last document, is this a picture of two physical pay statements you



received?
A Yes, it is.
Q Okay. And then looking at the period end, it is a little blurrier here, but am I correct that both period ends appear to be from September of 2024?
A Yes.
Q Okay. And then your pay rate is that listed in the bottom left hand corner of each statement?
A Yes.
MR. RUSSELL: I move this in as Union 14.
ARBITRATOR: Okay. Any objection?
MR. FREEMAN: I mean, I don't know if you can see the dates on there, Marc. I can't, but....
ARBITRATOR: You know what I'm going to do. Let's --
MR. RUSSELL: I mean --
MR. FREEMAN: I'm not going to make a big issue out of it. I would imagine that's what they are, but I just can't tell.
ARBITRATOR: Laurie, do you still have those available?

Page 74

MS. MCBRIDE: I do, but not with me.
ARBITRATOR: No, that's fine.
MS. MCBRIDE: I mean, if you zoom in on it, I'm sure --
ARBITRATOR: The last one looks like 9/14.
MR. RUSSELL: The issue it's a little blurry. I don't know if it really helps. I mean, to me that looks like 9/14. I mean --
MR. FREEMAN: I mean, I'm okay with a trust and verify approach, Marc. Like, if we want to get --
ARBITRATOR: If you can send new copies of that to Ian, and he can send them to Matt, and Matt, I'll reserve your rights on those.
MR. FREEMAN: Sure.
MS. MCBRIDE: Okay.
MR. RUSSELL: So that's in subject to sharing a clearer copy?
ARBITRATOR: Correct. Sort of de bene, I'll just say de.
MR. RUSSELL: I don't think it's necessary to try and put what I had sent as Union 12 in. It's just another pay statement, but it

Page 75

is a little bit cut off.
Q So, all right, Miss McBride, I'm going to share another document here, which was sent to everybody as Union Exhibit -- labeled as Union Exhibit 15, and I think we're still on track with it being Union 15.

(Whereupon, Union 15, was marked for identification.)

A May I ask a question?
ARBITRATOR: Yes.
A If you have my pay stubs from October and November that still say the same pay rate.
ARBITRATOR: Laurie, now you're getting ahead. Ian's steering the ship at the moment.
MS. MCBRIDE: Okay.
ARBITRATOR: I have a hunch if he's got them, I have a hunch we're going to be seeing them.
MS. MCBRIDE: Okay.
Q Okay. I'm showing you, again, what was put in as Union Exhibit 15. Can you see the document that's on the screen?

Page 76

A Yes.
Q Okay. I'm just scrolling down to the bottom of it. It looks like this is an email chain; is that right?
A Correct.
Q Okay. The bottom email, who sent that email?
A I have to read it first.
Q Yes.
A The bottom email is from me.
Q Okay, I can zoom in a little more.
A Yes. There you go.
Q And who are you sending that email to?
A I am sending that email to Stephen Cappellini.
Q Okay. And who is Stephen Cappellini?
A He is the human resources.
Q Human resources person where?
A Good Samaritan Hospital.
Q Was --
A And he -- go right ahead.
Q Is he still in that position, as far as you know?
A Oh, gosh, I don't know, to tell you the truth.
Q As of December 10, 2024 when you sent the email, is it your understanding that he was working in human resources for BMC, at Good Samaritan?

Page 77

A Yes.
Q Okay. Scrolling up, there's an email. The next email chain, it looks like it's from Stephen Cappellini; do you see that?
A Yes.
Q Did you receive that email from him?
A I did, on December 10th.
Q Okay. And then scrolling up to the top, it looks like you sent an email back to him. That last email up there, was that sent by you?
A Yes.
Q Okay. And in the second email -- well, your first email, you say, you're asking about your anniversary, you say it's incentive from September 2024; do you see that?
A Yes, I do.
Q What did you mean by anniversary incentive?
A That would be our anniversary date incentive that we get every year in September.
Q When you say incentive, did you understand it to be a wage increase or something different?
A That's the wage increase.
Q Okay. And was this the first email that you had sent to Mr. Cappellini about the issue?

Page 78

A No.
Q Okay. When had you previously communicated with him about it?
A I believe it was on October 1st, wondering why we had received the September anniversary incentive.
Q Wondering why you had, or sorry, wondering why you had not?
A Why we had not for September.
Q And when you say we, who are you referring to?
A Probably just me. I didn't know anybody else who hadn't received it yet, but now I know that there are many people who haven't received it.
Q Okay. But at the time you were reaching out about your own increase, correct?
A Correct.
Q Okay. And then, the second email in here, it says working on, it says BMC is working on getting these caught up this month.
A Yes.
Q Okay. Subsequently, did you get any other communication from Mr. Cappellini about what was happening with the September 2024 anniversary increase?
A Yes. I have more emails from January and

Page 79

February.
Q Can you summarize what you were eventually told by Mr. Cappellini?
A That BMC would not be sending out the incentive for September of 2024.
Q That was -- you would not be receiving it?
A Correct.
Q Okay. Do you recall if he provided an explanation to you as to why you would not be receiving it?
A I can't remember. I have to look. I wouldn't want to misspeak. I would have to look at my emails.
MR. RUSSELL: I would move this in as Union 15.
ARBITRATOR: Any objection?
MR. RUSSELL: No.
ARBITRATOR: Okay, it's in.
MR. RUSSELL: I don't have any additional questions.
ARBITRATOR: Okay. Matt?
MR. FREEMAN: Yes.

CROSS EXAMINATION
BY MR. FREEMAN:

Page 80

Q Hi, Ms. McBride.
A Hi.
ARBITRATOR: By the way, this is Matt Freeman. He's counsel for the hospital, and Ashley Krezmien is also co-counsel for the hospital.
MS. MCBRIDE: Okay.
MR. FREEMAN: That's who we are.
ARBITRATOR: And I don't know if you know Ms. Benedict, who I believe is Director of Labor Relations.
MS. MCBRIDE: Great.
Q All right. Thank you for your testimony today.
When did you become an exercise therapist?
A I'm not a therapist. I'm a technician.
Q Oh, sorry, I had that wrong. When did you become an exercise technician?
A We had the title changed back in the, I think it was the last contract. We were known as EKG technicians, and now we were known as cardiac stress exercise technicians, because we do stress tests, also. Sorry.
Q No, that's fine. So you were formerly known as

Page 81

an EKG technician?
A Correct.
Q And then during the last contract, like how many years ago did you move to become an exercise technician?
A It was -- well, with the last contract. What was that, five or six years ago?
Q Okay, got it. All right. Are you familiar with the like wage grid that they used at Steward?
A Yes.
Q Do you know what grade you were as an EKG technician?
A We were a grade 16, I believe.
Q Okay. And then did that change when you became an exercise technician?
A Yes. It went up to a 19.
Q Okay. All right. Got it. Then you had reached out to Mr. Cappellini about September 2024, and I just want to make sure I'm right. You were expecting to receive an increase to your, like, a bonus or lump sum payout, right?
A I never got a lump sum payout. I was only promised a two percent on my September anniversary date.

Page 82

Q Got it, okay. So trying to pin down the year you moved to exercise technician.
A I don't have my folder with me.
Q No problem. All right. Let me give --
MR. FREEMAN: Off the record for a couple minutes, Marc, and then we'll come back.
ARBITRATOR: Why don't you shoot for 1:05?
MR. FREEMAN: That's good.
ARBITRATOR: So Ms. McBride, you have to stay here. You can mute yourself, kill your camera until 1:05. Everybody else can go to their breakout rooms, and I'll see you all at 1:05.
(Brief Recess)
ARBITRATOR: Back on the record. Hospital's witness on cross examination.
MR. FREEMAN: No further questions.
ARBITRATOR: Oh. That was easy. Okay, Miss McBride, you're free to move about the country and do whatever you want.
MS. MCBRIDE: Thank you so much.
ARBITRATOR: It's 1:09, and I think a lunch break is probably appropriate before

Page 83

hearing the next -- I mean, Ian, am I correct the Union is resting subject to rebuttal?
MR. RUSSELL: Yes.
ARBITRATOR: Let the record show that. What do the parties think they need for a lunch break? It's now 1:09. When can we resume?
MR. FREEMAN: I think we could just do the rebuttal. It'll be less than 15 minutes.
ARBITRATOR: How about 1:30?
MR. FREEMAN: Okay. Or I could just do it?
ARBITRATOR: Ian, what do your folks need?
MR. RUSSELL: I'm sorry, Matt, are you like giving an opening or just doing the rebuttal, or what's the --
MR. FREEMAN: Yeah, giving an opening. I think that's it.
ARBITRATOR: You mean you're not calling any witnesses?
MR. FREEMAN: I don't think so, no.
ARBITRATOR: Okay. Then let's take a -- let's get back at 1:30 and we'll do it then.
MR. FREEMAN: Perfect.

Page 84

(Luncheon Recess)
ARBITRATOR: Welcome back. Let me see where we are here. Just to recount, the Union has rested subject to rebuttal, correct?
MR. RUSSELL: Yes.
ARBITRATOR: And the employer has indicated, unless there has been a change, that it is not intending to call any witnesses, that it is simply going to -- well, I shouldn't say simply, is going to present something in the nature of an opening statement. Okay. And of course, I anticipate we will be filing post hearing briefs anyway; is that correct?
MR. FREEMAN: Yes.
ARBITRATOR: Okay.
MR. FREEMAN: She likes writing briefs.
MS. KREZMIEN: I love writing post hearing briefs.
ARBITRATOR: Oh, okay then.
MS. KREZMIEN: I live for it.
ARBITRATOR: Okay. All the more power to you, my friend. In that case, Matt, we will hear the employer's statement.
MR. FREEMAN: Great, thank you.

Page 85

STATEMENT BY MR. FREEMAN
MR. FREEMAN: So, you know, as I think everybody already knows, the employer's position here is that the matter is not substantively arbitrable. That's an issue we're allowing the federal court to decide. The employer is also arguing the matter is not procedurally arbitrable. My former colleague, Bob Morsilli, made that argument in the opening, so I'm not going to repeat it here.
So, what I'll do briefly is just address the merits of the Union's case, assuming that both of those arguments were to be lost just for the sake of preserving our argument on the merits. Although, thematically the issues with the Union's case harken back to both of those arbitrability issues. And that's because essentially the Union is operating from the premise that employees in the bargaining unit, the employees listed on their chalk, with September anniversaries, basically, were entitled to a two percent increase.
And they're making it sound as though that two percent increase was automatic, but

Page 86

that's simply not the case based on the plain contract language. And so we heard testimony from Andy Rodgers that they came up with the two percent based on the concept of advancement on the wage grid that appears in the contract.

But he also said that the Union didn't actually apply the wage grid in conducting the analysis that led to the conclusion that employees are entitled to a two percent increase. And that is really where the problem is.

So I'll share my screen. So the wage grid is on the right, and so we're in agreement that the Greater Boston wage grid would be the applicable wage grid. So, you have a few different kind of issues when you look at this, because as you can see on the grid itself, you've got grades, and we talked a little bit about grades in the testimony. I asked the witnesses what grade they were. They pretty readily knew the answer to that question, because I think it's an important determinant, is my guess, as to what wages people are paid at Steward.

And then the other one is years of service. I can never remember which is the x and

Page 87

y axis anymore, but years of service, relevant experience, going across. And so all of those kind of matter, because if you look at the contract language, which I put over on the right. Oh, and by the way, if you were interested, there's towards the back of the contract, this is the exhibit that has all the different grades with the different titles. If you want to look at that.

But if you go back to the contract, and that's where we're going to focus on, and I talked about this, you know, we asked about this language briefly. But you do have these two sections, and what you have here, and it's pretty clear reading the language, is the implementation of a wage scale in this contract. And so I've been through this, implementing a wage scale for the first time is a challenge.

And so they did this, and so you have kind of your initial wage increases, so how the parties are going to handle putting in people on the scale to begin with. And then you have your subsequent increases after the scale is kind of implemented, and what's going to happen year over

Page 88

year.

And this year over year piece has two components to it, and both of these are talked about a little bit in testimony. One is what I'll call a catch-up provision. You heard Andy Rodgers talk about this, I think the four percent increases, where people get more of an increase if they're behind on scale to catch them up.

Then you also have a slowdown provision, so people who are above or paid more than placement on the scale, they get a two percent lump sum bonus and remain on step. They don't move on step. So differentiations for that.

Now, whether or not people were on scale or above it question is a challenge. Because we would need to know where Steward had people positioned on the scale. And that depends on a couple of things. We talked about them a little bit, right.

The first is the Steward hire date. So if we look at the section that talks about how employees are determined to be on the scale, it's up here in this section, understandably, where

Page 89

they're implementing the scale, where they say that you've got non-technical business office clerical positions. It's years of relevant experience determined by the workers' Steward hire date. And the Union acknowledged through Mr. Rodgers' testimony that they're not sure how Steward determined what the Steward hire date was, or whether there was a difference between the Steward hire date and the hire date listed on the information that Steward had provided to the Union. Those hire dates dating back to the 1980s, well before, as Mr. Matthews helped us out, Steward acquired Good Samaritan Medical Center in 2010.

So, there's some questions to be asked there that are kind of unanswered. And then you have the workers in professional, technical, and licensed trades, where experience depends maybe on when they got their license or relevant experience in an equivalent position.

So, again, sort of more questions as to where people fall on the scale. And then you heard about people moving grades, and both of our witnesses today testified about changing grades,

Page 90

so there's all that that goes into the analysis as well.

The reason I mention all that is because there are a lot of questions there about how this would work in an analysis that would have to happen to determine how Steward might have made decisions back in September 2024 to decide whether people should have moved on the scale, or whether they should have gotten a lump sum bonus.

And if you look at the MOA, the extension agreement, it certainly suggests that this is kind of what was happening at the time, because it specifically talks about, like, for example, this November 1, 2024 increase being two percent across the board, including workers who have fewer than 20 years of experience, whose current rate is above their experience step rate.

So, in other words, different from the contract, which says that those folks get a lump sum bonus in this MOA, they're going to get an increase in May and November. And by the way, that increase in May, very likely, although we don't know, would have impacted people's

Page 91

placement on that grid, whether they were at or above or below their place on the step scale, because they got an across the board increase that would have moved them above scale in some cases, probably.

And I know I have a lot of unanswered and indeterminate statements there for a reason. The reality being that this deal, BMC didn't take on that decision making and figure out all of the machinations that Steward may or may not have done to figure out what to give people and what they were owed.

And so trying to go back and recreate that history is, through this exercise, I think, shown to be really not doable, right. We have -- the Union has a burden in this case to put on evidence to show that the contract was violated.

So they had two witnesses testify, and they have information about the wage rates of other employees that show that they only got two percent of increases between July and December of 2024, but it doesn't get into where they were on the step scale, whether they were considered to have a Steward hire date or different hire date,

Page 92

or what their experience rate was, what grade they were, where they moved, or any of those other things that would go into the analysis of whether or not people were entitled to an increase to their base rate or a lump sum bonus payment.

And the Union testified that for the majority of the folks on that list, they don't know whether they got a lump sum bonus payment, and they didn't ask. So they just have failed to establish a practice that's consistent and regular, that would be something that would now allow the arbitrator to somehow read something into the contract that's different from the language. It's a very high burden. They haven't met that burden.

So even if this was Steward defending the case, I would say the Union hasn't met their burden of establishing a practice that would possibly result in a violation of the collective bargaining agreement, and certainly not with respect to a situation where BMC would be responsible for it.

So based on that, the hospital rests.

Page 93

ARBITRATOR: Okay. Just, and I know I'll be reading more about this in the brief, but I just want to clarify one thing.

So is it now, I shouldn't say now. Is it BMC's position that the collective bargaining agreement in effect in September of '24 made no provision for an automatic anniversary increase?

MR. FREEMAN: Yes. Based on its plain language.

ARBITRATOR: Okay. All right.

MR. RUSSELL: Well, my question is, I know they only put on an opening and no witnesses, but it's the first time the Union has for their position. Can I put on a rebuttal witness?

ARBITRATOR: I see no reason why not.

MR. RUSSELL: Okay. Then the Union calls Helene Benedict.

ARBITRATOR: Okay.

MR. FREEMAN: Hostile witness.

ARBITRATOR: I'd like to know -- in the context of labor arbitration, I would rather say adverse witness.

MR. FREEMAN: Well, I'm going to object

Page 94

to that, because, you know, all I'm saying is that the contract speaks for itself, as we already testified to, and talked about quite a bit.

ARBITRATOR: Well, since I don't know what he's going to ask Ms. Benedict, I can't sustain the objection. We'll take it as, you know, since we're doing movies and stuff, we'll take it as time goes by.

MR. FREEMAN: Okay. In that case, I'd like a caucus to talk to my team before we start that testimony. She hasn't testified yet, so she's not --

ARBITRATOR: I know. I just -- how long do you need?

MR. FREEMAN: I'd like half an hour.

ARBITRATOR: All right. 2:15?

MR. FREEMAN: Sure.

ARBITRATOR: Look, we're having just a late lunch. Anyway, Ian, so Miss Benedict's going to be in the breakout with him, and Matt's absolutely correct that she has not started her testimony, so it's entirely appropriate for them to consult. So we'll see you at 2:15.

Page 95

(Brief Recess)

ARBITRATOR: We're back on the record. I believe, unless there's been a change of mind, that the Union is calling us a rebuttal witness Ms. Helene Benedict; is that correct, Ian?

MR. RUSSELL: Yes.

ARBITRATOR: Ms. Benedict, if you would unmute yourself. You thought you flew below the radar today, huh?

MS. BENEDICT: No so fast, right.

MR. FREEMAN: I'm going to be in trouble for this, for sure.

ARBITRATOR: Anyway, Ms. Benedict, are you alone where you are?

MS. BENEDICT: Okay. Put your cell phone aside or out of reach. Thank you. And if you would please raise your right hand.

HELENE BENEDICT, DULY SWORN

ARBITRATOR: Would you please state and spell your name for the record, please?

MS. BENEDICT: Yes. It's Helene, H-e-l-e-n-e, Benedict, B-e-n-e-d-I-c-t.

Page 96

ARBITRATOR: Okay. Ian, your witness. By the way, I just want to caution, since you're being called as an adverse witness, he can ask you leading questions that will call for just a yes or no response. I'll give you the same caution I gave to everybody else, because you're human, you're going to want to say yes, comma, and explain. Stop at the comma. Matt will have a chance to fill in the blanks. Okay?

MS. BENEDICT: Okay, thank you.

ARBITRATOR: Ian, your witness.

REBUTTAL EXAMINATION

BY MR. RUSSELL:

Q Good afternoon, Ms. Benedict.
A Good afternoon.
Q What is your current title at BMC?
A Senior Director of Employee and Labor Relations.
Q Okay. How long have you been in that position?
A Senior director since October of 2024.
Q Okay. Since October of 2024. And what position were you in before that?
A Director of Employee and Labor Relations.

ARBITRATOR: Let me ask this question, if I can. Prior to October 2024, you were Director of Employee and Labor Relations for whom?

Page 97

MS. BENEDICT: Boston Medical Center.

ARBITRATOR: Okay. Did you ever work at Good Sammy before the acquisition by BMC?

MS. BENEDICT: No, I did not.

ARBITRATOR: Okay. That's what I was -- all right, go ahead.

Q Okay. Since October 1st of 2024, have you played a role in HR issues at what is now BMC South?
A Did you say since October 20, 2024?
Q Since October 1, 2024.
A Yes.
Q Okay. What role have you played in general in HR issues at that hospital?
A I have been developing relationships with the organizers at SEIU, also been available for questions, mostly from the organizers. I helped with the major onboarding of all the employees from the two hospitals that we purchased back in 2024.
Q In this case, there's a document in the record, which is a response to an information request,

Page 98

and it's about pay adjustments that have been made to the pay of certain employees since October 1st of 2024. Are you familiar with that document?
A Can you show it to me?
Q Yes.
ARBITRATOR: Ian, could you tell us what exhibit number it is, please?
MR. RUSSELL: It's, I believe it's Union Exhibit 8.
Q I should be sharing it. Can you see that that document that's on the screen, Miss Benedict?
A I can, yes.
Q Okay. Are you familiar with this document?
A I am.
Q Okay. So my understanding, and you can -- actually let me just ask you. What's your understanding of what this document shows?
A This was a document I put together that showed increases in pay for a certain amount of time. I don't remember what the time period was, for certain employees, what their increases in pay were.
Q Okay. Are these increases that are -- the

Page 99

increases that are reflected on here, were those provided by BMC at BMC South?
A I can't say if they're BMC South. Based on the dates that are on this document, yes, they would have been provided by Boston Medical Center. Yes.
Q Okay. And you said you played a role in creating this document; did I hear you right?
A I did, yes.
Q And is it your understanding that this document was created in response to an information request about this case?
A I don't remember.
Q Okay. So I'm going to scroll down here on this document, and I'm going to -- I'm just going to have you look here at Scott Matthews. Do you see where he's listed on this document?
A I do.
Q You were present for Scott Matthews' testimony earlier today, right?
A Yes.
Q Are you aware that he is an employee at BMC South?
A Yes.

Page 100

Q Okay. Am I correct that, according to this document, he received a two percent step increase on September 21, 2025?
A Correct.
Q Okay. Do you know, as far as you are aware, would that be an anniversary increase?
A This doesn't say it's an anniversary increase.
Q It says it's a step increase. What's your understanding of what that means?
A That's typically, yes, an anniversary increase.
Q Okay. Do you have an understanding as to why he would have received a two percent increase?
A If -- so, here I say a two percent step increase was given to him on 9/21. That would have been his anniversary date.
Q Okay. Do you have an understanding as to why it would have been two percent?
A The steps are two percent in the contract.
Q Okay. So is it your understanding that this reflects an increase, you know, moving up one step on the scale?
A Yes.
Q Okay. And now the 9/21, does that reflect that that's his anniversary date?

Page 101

MR. FREEMAN: Objection. I guess just foundation for whether she has knowledge of that, I suppose.
ARBITRATOR: Well, I mean, she could say yes, no, or I don't know.
MR. FREEMAN: Okay, fair enough.
A I don't know what his anniversary date is. I don't want to make an assumption.
Q Okay. Do you know any reason other than September 21st being his anniversary date, why he would have received a two percent step increase on that date?
A No.
Q Looking, I've highlighted on here Laurie McBride; do you see that?
A Yes.
Q This also reflects that she received a two percent step increase on September 12, 2025?
A Yes.
Q Okay. Is there any reason other than September 12th being her anniversary date why she would have received a two percent step increase on that date?
A Not that I know of.

Page 102

Q Okay. What information did Steward, not Steward, did BMC rely upon to provide step increases to employees at BMC South in 2025?

MR. FREEMAN: I'm just going to object to the relevance of how BMC determined how to do step increases in 2025, because they had owned the hospital, they had to make some kind of determinations, and I guess relevant to how Steward may or may not have made decisions in 2024.

ARBITRATOR: Put it this way, the question is relevant. Your point is well taken. It goes to the weight. Go ahead. Overruled.

A Can you please repeat?

Q My question was, what information did BMC rely upon to provide step increases to employees at BMC South in 2025?

A We received data from Steward, which included anniversary dates.

Q Okay. And do you know what information was relied upon to determine if someone was owed a step increase in a particular year?

A I'm sorry, can you -- can you rephrase that? I'm not sure what you're asking, actually.

Page 103

Q What information would you look at -- is there -- let me ask this. Beyond someone's anniversary date, what information, if you're aware, did BMC look at to determine if someone was owed a two percent step increase?

A We only had the anniversary date to rely on. We didn't have any history.

Q Okay. So based on having the anniversary date, it was determined by BMC that the employees who are listed on here as receiving step increases in September were owed a step increase in September of 2025; is that right?

MR. FREEMAN: Objection.

ARBITRATOR: Overruled.

A I apologize. Ian, can you just state that again? It was a lot.

Q So -- sorry. I had asked you what information you relied upon, or BMC would have relied upon, to determine if someone was owed an increase on these dates. And you said you had the anniversary dates. So I am asking, does that mean that all you needed was the anniversary date to determine that someone was owed a two percent step increase on the dates listed here in

Page 104

September of 2025?

MR. FREEMAN: I'm just objecting to the extent it's calling for a legal conclusion as to whether or not something was owed versus whether or not they decided to pay it.

ARBITRATOR: Well, the witness can answer the question as she sees fit.

A So we had the anniversary date, and we moved people based on those anniversary dates that we received from Steward. Prior to 10/1, we had no data. So would have moved people, or we moved people on the date that we were given as their anniversary date. I'm not -- I apologize, I'm not sure that answers -- you can ask it again, but it's a confusing question.

Q I mean, I'll take the answer that you've given. And I don't want to go through each of these people necessarily, but if this document shows someone receiving what is called on here a step increase on a particular date, does that mean that they received an anniversary step increase on that date in 2025?

A Yes.

Q And then in the column to the left of that, where

Page 105

it has a date that's November 10, 2025, and then it says two percent ATB, what does ATB refer to?

A Across the board increase.

Q Okay. Am I correct that that was the two percent across the board increase that was owed to employees in November of 2024?

A Yes, it was in the extension.

Q Okay, right. I'm asking in part because it says the date that's given on some of these is November 10, 2025, but my understanding is that, and you can tell me if I'm wrong, is that the across the board increase was actually provided in November of 2024; is that right?

A Yes, you are correct.

Q Okay.

A It was 2024.

Q And there wasn't a second across the board increase in November of 2025, was there?

A Correct. There was not.

Q Okay. Did BMC have access to Steward's payroll system with information prior to October 1, 2024 for any period of time following BMC taking over BMC South?

A Not that I'm aware of.

Q What information did you receive from, to your knowledge, did BMC receive from Steward regarding employee pay rates as of October 1, 2024?
A I don't know what we actually received. I just know what was loaded into Workday.
Q Okay. You don't personally know what was received?
A No.
MR. RUSSELL: I'm going to take a short caucus. I think I just need five minutes.
ARBITRATOR: Okay. Well, you know, Matt and Ashley can go to their breakout room. Ms. Benedict, do what you want for the next five, except talk with anybody about your testimony. It's 2:37. We'll come back at 2:45.
(Brief Recess)
ARBITRATOR: Back on the record. Matt, your witness?
MR. FREEMAN: It's Ian.
ARBITRATOR: I've lost track.
MR. RUSSELL: Yes, I was still -- I don't have any other questions for this witness.
ARBITRATOR: Oh, I was right the first time. Matt, your witness.



MR. FREEMAN: I have nothing for this witness.
ARBITRATOR: Okay. You too then are free to move about the country. Does the Union have any further rebuttal evidence?
MR. RUSSELL: I just -- I actually really only need -- I need two more minutes with Andy, and then I should be able to say that we're done, I think. But just have to double check.
ARBITRATOR: Okay. Let me just ask this question. Matt, are you anticipating any surrebuttal evidence?
MR. FREEMAN: No.
ARBITRATOR: Okay. So 2:48. 2:52. And Ms. Benedict, you can go this time.
(Brief Recess)
ARBITRATOR: Back on the record. Does the Union have any further rebuttal evidence?
MR. RUSSELL: No.
ARBITRATOR: Okay. And the employer has no surrebuttal evidence, so that would indicate that we have completed the evidentiary phase of the proceedings.
I know the parties intend to file post



hearing briefs. So, I don't think we need to affix the exact date right now. I'm going to figure -- Sue, would I be correct in figuring roughly two weeks to transcript?
COURT REPORTER: Correct, two weeks, yes.
ARBITRATOR: Okay. So that's just -- okay. So now we would normally talk about starting off with 30 days after transcript, but I don't know about people's vacation schedules, and I would certainly encourage everybody to take them.
So, given your vacation schedules, what's a realistic target to set the initial date for there's, an initial time period for their submission?
MR. FREEMAN: Ashley, I'll leave this one to you.
MS. KREZMIEN: So does everybody want one month from when we get the transcript?
ARBITRATOR: Ashley, tell us what you need as a starting date. It's going to be extended anyway, no matter what I do.
MS. KREZMIEN: Well, I'm not going on



vacation until August 9th. I can't speak for Ian.
MR. RUSSELL: I'm pulling out the calendar. So we got the 22nd today. We're probably not there -- so we'd be looking at like around the 6th, potentially for it.
MS. KREZMIEN: How about this, can we do August 21st; does that work for everybody?
ARBITRATOR: Ian?
MR. RUSSELL: I'm just double checking, I'm looking at my own vacation thing here, and hearing dates. Yeah, I think the 21st works for now. If we need to adjust --
ARBITRATOR: Okay. And I just ask that we can, if we're going that long, which you have no problem with, you know, I trust you both do your best to avoid extensions. Okay, I thought so. I have to say that, you know, it's in the playbook.
I'm going to inform the Labor Relations Connection that by agreement of the parties, the briefs will be due to be sent to the Labor Relations Connection on or before August 21, 2026. With that, I want to thank everybody for

everything they did. I want to wish everybody a good summer, and since you mostly appear to be taking vacations, I hope you enjoy them, even though Ian's child is about to enter the terrible twos.

MR. FREEMAN: Maybe in like five years you'll get a vacation, six years, something like that.

MR. RUSSELL: We are doing a family trip to Ireland with some extended family, so yeah, I'll get to experience an 18 month old.

MR. FREEMAN: Yeah, I'll repeat it: five or six years, you'll get a vacation. Family trips, sure.

(Off the record discussion)

ARBITRATOR: Ian, if it's beforehand, I hope you have a very good trip. And Mr. Rodgers and Ms. Benedict, same to you. And Sue, as always, thank you for you for being the most important player here. I can call us adjourned at this point. Do you need me to keep the meeting open for some period, so that you can confer with your folks? I'm happy to do that.

MR. RUSSELL: Sure, just for five



minutes.

MR. FREEMAN: Sure.

ARBITRATOR: I won't close it till 3:15. Thank you, all.

(Whereupon, the arbitration in the above-entitled matter concluded at 2:57 p.m.)



ERRATA SHEET

CASE: 1199SEIU UNITED HEALTHCARE WORKERS EAST AND BOSTON MEDICAL CENTER (SOUTH)

DAY 2: TESTIMONY OF ANDY RODGERS, SCOTT MATTHEWS, LAURIE MCBRIDE and HELENE BENEDICT

PAGE LINE PRESENTLY READS SHOULD READ

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________



C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH, SS

I, Susan Baxter, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing arbitration was taken before me on June 22, 2026. The said witnesses were duly sworn before the commencement of their testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 7th day of July, 2026.

Susan Baxter

Susan Baxter, Notary Public
My Commission Expires:
February 12, 2032

**&**

**&** 4:10

**0**

**02109** 2:15
**02116** 2:7

**1**

**1** 9:10 10:10 38:18 43:24 44:5 90:15 97:13 105:21 106:3
**1-113** 1:1
**10** 3:19 13:22 13:23 20:23 56:10,12 57:5 58:4,10 61:16 61:17,21 76:22 105:1,10
**10/1** 104:10
**10/13** 59:15
**10/27** 59:15
**10/27/24** 59:15
**10th** 2:14 77:7
**11** 3:20 58:10 58:23 59:3,7
**1199seiu** 1:9 4:5 112:2
**11:25** 44:16
**11:35** 44:18,24
**11:45** 51:21
**11:53** 52:1
**12** 3:21 9:14,18 9:20 14:12 18:16 59:7,24 60:16 69:5,7 74:24 101:18 113:24
**12.01** 1:4 4:10
**12/20/24** 7:10
**12:12** 64:10
**12:20** 64:11 65:4
**12:28** 66:2
**12:35** 66:2
**12th** 101:21
**13** 3:22 68:21 69:5,10,14 72:8
**14** 3:23 68:22 72:12,13,16 73:12
**15** 3:24 42:8 75:5,6,8,23 79:14 83:8
**16** 81:13
**18** 110:11
**19** 81:16
**1980s** 89:12
**1986** 42:8,10
**1:05** 82:8,12,14
**1:09** 82:23 83:6
**1:30** 83:9,23
**1st** 78:4 97:10 98:3

**2**

**2** 1:16 2:14 4:4 112:4
**20** 13:21 36:24 55:7 90:17 97:12
**2000s** 49:20
**2005** 67:22 68:1
**2009** 53:16,17
**2010** 53:23 89:14
**2018** 58:1
**2020** 10:10 23:24 38:14,18
**2023** 3:18 48:5
**2024** 7:9,10,16 8:7,7 10:5,10 21:6,18 23:3,8 24:4,20 26:6 27:14 29:17 30:4,10,18 32:2 33:20 38:19 39:16 40:9 43:13,14 44:1,5 45:14 46:11 50:2 54:16,19,24 55:1 58:17 61:19,23 62:5 62:16 63:13,17 63:24 68:4,6,9 68:11 73:6 76:22 77:15 78:22 79:5 81:18 90:7,15 91:22 96:20,21 97:1,10,12,13 97:22 98:3 102:10 105:6 105:13,16,21 106:3
**2025** 24:1 42:18,18,21 55:12,14 56:1 67:24 68:14,17 100:3 101:18 102:3,6,17 103:12 104:1 104:22 105:1 105:10,18
**2026** 1:15 109:24 113:8 113:19
**2032** 113:24
**21** 100:3 109:23
**21st** 55:16,18 62:20 101:10 109:8,12
**22** 1:15 113:8
**22nd** 109:4
**24** 1:4 4:10 42:20 55:8 57:3,3 62:9 63:3 93:6

**26** 1:4 4:10
**28196** 113:21
**2:15** 94:17,24
**2:37** 106:15
**2:45** 106:15
**2:48** 107:14
**2:52** 107:14
**2:57** 111:7

**3**

**30** 108:9
**31** 10:10 38:18
**328-25** 1:4 4:9
**3:15** 111:4

**4**

**41** 3:5
**48** 3:18
**49** 3:4
**4th** 2:6

**5**

**53** 3:7
**56** 3:19
**59** 3:20

**6**

**6** 3:4 6:17,21 17:16 41:22 45:6
**6/20/2024** 71:5
**60** 3:21
**61** 3:8
**67** 3:10
**69** 3:22
**6th** 109:6

**7**

**7** 46:18 47:7
**7/20/24** 7:9 71:18,21
**72** 3:23
**75** 2:6 3:24
**79** 3:11
**7th** 113:19

**8**

**8** 47:1,2,3,6,8 98:10
**8/17/2024** 71:23
**8/20** 71:7

**9**

**9** 3:18 47:4,5,5 47:21 48:1 49:1 56:8
**9/1** 57:3
**9/12** 57:3
**9/14** 57:3 74:6 74:9
**9/20/24** 7:9
**9/21** 100:14,23
**96** 3:13
**9th** 109:1

**a**

**able** 33:24 107:8
**above** 25:12 37:1,14 39:9 63:18 88:10,16 90:18 91:2,4 111:7
**absolutely** 94:22
**access** 105:20
**accurate** 7:6 31:5 40:6,14 40:15 50:20 113:13
**acknowledged** 89:5
**acquired** 89:13
**acquisition** 97:6
**action** 1:5 4:11
**actively** 48:22
**actual** 21:8
**actually** 13:9 16:12 24:9 61:24 64:13 70:17 86:7 98:17 102:24 105:12 106:4 107:6
**additional** 10:9 38:17 49:8 79:19
**address** 85:12
**addressing** 23:5
**adjourned** 4:19 110:20
**adjust** 109:13
**adjustments** 98:1
**admonition** 5:13
**advance** 29:9
**advanced** 12:21
**advancement** 86:4
**adverse** 93:23 96:3
**affix** 108:2
**afraid** 52:23
**afternoon** 67:3 96:15,16
**ago** 61:22 62:4 81:4,7
**agree** 15:16,23 18:18 38:24 72:2,5
**agreed** 14:14
**agreement** 8:9 8:11,19 9:1,5,9 10:1 19:3,20 20:2,17 32:7,7 32:12,14 36:1 38:3 43:19 44:10 54:7 61:10 67:19 86:12 90:12 92:21 93:6 109:21

**ahead** 13:15 28:21 32:22 65:16 75:16 76:19 97:9 102:13
**aid** 62:6,9,10
**allow** 92:13
**allowing** 85:5
**alternatively** 16:19
**amanda** 2:21 46:16 69:19
**amount** 56:3 98:20
**analysis** 20:13 37:10,15 39:11 40:13 86:8 90:1,5 92:3
**andrews** 42:7
**andy** 3:3 16:24 20:5 23:7 29:19 42:1 43:21 45:5 48:4 86:3 88:5 107:8 112:4
**andy's** 27:9,15
**ann** 66:19
**anniversaries** 85:21
**anniversary** 1:5 4:11 9:6 10:5,9 12:10 12:20 21:18 22:13 23:18 25:3,9,14 26:5 27:12,13 28:5 29:6,10 32:16 32:19 33:9,11 33:12,13 34:9 34:13,17,21 35:5 37:4 38:17 43:2 45:13 46:3 50:17 54:6,10 54:11,12,17,23 55:4,11,16,19 55:21,23 57:20 67:18,23 68:3 68:10,13 77:14 77:17,18 78:5 78:22 81:24 93:7 100:6,7 100:10,15,24 101:7,10,21 102:19 103:2,6 103:8,21,22 104:8,9,13,21
**annual** 28:4,16 29:10 43:3
**answer** 5:17,19 8:12 11:17 27:22 86:20 104:7,16
**answering** 27:5 29:22
**answers** 104:14
**anticipate** 84:12
**anticipating** 107:11
**anybody** 34:24 35:4 65:7 78:10 106:14
**anymore** 87:1
**anyway** 84:13 94:20 95:13 108:23
**apologies** 65:16
**apologize** 40:20 103:15 104:13
**appear** 73:5 110:2
**appeared** 1:18
**appears** 34:10 86:5
**applicable** 86:14
**application** 8:10,16
**applies** 19:24
**apply** 86:7
**approach** 74:11
**appropriate** 4:22 30:23 82:24 94:23
**arbitrability** 85:17
**arbitrable** 24:5 85:5,8
**arbitration** 1:8 4:4 38:2 93:22 111:6 113:8
**arbitrator** 1:13 4:3,17 5:11 6:1 6:20 8:12 9:13 11:16 12:5,17 13:11 15:10 17:5,11,18 19:13,16 24:9 24:22 25:5,21 26:10,19 27:4 27:17 28:1,11 28:18 29:19 30:2 31:8,13 31:20 32:20 34:1,4,7,15 35:11 39:2,21 39:23 41:12,17 41:23 44:11,16 44:21 45:2 46:16,18 47:2 47:5,9,17,21 49:2,6,9 51:10 51:16,21,24 52:3,6,10,13,20 53:5 55:8 56:9 57:6,9 58:4 59:1 60:1,12 60:20,22 61:1 64:9,13,24 65:3,11,15,19 66:1,4,7,15,20 66:23 68:22 69:2,10,17,22 71:11,24 72:4

72:10,13 73:13 73:17,23 74:2 74:5,13,20 75:12,15,18 79:15,17,20 80:3,9 82:7,10 82:16,19,23 83:4,9,12,19,22 84:2,6,15,19,21 92:13 93:1,10 93:16,19,21 94:5,14,17,19 95:2,7,13,21 96:1,11,24 97:5,8 98:7 101:4 102:11 103:14 104:6 106:11,17,20 106:23 107:3 107:10,14,17 107:20 108:7 108:21 109:9 109:14 110:16 111:3
**area** 71:22
**argue** 25:4 27:10
**arguing** 85:7
**argument** 85:9 85:14
**arguments** 85:13
**article** 9:18,20 14:11 18:16
**articles** 1:4
**articulated** 8:5
**arts** 4:10
**ashley** 2:4 4:15 5:15 6:1 46:14 80:5 106:12 108:17,21
**ashley.krezm...** 2:9
**aside** 95:16
**asked** 17:14 26:8 27:20 50:22 71:7 86:18 87:12 89:15 103:17
**asking** 5:14,16 16:24 25:1 26:3 27:18,19 55:7 65:14 77:13 102:24 103:21 105:8
**assign** 66:1
**assigned** 4:9
**assume** 4:22
**assuming** 7:20 8:20 50:3 85:12
**assumption** 23:19 101:8
**atb** 105:2,2
**attachment** 47:8
**attention** 10:7 14:12 19:19
35:22,24
**audible** 15:9
**audio** 31:7
**audiographic...** 113:11
**august** 58:16 63:3 109:1,8 109:23
**auspices** 4:7
**automatic** 85:24 93:7
**available** 63:1 73:24 97:18
**avoid** 109:17
**aware** 37:9 54:5,22 67:24 99:22 100:5 103:3 105:24
**axis** 87:1

**b**

**b** 7:1 16:14,18 45:8 66:22 95:24
**back** 6:15 8:17 17:22 18:4 19:6 31:19 35:24 39:23 40:4 44:17 51:14 61:23 65:4,11 66:2 77:9 80:19 82:6,16 83:23 84:2 85:16
87:6,10 89:11 90:7 91:13 95:2 97:21 106:15,17 107:17
**barely** 53:9
**bargaining** 8:11,24 9:4,9 19:3,19 20:2 28:23 32:11,14 35:24 44:9 54:7 61:10 67:19 85:19 92:21 93:5
**base** 10:4 92:5
**based** 7:19 21:19 22:15,16 23:17 25:13 27:14 34:7 40:5 43:10,22 72:5 86:1,4 92:24 93:8 99:3 103:8 104:9
**basically** 85:21
**basing** 13:8 21:9
**basis** 23:7,19 24:1,18 26:3 49:5
**baxter** 113:5,22
**bear** 57:15 62:1
**becoming** 55:3

**began** 41:4
**beginning** 14:11 27:2 35:2 38:5
**believe** 5:4 6:13 11:9 26:6 35:20 42:3 43:20 46:19 53:23 61:16,18 69:8 71:4 78:4 80:10 81:13 95:3 98:9
**bene** 74:20
**benedict** 2:22 3:12 80:10 93:18 94:6 95:5,7,10,13,15 95:19,23,24 96:10,15 97:4 97:7 98:12 106:13 107:15 110:18 112:5
**benedict's** 94:20
**best** 45:17,23 109:17 113:12
**better** 31:7
**beyond** 103:2
**big** 6:12 73:21
**bigger** 33:6 57:16
**bit** 11:3 14:11 19:5,22 31:17 51:20 70:3 75:1 86:17 88:4,20 94:4
**blanks** 96:9
**blood** 113:15
**blurrier** 73:4
**blurry** 74:8
**bmc** 7:16 20:10 23:20 24:1 28:6 33:7,12 43:6,12 53:12 55:2,3,5,11,23 59:20 67:4,6,7 68:13 76:24 78:17 79:4 91:8 92:22 96:17 97:6,11 99:2,2,3,22 102:2,3,5,15,17 103:3,9,18 105:20,22,23 106:2
**bmc's** 93:5
**board** 43:24 44:4 90:16 91:3 105:3,5 105:12,17
**bob** 4:15 85:8
**bonus** 37:3 39:8,15 81:21 88:12 90:10,21 92:5,9
**boston** 1:11 2:7 2:15 4:6 43:6,6 59:13 86:13 97:4 99:5 112:3
**bottom** 36:4 73:9 76:2,6,9
**break** 11:14 44:15 64:19 65:14 82:24 83:6
**breaking** 11:3 22:21
**breakout** 44:23 51:20 65:24 82:13 94:21 106:12
**brief** 39:22 45:1 52:2 65:10 66:3 82:15 93:2 95:1 106:16 107:16
**briefly** 40:5,18 41:15 85:11 87:13
**briefs** 84:13,16 84:18 108:1 109:22
**broke** 18:11 26:17
**bullet** 43:23 44:7
**burden** 91:16 92:15,16,19
**burns** 45:22
**business** 15:4 16:20 89:2

**c**

**c** 2:1 4:1 53:4 66:22 95:24 113:1,1
**calculated** 7:19 8:3
**calculations** 8:21
**calendar** 109:4
**call** 5:16 18:24 31:7 51:17 64:15 65:21 84:8 88:5 96:4 110:20
**called** 13:4,10 19:1 25:12 26:13 29:1 49:17 53:12,15 54:13 96:3 104:19
**calling** 32:7 43:18 45:6 52:3 58:10 66:5 83:20 95:4 104:3
**calls** 93:18
**camera** 65:5 82:12
**cappellini** 76:13,14 77:4 77:24 78:21

79:3 81:18
**cardiac** 67:14 80:21
**care** 1:9 65:6
**caritas** 53:20
**case** 4:6 23:7 24:15 33:16 64:18,19 84:22 85:12,16 86:1 91:16 92:18 94:10 97:23 99:12 112:2
**cases** 91:5
**catch** 11:8 88:5 88:8
**categories** 15:23
**caucus** 44:15 64:8 94:11 106:10
**caught** 11:11 11:13,24 78:18
**caution** 96:2,6
**cc'd** 46:6
**cell** 52:11 95:15
**center** 1:11 4:6 4:13,20 20:1 43:6,7 49:17 58:19 59:13 89:14 97:4 99:5 112:3
**center's** 24:12
**certain** 27:21 64:4,5 98:2,20 98:22
**certainly** 24:18 33:24 90:12 92:21 108:11
**certification** 14:8 16:3
**certify** 113:7
**cetera** 24:6,6
**chain** 3:24 76:3 77:3
**chair** 52:24
**chalk** 6:16,21 10:3 17:15 18:7 39:15 40:17 41:22 42:15 45:7 49:22 50:23 85:20
**challenge** 87:18 88:16
**chance** 63:1 96:9
**change** 61:21 81:14 84:7 95:3
**changed** 20:19 64:1 80:19
**changing** 89:24
**charge** 34:5
**chart** 10:14,14 16:11,17 17:19 18:2,13
**check** 46:21 62:21 107:9
**checking** 62:2 109:10
**child** 110:4
**christi** 53:20
**christine** 45:21
**claim** 34:8
**clarify** 17:21 93:3
**class** 1:5 4:10 15:13
**clear** 33:8 39:7 87:15
**clearer** 74:19
**clerical** 15:4 16:20 89:3
**close** 64:23 111:3
**closer** 11:13
**colleague** 85:8
**collective** 8:10 8:24 9:4,9 19:3 19:19 20:2 32:11,14 35:24 44:9 54:7 61:10 67:18 92:20 93:5
**column** 7:2,20 13:3,14,14 16:10 42:3,14 43:8 104:24
**columns** 6:23 7:11,20 10:18 16:24 17:16 45:8
**come** 44:17 51:14 66:2 82:6 106:15
**comfortable** 52:24
**coming** 8:21 13:6 28:6 29:11 46:3 47:19
**comma** 5:18,22 96:7,8
**commencem...** 113:9
**commission** 113:23
**commonwealth** 113:3,6
**communicated** 78:2
**communicating** 46:1
**communication** 78:21
**compared** 11:21
**compensation** 9:15
**complaining** 30:18,23
**complaints** 30:5
**complete** 64:18 113:13

**completed** 107:22
**completing** 37:10
**complied** 4:23
**components** 88:3
**computer** 59:17
**concept** 9:22 13:6 14:5 35:22 86:4
**concern** 50:11
**concerned** 28:7 46:4
**concluded** 111:7
**conclusion** 86:8 104:3
**conducting** 86:7
**confer** 110:23
**confusing** 104:15
**connected** 113:15
**connection** 1:3 4:8 31:17 109:21,23
**consideration** 39:10
**considered** 91:23
**consistent** 36:8 92:11
**constantly** 50:15
**consult** 94:24
**contacted** 45:12,17
**context** 93:22
**continue** 44:8
**continued** 6:5
**contract** 8:17 9:17,23 10:1,4 11:5,19 12:11 12:18 14:6 17:19 18:2,8,9 18:14 19:2,21 22:14 24:21 25:2,14,18 26:14 27:11,15 28:13 32:17,21 32:23 33:2,13 33:21 35:3 36:13 38:5,6,8 39:2 44:11 54:13 80:20 81:3,6 86:2,5 87:4,6,10,16 90:20 91:17 92:14 94:2 100:18
**contrast** 12:20
**contribute** 25:17
**control** 49:16
**controversy** 113:17
**conversation** 27:16
**conversations** 26:12,23 27:21 28:3,22 50:4
**copies** 58:5 74:13
**copy** 48:21 56:21 71:8 74:19
**corner** 58:1 71:15 72:6 73:9
**corporate** 53:18
**correct** 8:4,11 8:15 9:19 16:14 18:3 21:22 27:23 29:3 30:20,24 32:4,8,9,12,13 32:16 39:11,12 40:22 42:12,13 42:19 43:9,15 43:21 44:1,6,7 47:22 50:3 51:16 55:9 57:18 62:16 63:14 67:8,9 68:2,23 69:8 70:18 72:7,14 73:4 74:20 76:5 78:14,15 79:7 81:2 83:1 84:4,13 94:22 95:5 100:1,4 105:4,14,19 108:3,5
**correctly** 12:8 12:23
**counsel** 2:10,17 4:16 80:4,5
**count** 22:17
**country** 65:20 82:21 107:4
**county** 113:4
**couple** 15:2 19:22 82:6 88:19
**course** 84:12
**court** 5:8 30:16 47:11 58:7 85:6 108:5 113:5
**covered** 56:24
**coworkers** 11:13,21
**create** 11:22
**created** 4:18 6:17 99:11
**creating** 99:7
**cross** 3:2 4:21 5:15 6:5 40:1 61:5 79:23 82:17

**current** 21:8 22:2 53:24 54:1 67:13 90:18 96:17
**currently** 31:5 53:11 62:8 67:3
**cut** 75:1
**cycle** 63:8

**d**

**d** 3:1 4:1 7:2 42:3 53:4,4 66:22 95:24
**data** 22:17 102:18 104:11
**date** 7:2 10:5 12:10 15:7,16 17:8,8,10 22:13 32:16 37:4 40:19 41:3 42:4,7 46:3 49:19 50:17 57:20 59:14 67:18,23 71:12,16 77:18 81:24 88:21 89:5,7,9,9 91:24,24 100:15,24 101:7,10,12,21 101:23 103:3,6 103:8,22 104:8 104:12,13,20 104:22 105:1,9 108:2,14,22
**dates** 7:3 10:9 12:20 38:17 73:15 89:11 99:4 102:19 103:20,21,24 104:9 109:12
**dating** 89:11
**david** 53:3
**day** 1:16 4:4 5:5 22:4 59:20 112:4 113:19
**days** 29:1 108:9
**de** 74:20,21
**deal** 91:8
**dealing** 30:22 37:20
**december** 7:10 7:16 8:7 10:10 32:2 38:18 43:14 76:22 77:7 91:21
**decide** 85:6 90:8
**decided** 104:5
**decision** 91:9
**decisions** 90:7 102:9
**defending** 92:17
**defined** 14:6 18:15
**defines** 18:6
**definition** 15:22 18:17
**definitions** 16:6 16:13 18:5
**dentist** 52:24
**depending** 14:9
**depends** 88:18 89:18
**deposit** 3:19
**deposition** 113:14
**derived** 7:3,12 7:13
**describe** 70:8
**described** 4:10
**describing** 30:12
**description** 3:17
**determinant** 86:21
**determinations** 102:8
**determine** 10:2 21:4 40:7 41:1 71:3 90:6 102:21 103:4 103:19,23
**determined** 15:6,15 31:24 33:3 88:23 89:4,7 102:5 103:9
**determining** 8:16
**developing** 97:17
**dialog** 24:11
**difference** 21:11 89:8
**different** 6:22 7:14,15 15:2 15:22 19:23 54:11 70:21 77:21 86:15 87:7,8 90:19 91:24 92:14
**differentiated** 41:7
**differentiations** 88:13
**difficult** 69:23
**direct** 3:2,19 6:22 7:3 8:5 14:12 19:18 31:23 33:1 35:21,23 53:7 67:1
**direction** 113:12
**directly** 113:16
**director** 80:10 96:18,20,23 97:2
**discussion** 110:15

**discussions** 27:9
**distance** 10:18 13:5,10,18 17:11 18:3,12
**doable** 91:15
**docket** 4:9
**document** 6:16 8:21 9:1,7 16:22 17:2 20:3,5 29:20 29:23 40:21 44:19 46:13 48:4,6,8,10,15 49:3 56:15,18 56:23 57:12 58:11,13,15 59:8,10,12 60:2,3 68:20 69:24 70:6,8 71:1,13,22 72:19,23 75:3 75:23 97:23 98:4,12,14,18 98:19 99:4,8 99:10,15,17 100:2 104:18
**documents** 19:12 20:9 43:11 46:23 47:13 70:16,19
**doing** 5:15 8:21 14:3 83:15 94:8 110:9
**double** 107:9 109:10
**draw** 10:7
**dropped** 8:14
**due** 109:22
**duly** 52:18 66:13 95:19 113:9

**e**

**e** 2:1,1 3:1 4:1,1 7:20,22,24 53:4 66:21,22 95:24,24,24,24 95:24 113:1,1
**earlier** 18:15 49:14 99:20
**early** 49:20
**earning** 20:8
**easier** 18:23 47:12 70:3
**easiest** 6:16
**easily** 13:14
**east** 1:9 4:5 112:2
**easy** 82:19
**effect** 93:6
**ehrenberg** 2:13
**eight** 52:1 65:6
**either** 11:7 13:21 16:2
**ekg** 80:20 81:1 81:11
**email** 3:24 48:20 58:8 76:3,6,6,9,12 76:13,22 77:2 77:3,6,9,10,12 77:13,23 78:16
**emailed** 56:7
**emails** 46:6 78:24 79:12
**emma** 45:21
**employed** 41:5
**employee** 21:19 23:11 28:22 41:3 42:6 96:18,23 97:2 99:22 106:3
**employees** 10:2 15:14,23 21:5 23:9,16 24:19 25:8 26:7,8,12 26:21 27:11,16 27:20 29:16 30:5,11,18,22 31:3 32:1 33:3 33:17 40:10 42:15,16,16,23 43:12,24 45:11 45:17 46:9 49:24 50:4,11 85:19,20 86:9 88:23 91:20 97:20 98:2,22 102:3,16 103:9 105:6
**employer** 2:10 84:6 85:6 107:20
**employer's** 84:23 85:3
**employment** 41:4
**encourage** 108:11
**ends** 73:5
**english** 25:10
**enjoy** 110:3
**enter** 110:4
**entirely** 94:23
**entitled** 24:4,19 25:9,11 26:4 30:19 33:4,17 34:9 48:4 85:21 86:9 92:4 111:7
**entitles** 33:22
**entity** 43:5 53:18
**equal** 37:6 63:20,21,23
**equated** 34:10
**equity** 11:22
**equivalent** 16:3 21:21 89:20
**errata** 112:1
**especially** 69:23
**esq** 2:3,4,12

**essentially** 85:18
**establish** 24:18 92:11
**establishing** 92:19
**et** 24:6,6
**eventually** 79:2
**everybody** 9:12 11:15 19:10,15 25:3 29:1,13 31:18 35:10,14 44:22 47:13 64:20 75:4 82:12 85:3 96:6 108:11,19 109:8,24 110:1
**everybody's** 18:22 54:10
**evidence** 63:7 91:17 107:5,12 107:18,21
**evidentiary** 107:22
**exact** 14:7 49:19 108:2
**exactly** 20:22 20:24 23:4 25:20 41:8 50:6
**examination** 4:21 6:5 40:1 41:20 49:12 53:7 61:5 67:1 79:23 82:17 96:13
**example** 90:15
**excel** 20:21
**except** 65:4,7 106:14
**exercise** 67:14 80:14,18,22 81:4,15 82:2 91:14
**exhibit** 9:10 17:16,22 40:5 45:6 49:1 56:8 59:7 72:12 75:4,5,23 87:7 98:8,10
**exhibits** 3:16 35:19
**expected** 31:24
**expecting** 81:20
**experience** 10:18 12:9 13:4,5,10,18,19 13:23,24 14:1 14:2,3,5 15:1,6 15:15,22 16:3 16:7,10,17,23 17:1,5,10,12,17 18:1,3,4,6,12 18:13,15,17 20:23 23:13 37:1,2,5,14 40:11 41:1 87:2 89:4,18 89:20 90:17,18 92:1 110:11
**expires** 113:23
**explain** 13:5 27:1 96:8
**explainable** 13:15
**explaining** 5:19
**explanation** 79:9
**explore** 33:24 34:2
**expressed** 50:11
**extended** 108:23 110:10
**extension** 8:9 8:19 10:1 32:7 43:18,18 90:12 105:7
**extensions** 109:17
**extent** 23:3 104:3
**extracted** 18:24

**f**

**f** 7:20,23,24,24 8:3 113:1
**face** 52:7,7
**fact** 23:6 50:1
**failed** 92:10
**fair** 13:11 17:20 18:7 39:4 63:16 101:6
**fairly** 64:23
**fall** 89:22
**familiar** 61:9 81:8 98:3,14
**family** 110:9,10 110:13
**fan** 6:13
**far** 13:3 42:10 54:22 67:23 76:20 100:5
**fast** 14:22 95:10
**february** 79:1 113:24
**federal** 85:6
**fewer** 36:24 90:17
**fi** 8:14
**figure** 19:23 22:1 23:18 34:12 62:5 91:9,11 108:3
**figuring** 108:3
**file** 107:24
**filing** 84:12
**fill** 96:9
**finally** 38:2
**fine** 5:11 41:17 44:21 69:22 74:2 80:24

**finishing** 41:16
**first** 7:1,16 11:5,19 12:21 12:22 13:14,14 16:19 18:10 21:15 29:14,15 29:18 30:8 36:1 37:3,20 38:6,8 42:3 43:22 51:20 55:15,17,21,24 59:14 66:1 69:6 76:7 77:13,23 87:18 88:21 93:13 106:23
**fit** 104:7
**five** 10:19,21 12:9,19,23 13:9 49:23 51:23,24 64:7 65:23 81:7 106:10,13 110:6,13,24
**flew** 95:8
**floor** 2:6,14
**focus** 87:11
**folder** 82:3
**folks** 83:12 90:20 92:8 110:23
**follow** 39:13 50:16
**following** 37:3 38:24 55:2 68:9 105:22
**foregoing** 113:7
**former** 19:24 85:8
**formerly** 80:24
**forward** 47:10
**foundation** 101:2
**four** 10:19,21 11:10,23 12:22 34:22,24 35:2 35:4,13,23 36:3,9,15 88:6
**free** 65:20 82:20 107:4
**freeman** 2:3 3:4,8,11 4:14 6:3,6,10 11:14 12:2 13:16 17:3,20 19:14 20:11 23:15,21 24:2,17,23 25:20 26:2 31:15,21 33:16 33:20 34:14 39:4,20 40:2,3 41:11 42:20,22 43:20 46:17 49:3,10,13 51:8 57:7,10 57:14,18,22 58:2,24 60:21 61:3,6 64:7,12 65:2,17 71:17 71:20 72:2,9 73:14,20 74:10 74:16 79:21,24 80:4,8 82:5,9 82:18 83:7,10 83:17,21,24 84:14,16,24 85:1,2 93:8,20 93:24 94:10,16 94:18 95:11 101:1,6 102:4 103:13 104:2 106:19 107:1 107:13 108:17 110:6,12 111:2
**friend** 84:22
**full** 5:4,4 36:1 55:15,21
**further** 41:11 51:8 58:3 65:17 82:18 107:5,18

**g**

**g** 4:1 7:20,22 7:23,24 8:3
**general** 97:15
**generally** 35:9
**getting** 20:24 24:23 29:5 30:6,7,19,23 31:4 34:24 36:9,15 37:23 39:9 46:5 50:11 75:15 78:18
**give** 34:4 41:18 44:18 52:15 64:7 82:4 91:11 96:5
**given** 23:11 37:23,24 43:3 100:14 104:12 104:16 105:9 108:13
**giving** 83:15,17
**go** 9:11 13:15 14:8 17:3,22 18:23 19:7 28:21 31:19 32:21,22 39:20 39:23 44:23 47:14 64:1,13 65:16 76:11,19 82:12 87:10 91:13 92:3 97:9 102:13 104:17 106:12 107:15
**goes** 28:19,20 57:17 90:1 94:9 102:13
**going** 4:24 5:1 5:18 6:7,14,15 6:17 9:7,8,11

9:14 14:10,12 16:21 19:2,18 20:4 22:24 24:6 25:16 28:7 40:4 44:14 51:17,24 52:15 56:6 57:11 66:10 68:19 69:5 70:5 73:17,20 75:2,19 84:9 84:10 85:10 87:2,11,21,24 90:21 93:24 94:6,21 95:11 96:7 99:14,15 99:15 102:4 106:9 108:2,22 108:24 109:15 109:20
**good** 6:7,8,9 14:22 19:24,24 26:13 27:19 29:4 36:23 42:11 46:20 49:17 52:6 53:9,10 56:22 58:19 64:15 67:3,7,10 70:15 72:22 76:17,24 82:9 89:13 96:15,16 97:6 110:2,17
**gosh** 76:21
**gotten** 31:3 90:9
**grace** 34:5
**grade** 40:10 61:15,16,17,21 62:10 81:11,13 86:19 92:1
**grades** 86:17 86:18 87:7 89:23,24
**great** 13:17 19:14 31:10 64:12 80:12 84:24
**greater** 86:13
**green** 45:21
**greenbaum** 1:13 4:16 52:8
**grid** 19:1,14,24 20:12 21:7,12 21:20,24 22:4 22:12 35:7 51:13 61:9 63:19 81:9 86:5,7,12,13,14 86:16 91:1
**grids** 19:23
**grievance** 1:4 37:19,22
**grounds** 16:22
**group** 15:13,19 69:18
**gsmc** 48:5
**guarantees** 40:17
**guess** 12:7 17:24 25:15 44:15 48:15 58:10 86:21 101:1 102:8

**h**

**h** 7:20 8:4 43:8 53:4 95:24
**half** 94:16
**hand** 52:15,22 66:11,17 71:15 72:6 73:9 95:17 113:18
**handful** 45:22 50:8,10
**handle** 87:21
**hang** 38:11
**hanging** 51:12
**happen** 20:18 28:7 49:15,18 61:15 62:23 87:24 90:6
**happened** 20:16 24:13 36:11 55:4
**happening** 78:22 90:13
**happy** 32:24 110:23
**hard** 24:15
**harken** 85:16
**head** 22:17
**headcount** 7:16 35:17 40:23 43:10 48:11,12 48:21
**headed** 38:2
**heading** 10:11 38:16
**health** 1:9
**healthcare** 4:5 49:4 53:22 112:2
**hear** 21:15 24:11 30:9 31:10 57:8 64:19 84:23 99:8
**heard** 86:2 88:5 89:23
**hearing** 4:4 24:12 83:1 84:13,18 108:1 109:12
**held** 4:7
**helene** 2:22 3:12 93:18 95:5,19,23 112:5
**help** 35:3
**helped** 89:12 97:19

**helpful** 27:1 33:4
**helps** 31:10 74:8
**hereunto** 113:18
**hi** 6:10 57:10 61:7,8 80:1,2
**high** 92:15
**higher** 63:19,21
**highlighted** 101:14
**hire** 7:2 15:7,16 40:19 42:4 88:21 89:5,7,9 89:9,11 91:24 91:24
**hired** 41:4
**historical** 22:17
**history** 28:8 46:5 50:12,14 63:11 91:14 103:7
**hit** 55:15
**hmm** 30:13
**hold** 62:8
**honest** 41:9
**hope** 110:3,17
**hopefully** 33:6
**hospital** 23:4 27:10 29:18 30:22 41:6 42:11 49:16 53:11,14,19 55:2,3 64:19 65:1 67:7,11 70:15 72:22 76:17 80:4,6 92:24 97:16 102:7
**hospital's** 82:17
**hospitals** 97:21
**hostile** 93:20
**hour** 94:16
**hr** 97:11,15
**huh** 95:9
**human** 5:17 29:8 36:13 46:6 76:15,16 76:24 96:7
**hunch** 75:18,19
**hundreds** 29:2

**i**

**ian** 2:12 4:13 5:20 17:4,21 17:23 34:4 41:12 45:2 51:16 53:5 64:14 65:12 66:4,23 69:17 71:11 74:14 83:1,12 94:20 95:5 96:1,11 98:7 103:15 106:19 109:2,9 110:16
**ian's** 25:23 75:16 110:4
**idea** 13:8 21:19 24:13 39:7 40:7
**identification** 46:19 47:3,22 48:2 56:10,13 59:4 60:17 69:11,15 72:17 75:9
**imagine** 73:21
**impacted** 90:24
**implementati...** 87:15
**implemented** 87:24
**implementing** 87:17 89:1
**important** 86:21 110:20
**incentive** 77:14 77:17,18,20 78:5 79:4
**included** 102:18
**including** 90:16
**increase** 7:19 7:21 9:6,23,24 10:4 21:21 22:8,10 23:2,5 23:10,17,23 24:4,19 25:3 25:12 26:5,15 27:12,13 28:5 28:16 29:10,11 32:10,15 33:3 33:9,10,18,19 33:23 34:9,13 34:17,21 36:3 36:17 37:23 38:1,22 39:9 39:16 40:8 42:17 43:2,3,4 43:9,10,12,24 44:4 45:13 46:8 50:2,12 50:17 51:2 54:6,13,17,23 55:5,11,23 56:4 63:13 68:4,10,13,16 77:21,22 78:14 78:23 81:20 85:22,24 86:9 88:7 90:15,22 90:23 91:3 92:5 93:7 100:2,6,7,8,10 100:12,13,20 101:11,18,22 102:22 103:5 103:11,19,24 104:20,21 105:3,5,12,18
**increases** 1:5 4:11 8:8 10:9 11:10,23 12:19

20:18 21:18 29:6 30:7,19 30:24 31:4 32:2,5,19 33:12,14 35:4 35:15 36:10 38:13,17,23 42:24 50:19 87:20,23 88:7 91:21 98:20,22 98:24 99:1 102:2,6,16 103:10
**indeterminate** 91:7
**indicate** 46:9 107:21
**indicated** 31:23 84:7
**indicates** 44:8
**indirectly** 113:17
**inform** 109:20
**information** 26:7 47:7 89:10 91:19 97:24 99:11 102:1,15,20 103:1,3,17 105:21 106:1
**initial** 38:13,22 87:20 108:14 108:15
**ink** 25:9
**instruction** 4:22
**intend** 107:24
**intended** 11:21 38:5
**intending** 84:8
**intent** 11:9 35:1
**interested** 87:5 113:16
**interpretation** 18:9 39:1
**interrupt** 67:21
**introduce** 6:10
**inventory** 54:1 62:7
**iphone** 66:9
**ireland** 110:10
**irussell** 2:16
**issue** 24:3,3 26:22 29:3 31:18 37:15 41:2 46:1 73:21 74:7 77:24 85:5
**issues** 85:15,17 86:15 97:11,16
**it'll** 83:8

**j**

**jackson** 2:5
**jacksonlewis....** 2:8,9
**january** 10:10 29:17 30:4,10 30:17 38:13,18 78:24
**job** 7:1 14:9 53:24 62:2,6,7 67:13
**joint** 9:10
**july** 7:9 32:2 43:13 63:3 91:21 113:19
**june** 1:15 71:7 113:8

**k**

**k&l** 42:21
**karen** 45:22
**keep** 110:21
**kid** 6:13
**kill** 65:5 82:11
**kind** 6:23 7:18 10:14 14:13 16:10 18:5 27:1 37:10 40:7 41:1 57:19 86:15 87:3,20,23 89:16 90:13 102:7
**knew** 24:1 28:5 29:10 36:11 86:19
**know** 5:12 13:6 13:20 14:7,20 21:1 22:15 24:24 25:15 26:24 27:3 29:4,12 30:3 31:8 33:5,15 34:10 36:10 40:24,24 41:2 41:2,6,8,9 42:10 45:19 49:15,18,19 50:7 53:18 61:11,15,19 62:10 63:15 64:16 66:7,9 73:14,17 74:8 76:20,21 78:10 78:11 80:9,10 81:11 85:2 87:12 88:17 90:24 91:6 92:9 93:1,12 93:21 94:1,5,8 94:14 100:5,20 101:5,7,9,24 102:20 106:4,5 106:6,11 107:24 108:10 109:16,18
**knowledge** 101:2 106:2 113:12
**known** 80:20 80:21,24

**knows** 85:3
**krezmien** 2:4 4:15 47:1,4 80:5 84:17,20 108:19,24 109:7

**l**

**l** 66:21 95:24
**labeled** 13:4 75:4
**labor** 1:3 4:7 80:11 93:22 96:18,23 97:2 109:20,22
**lack** 64:17
**land** 6:13
**language** 14:7 27:15 33:22 35:1 37:9 86:2 87:4,13,15 92:15 93:9
**large** 19:15
**late** 94:20
**laurie** 3:9 45:20 65:21 66:13,18 66:18 67:3 69:23 72:19 73:23 75:15 101:14 112:5
**lead** 13:17 54:2
**leading** 96:4
**learn** 26:7
**leave** 108:17
**leaving** 28:6
**led** 86:8
**left** 13:3 19:20 57:24 72:6 73:9 104:24
**legal** 104:3
**lewis** 2:5
**liberty** 2:14
**license** 89:19
**licensed** 15:21 89:18
**licensure** 16:2
**lieu** 39:16 51:2
**life** 44:9
**likely** 5:14 90:23
**likes** 84:16
**line** 20:22 31:16 112:6
**list** 3:18 16:23 39:15 43:13 45:8 48:5 49:24 50:5,23 92:8
**listed** 16:24 42:6,7 45:11 73:8 85:20 89:9 99:17 103:10,24
**little** 11:3 14:11 19:5,22 31:17 51:19 71:4 73:4 74:7 75:1 76:10 86:17 88:4,20
**live** 84:20
**loaded** 106:5
**long** 28:8 41:5 51:22 53:14 54:3 67:10,15 94:15 96:19 109:15
**look** 6:18 9:21 10:13 14:1 19:4,10 29:20 29:22 37:12 40:9,16 48:5 60:7 61:24 62:18,20 79:11 79:12 86:15 87:3,8 88:22 90:11 94:19 99:16 103:1,4
**looked** 37:17 62:19
**looking** 9:20 10:8 13:2 18:2 18:6,14,16 21:4,6,8 24:7,7 29:23,24 36:1 42:1,2,14 56:23 57:14 60:6,13 62:3 69:23 70:16,23 71:1,6 73:3 101:14 109:5 109:11
**looks** 15:1 41:23 48:11 71:23,24 74:5 74:9 76:3 77:3 77:8
**lost** 85:13 106:20
**lot** 11:20 20:16 29:2,13 90:4 91:6 103:16
**loud** 14:19
**love** 84:17
**lower** 57:24 72:6
**lowest** 62:14
**lump** 37:2,23 39:8,15 46:10 50:24 51:1,3 54:19 62:16 68:6 81:21,22 88:12 90:9,20 92:5,9
**lunch** 64:18 82:24 83:5 94:20
**luncheon** 84:1
**lynn** 42:7

**m**

**m** 42:14,14 53:4 66:22
**ma** 2:7,15
**machinations** 91:10

**made** 20:19 33:15 45:7 85:9 90:7 93:6 98:2 102:9
**major** 97:20
**majority** 28:24 92:8
**make** 6:13,19 18:22 29:9 31:6 33:6,8 39:6 46:22 47:2 50:15 57:16 64:20 70:3 73:20 81:19 101:8 102:7
**makes** 18:23
**making** 24:15 50:18,19 85:23 91:9
**marc** 1:13 4:16 6:3 12:3 13:1 52:7 73:15 74:11 82:6
**marcgreenba...** 1:14
**marked** 48:1 56:12 59:3 60:16 69:14 72:16 75:8
**marriage** 113:15
**massachusetts** 113:3,7
**materials** 62:6 62:9,10
**matt** 4:14 5:14 5:14 6:1,10 12:6 13:15 24:9 27:20 28:18 31:13 39:24 46:14 57:6 60:20 61:1 64:24 65:13 74:14,15 79:20 80:3 83:14 84:22 96:8 106:12,17 106:24 107:11
**matt's** 94:21
**matter** 1:8 28:3 85:4,7 87:3 108:23 111:7 113:17
**matthew** 2:3
**matthew.free...** 2:8
**matthews** 2:23 3:6 45:19 51:17 52:4,6,9 52:12,18 53:3 53:3,9 57:10 57:13,21,24 60:5,9 61:7 64:9 65:4,9,19 89:12 99:16,19 112:4
**mcbride** 3:9 45:20 65:21 66:5,7,13,18,18 66:19,21,22 74:1,3,17 75:2 75:17,21 80:1 80:7,12 82:10 82:20,22 101:14 112:5
**mean** 16:16 17:13 20:14 23:1,4,6,20 25:2 28:19 33:7,16 67:21 71:14 73:14,19 74:3,9,9,10 77:17 83:1,19 101:4 103:22 104:16,20
**means** 10:24 100:9
**meant** 50:14 55:8
**medical** 1:11 4:6,13,20 20:1 24:12 43:6,6 49:17 58:19 59:13 89:13 97:4 99:5 112:3
**meeting** 29:16 110:22
**meetings** 28:10 30:11,17
**members** 28:10
**membership** 3:18 28:10 48:5
**memorandum** 32:6
**memory** 45:18
**mention** 90:3
**mentioned** 8:20 9:16 18:20 35:22 49:23
**merits** 24:14 28:21 85:12,15
**met** 52:7 92:16 92:18
**mic** 65:6
**middle** 14:13 15:3
**mind** 34:4 95:3
**minute** 14:1,18 22:15
**minutes** 51:23 64:7 65:7,23 82:6 83:8 106:10 107:7 111:1
**misleading** 13:2
**misspeak** 79:12
**mistakes** 50:15 50:18
**mm** 30:13
**moa** 90:11,21

**moment** 18:8 19:12,21 24:14 75:16
**monday** 1:15
**month** 7:15 29:9 48:20,21 55:18 78:18 108:20 110:11
**months** 46:7
**morning** 6:7,8 6:9 52:7 53:9 53:10
**morsilli** 4:15 85:8
**mou** 23:11 25:13 32:18 43:19 44:4
**move** 12:11 19:5,9,22 48:24 57:5 58:22 59:23 60:10 72:7 73:11 79:13 81:4 82:20 88:13 107:4
**moved** 82:2 90:8 91:4 92:2 104:8,11,11
**movement** 10:20 12:13 21:6,10
**moves** 21:19
**movies** 94:8
**moving** 89:23 100:20
**msn.com** 1:14
**multiple** 33:14
**mute** 82:11

**n**

**n** 2:1 3:1 4:1 66:21,21 95:24 95:24
**name** 5:5 6:12 7:1,1 40:20 53:2 66:16 95:22
**names** 45:9 50:6
**nature** 84:11
**necessarily** 20:24 22:5 104:18
**necessary** 74:23
**need** 5:6 41:14 41:15 44:19,22 51:13,19 65:23 70:17,24 83:5 83:13 88:17 94:15 106:10 107:7,7 108:1 108:22 109:13 110:21
**needed** 30:2 103:22
**needs** 33:7
**never** 46:8 63:11 64:5 81:22 86:24
**new** 18:5 20:21 60:2 74:13
**nine** 47:15 62:12,13
**nominally** 34:5
**non** 15:4 16:20 89:2
**normally** 108:8
**notary** 113:6 113:19,22
**note** 10:17
**november** 3:18 8:8 44:5 48:5 75:14 90:15,22 105:1,6,10,13 105:18
**number** 4:9 37:6 47:17 69:1,2 98:8
**numbered** 47:15
**numbering** 46:22 69:7,8

**o**

**o** 2:12 4:1 53:4
**oath** 5:3
**oaths** 52:16
**object** 16:21 20:4 22:24 93:24 102:4
**objecting** 104:2
**objection** 24:10 25:23 26:1 27:7,18 32:17 49:2,5 57:6,7 58:24 60:20 72:9 73:13 79:15 94:7 101:1 103:13
**objections** 58:3
**obvious** 4:17
**obviously** 6:7 6:24 23:21 54:11
**october** 42:18 55:17 56:1 63:7 71:7 75:13 78:4 96:20,21 97:1 97:10,12,13 98:3 105:21 106:3
**office** 15:4 16:20 89:2
**oftentimes** 22:3
**oh** 24:17 29:24 38:11 60:9 69:6 76:21 80:17 82:19 84:19 87:5 106:23
**okay** 5:11,12 5:23 6:1 7:8,18

8:4,16,24 9:3,7 9:11,12,20 10:7,13,17 12:1,17 13:11 13:24 14:5,10 14:21,22 15:13 17:18,22,23 18:20,21,22 19:7,11 20:11 21:24 22:7,14 25:21 26:10,19 27:5,17,18 28:1,18 30:2 30:21 31:2,18 32:20 34:6,11 35:12 37:17 38:7,11 39:4,6 39:13 40:16,24 41:10,12 43:4 43:16,21 44:16 44:21 45:23 47:2,5,11,20 48:7,14,18,23 49:6,21 50:10 50:22 51:7,10 51:15,16,21 52:10,13,14,20 53:17,21,24 54:5,16 55:22 56:18,23 57:4 57:12,13 58:2 58:18,20 59:1 59:10,16,19,22 60:22 61:1,21 61:23 62:10,13 62:15,23 63:8 63:13,16,23 64:6,9 65:3,19 66:1,2 67:6,23 68:3 69:22 70:5,10,13,16 70:21,23 71:6 71:8,19,20 72:3,10,11,23 73:3,8,13 74:10,17 75:17 75:21,22 76:2 76:6,10,14 77:2,8,12,23 78:2,13,16,20 79:8,17,20 80:7 81:8,14 81:17 82:1,19 83:10,22 84:11 84:15,19,21 93:1,10,17,19 94:10 95:15 96:1,9,10,19,21 97:5,8,10,15 98:14,16,24 99:7,14 100:1 100:5,11,16,19 100:23 101:6,9 101:20 102:1 102:20 103:8 105:4,8,15,20 106:6,11 107:3 107:10,14,20 108:7,8 109:14 109:17

**old** 110:11

**onboarding** 97:20

**once** 52:14

**ones** 10:23 35:18

**open** 4:3 110:22

**opening** 83:15 83:17 84:11 85:9 93:12

**operate** 28:14

**operated** 42:11

**operating** 30:21 53:18 85:18

**operation** 9:23 26:14 32:6,11

**opportunity** 5:20

**organizers** 97:18,19

**originally** 58:9

**ought** 12:7

**overrule** 26:1

**overruled** 102:13 103:14

**overtime** 9:15

**owed** 28:16 29:11 33:10,11 54:24 68:10 91:12 102:21 103:4,11,19,23 104:4 105:5

**own** 78:14 109:11

**owned** 102:6

**ownership** 53:21

**p**

**p** 2:1,1 4:1

**p.c.** 2:5

**p.m.** 111:7

**page** 3:17 14:14 36:2 38:12,22 112:6

**pages** 1:1

**paid** 39:9,14 72:6 86:22 88:10

**paragraph** 14:13 15:3 18:16 36:2,16 36:19 38:7

**parentheses** 16:12

**park** 2:6

**part** 8:17 16:12 16:19 18:10 21:15 26:17 30:8 35:12 63:7 71:1 105:8

**participants** 1:18

**particular** 9:3 49:23 102:22 104:20
**parties** 14:14 68:21 83:5 87:21 107:24 109:21 113:16
**past** 31:4 34:21
**pay** 11:23 21:9 22:3 29:1,3 55:15,21,24 56:24 57:19 58:18 59:14,15 60:3 62:3,18 62:19,21 63:8 63:19 70:9,10 70:13,21 71:2 72:22,24 73:8 74:24 75:13,14 98:1,2,20,22 104:5 106:3
**payday** 37:3
**payment** 46:10 50:24 54:20 62:16 68:7 92:6,9
**payments** 51:3
**payout** 81:21 81:22
**payroll** 3:20,21 3:22,23 56:21 58:16 59:13,21 63:9 105:20
**pc** 2:13
**people** 12:18 22:5,10 23:2 27:10 29:5,12 35:3,13 36:9 37:13 39:9,14 50:7 56:7 78:12 86:22 87:21 88:7,10 88:15,18 89:22 89:23 90:8 91:11 92:4 104:9,11,12,18
**people's** 50:19 90:24 108:10
**percent** 8:8 9:23,24 10:3 11:10,23 12:12 20:18 21:4,12 21:13,17,21 22:8,10 23:10 23:17,23 24:19 26:5 32:1,5,10 32:15 33:3,10 33:21,22 34:11 34:12,18,20,22 34:24 35:2,4,6 35:8,13,14,14 35:15,23 36:4 36:9,15,17,20 37:2,23 38:1 39:8,15 40:8 42:17 43:22,23 44:3 54:12 56:5 68:16,18 81:23 85:22,24 86:4,9 88:6,12 90:16 91:21 100:2,12,13,17 100:18 101:11 101:18,22 103:5,23 105:2 105:4
**percentage** 7:21 23:5
**percentages** 12:14
**perfect** 7:18 13:16 21:2 58:2 83:24
**period** 8:6 55:15,21,24 56:24 57:19 59:15 62:19 71:3,15,23 73:3,5 98:21 105:22 108:15 110:22
**person** 12:18 28:9 64:22 76:16
**personal** 6:12
**personally** 106:6
**phase** 107:22
**phone** 31:7 51:12,14 52:11 69:24 71:19 95:16
**phrases** 34:16
**physical** 70:10 72:24
**picture** 70:19 72:24
**pictures** 70:10
**piece** 88:2
**pin** 82:1
**place** 22:4 91:2
**placed** 4:21
**placement** 88:11 91:1
**places** 33:14
**plain** 86:1 93:8
**planning** 64:15 65:21
**playbook** 109:19
**played** 97:10 97:15 99:7
**player** 110:20
**plaza** 2:6
**please** 48:6 52:11,14,20,21 53:1,2 60:13 66:11,15,16,20 95:17,21,22 98:8 102:14
**plus** 10:19 12:9
**plymouth** 113:4
**point** 5:1 15:2 17:20 25:24

27:8 30:4,6,17 33:15 35:5 36:12 43:23 44:7 46:20 51:12 53:20,21 55:3 71:12 102:12 110:21
**pose** 31:13
**position** 8:5 14:15 16:4 24:5,12 33:9 34:3 54:3 67:15 76:20 85:3 89:20 93:5,14 96:19 96:21
**positioned** 88:18
**positions** 15:5 15:14 89:3
**possible** 39:13 39:17,18
**possibly** 92:20
**post** 84:12,17 107:24
**potential** 39:8
**potentially** 44:20 47:14 109:6
**power** 84:21
**practice** 92:11 92:19
**preceding** 16:6 16:13
**premise** 23:16 85:19
**present** 2:20 84:10 99:19
**presented** 23:2 23:8
**presently** 112:6
**preserving** 85:14
**presiding** 4:16
**presumably** 24:1
**presume** 26:13
**pretty** 7:24 14:22 29:4 38:9 64:5 86:19 87:14
**previous** 27:22
**previously** 69:18 78:2
**print** 59:17,21
**prior** 63:17 97:1 104:10 105:21
**probably** 27:4 51:11 78:10 82:24 91:5 109:5
**problem** 21:16 22:23 30:10 82:4 86:10 109:16
**problems** 28:8 29:14
**procedurally** 85:7
**proceed** 60:14
**proceedings** 107:23
**professional** 15:20 89:17 113:5
**progression** 44:8
**promised** 81:23
**provide** 102:2 102:16
**provided** 20:7 33:12 43:5,24 44:4 79:8 89:10 99:2,5 105:12
**provision** 25:14 88:5,10 93:7
**public** 113:6,22
**pull** 9:8 40:4 44:19
**pulling** 109:3
**purchased** 97:21
**pursuant** 44:4
**put** 5:21,22 6:18 13:12 17:15 20:5 25:22 52:11,22 55:17 66:10,17 74:23 75:22 87:4 91:16
93:12,14 95:15 98:19 102:11
**putting** 87:21
**pyle** 2:13
**pylerome.com** 2:16

**q**

**question** 12:6 13:6 17:24 25:17 26:11 27:5 28:1,20 31:14 39:13 42:2 51:5 57:11 60:2 75:11 86:20 88:16 93:11 96:24 102:12 102:15 104:7 104:15 107:11
**questions** 5:16 6:14 17:14 25:24 41:11 49:8 51:9 58:3 60:24 61:2 65:18 79:19 82:18 89:15,21 90:4 96:4 97:19 106:22
**quick** 5:13 9:14 62:1
**quicker** 19:6
**quite** 94:3

**quotes** 14:24

**r**

**r** 2:1 4:1 66:21 66:22 113:1
**radar** 95:9
**raise** 52:15 66:11 95:17
**range** 36:5
**rate** 7:8,9,11 21:8 22:2,6 37:1,14 57:23 60:4 72:5 73:8 75:14 90:18,18 92:1,5
**rates** 7:11 91:19 106:3
**rather** 93:22
**ratification** 37:21
**ratified** 11:5,19
**reach** 36:4 52:11 64:21 95:16
**reached** 45:19 46:2,7 81:17
**reaching** 45:24 78:13
**read** 13:12 14:19,19,20 16:11 71:16 76:7 92:13 112:6
**readily** 86:19
**reading** 14:23 87:15 93:2
**reads** 112:6
**real** 61:24
**realistic** 108:14
**reality** 91:8
**really** 14:22 27:8,14 33:14 38:4 74:8 86:10 91:15 107:7
**reason** 90:3 91:7 93:16 101:9,20
**rebuttal** 83:2,8 83:16 84:4 93:14 95:4 96:13 107:5,18
**recall** 5:2,2 9:3 45:11 49:24 51:14 63:16 64:4 79:8
**receive** 11:10 11:23 36:3 37:2 43:13 54:12,16,19 55:4,11,14,23 59:19 68:3,6,9 68:13 70:13 77:6 81:20 106:1,2
**received** 7:4,5 7:17 9:22 10:3 20:9 21:5 22:8 23:2 32:1 34:22 40:21 42:17,24,24 43:11 46:10,14 48:15,19 49:4 51:1 54:22 58:7 63:13 68:17 73:1 78:5,11,12 100:2,12 101:11,17,22 102:18 104:10 104:21 106:4,7
**receiving** 45:12 45:13 54:1,2 79:6,10 103:10 104:19
**recently** 61:21
**recess** 39:22 45:1 52:2 65:10 66:3 82:15 84:1 95:1 106:16 107:16
**recognize** 48:8 56:18 58:13 59:10 70:6
**recollection** 29:21 45:23 64:1
**record** 4:3,19 31:12 33:11 39:20,24 45:5 53:2 65:11 66:16 82:5,16 83:4 95:2,22 97:23 106:17 107:17 110:15 113:13
**records** 59:21
**recount** 84:3
**recreate** 91:13
**recross** 3:2 49:9,12
**redirect** 3:2 5:21 41:13,20 45:3
**refer** 13:19 105:2
**reference** 20:6
**referenced** 27:21
**references** 32:19
**referred** 16:7 34:18 35:10
**referring** 16:23 26:12 28:2 78:9
**refers** 18:4 33:13
**reflect** 100:23
**reflected** 99:1
**reflects** 60:3 100:20 101:17
**refresh** 29:20

**regarding** 106:2
**regardless** 22:11
**registration** 14:8
**regular** 37:3 60:8 92:12
**related** 23:10
**relation** 45:12
**relations** 1:3 4:7 80:11 96:18,23 97:2 109:20,23
**relationships** 97:17
**relative** 41:3
**relax** 52:22
**relevance** 23:13 102:5
**relevancy** 23:1
**relevant** 15:5 15:15 23:22 87:1 89:3,19 102:8,12
**relied** 102:21 103:18,18
**rely** 102:2,15 103:6
**remain** 37:4 88:12
**remember** 9:16 22:19 40:20 45:16 50:6 63:18 79:11 86:24 98:21 99:13
**remind** 47:9
**renumber** 47:16
**repack** 25:21
**repackage** 25:23
**repeat** 11:17,18 12:3 18:10 21:14 26:17 62:24 85:10 102:14 110:12
**rephrase** 102:23
**replacing** 4:15
**report** 7:16 48:11,22
**reporter** 5:8 30:16 47:11 58:7 108:5 113:5
**reports** 22:18 35:17,18 40:23 48:12
**represent** 12:14 19:21
**represented** 4:12,14
**represents** 12:15
**request** 47:7 97:24 99:11
**require** 27:11 27:12
**reserve** 74:15
**reserved** 4:20
**resources** 29:8 36:14 46:6 76:15,16,24
**respect** 92:22
**response** 15:9 96:5 97:24 99:11
**responsible** 92:23
**rest** 50:4
**rested** 84:4
**resting** 83:2
**rests** 92:24
**result** 92:20
**resume** 83:6
**reunite** 44:24
**review** 9:1
**reviewed** 8:20 9:4
**right** 5:11 7:21 8:1 11:12 14:21,24 15:2 16:13 17:23 18:20 19:7,8 19:18 22:1 24:3,21 28:18 30:4,12 31:11 32:3 34:15 35:11,21 37:12 38:11,16,21 39:4,18,19 42:4,5,6,8,13 42:18 44:5 45:7,9,16 46:23 48:8 49:21 52:15,21 54:5 56:6 58:3 60:11,13,23 61:16 62:19 63:4,16 64:6 65:12,15 66:11 68:19 70:5 71:8,15 72:19 75:2 76:4,19 80:13 81:8,17 81:19,21 82:4 86:12 87:4 88:20 91:15 93:10 94:17 95:10,17 97:9 99:8,20 103:12 105:8,13 106:23 108:2
**rights** 74:15
**roam** 65:20
**rodgers** 3:3 5:2 5:12,24 6:8,21 12:15,24 13:18 15:11 17:23 20:12 26:11,16 26:24 27:24 28:4,15 29:21 29:24 31:22 34:16,19 40:4

44:22 49:4,8 49:14 51:10,15 86:3 88:6 89:6 110:17 112:4
**rogers** 4:21
**role** 97:11,15 99:7
**roles** 15:21
**rome** 2:13
**rookie** 12:20
**room** 51:20 65:24 106:12
**rooms** 44:23 82:13
**roughly** 31:5 108:4
**rule** 24:10,16
**russell** 2:12 3:5 3:7,10,13 4:13 13:1 16:21 17:7,13 19:17 20:4 22:24 23:20,23 25:2 27:7 32:17 33:7,19 34:2,6 41:14,18,21 42:21 43:17 44:14,18 45:4 46:13,20 47:6 47:12,20,23 48:24 49:7 51:19,23 52:5 53:8 55:10 57:5,16 58:22 59:23 60:7,10 60:19,23 64:21 65:13,23 66:6 67:2 68:24 69:4,12,20 71:14 72:3,7 72:14 73:11,19 74:7,18,22 79:13,16,18 83:3,14 84:5 93:11,17 95:6 96:14 98:9 106:9,21 107:6 107:19 109:3 109:10 110:9 110:24

**s**

**s** 2:1 4:1 53:4,4
**sake** 85:14
**sam** 26:13
**samaritan** 19:24 20:1 42:11 49:17 56:22 58:19 67:7,10 70:15 72:22 76:17,24 89:13
**sammy** 97:6
**satisfy** 24:24
**savvy** 19:11
**saw** 35:5,9,16 36:15
**saying** 31:2,3 35:15 40:7 46:2,7 94:1
**says** 12:13 15:3 16:13 17:5,7,8 17:17 20:24 25:2 38:11,13 51:24 58:1 60:8 71:17,22 78:17,17 90:20 100:8 105:2,8
**scale** 13:21 14:1 18:21,24 19:9 20:6,19 20:20 21:7 23:14 35:8 36:3 37:5,13 39:10 40:12,13 63:18,20 64:2 64:5 87:16,17 87:22,23 88:8 88:11,16,18,23 89:1,22 90:9 91:2,4,23 100:21
**schedules** 108:10,13
**scott** 2:23 3:6 45:19 52:18 53:3 56:15 58:11 59:6 60:7 99:16,19 112:4
**screen** 6:18 19:20 30:1 32:24 42:1,14 56:6,16 57:17 68:20 70:1 75:24 86:11 98:12
**scroll** 9:14 14:10 32:24 33:5 70:5,17 99:14
**scrolling** 71:21 76:2 77:2,8
**seal** 113:19
**second** 8:15 9:8 15:19 26:17 36:21,22 41:18 57:8,15 62:1 77:12 78:16 105:17
**section** 9:3,15 9:17 10:8,13 18:5,15 38:22 88:22,24
**sections** 87:14
**see** 9:12 10:11 10:14 12:7 14:16,24 15:8 16:4,7 19:10 19:11,15 35:4 35:16 36:6 37:7,8,12 38:12,21 42:1 49:15 56:15

58:11 59:8 62:2,3 65:3 66:9 69:24 71:19 72:19 73:15 75:23 77:4,15 82:13 84:2 86:16 93:16 94:24 98:11 99:16 101:15
**seeing** 22:17 36:17 75:19
**seemed** 36:14
**seen** 34:19 61:14
**sees** 104:7
**seiu** 97:18
**send** 48:21 74:13,14
**sending** 76:12 76:13 79:4
**senior** 96:18,20
**sense** 31:6 64:20
**sent** 35:17 46:13,16,23 47:13 58:5,9 59:6,16,18 68:21 69:4,5 69:18,20 72:11 74:23 75:3 76:6,22 77:9 77:10,24 109:22
**sentence** 15:20
**separate** 9:24 37:19,21
**september** 7:10 8:6 10:5 21:5 21:18 22:9,11 22:13 23:3,8 23:17,24,24 24:4,20 26:6 27:14 28:17 33:20 39:16 40:9 42:8,18 43:2 45:14 46:4,8,10 50:2 50:12 53:16,17 54:16,19,24 55:20,20 61:23 62:16,20 63:5 63:6,17 67:22 67:24 68:4,6,9 68:11,14,17 73:5 77:15,19 78:5,8,22 79:5 81:18,23 85:21 90:7 93:6 100:3 101:10 101:18,20 103:11,11 104:1
**sequence** 47:18
**service** 13:9 15:5 40:11 86:24 87:1
**set** 108:14 113:18
**shanks** 45:21
**share** 19:6 43:16 56:6 68:19 75:2 86:11
**shared** 30:1
**sharing** 9:7 41:22 43:17 45:5 56:7 58:9 59:6 68:20 72:11 74:19 98:11
**sheet** 112:1
**ship** 75:16
**shipping** 54:2
**shoot** 69:6 82:7
**short** 44:14 106:9
**show** 4:3,19 19:2 24:20 83:4 91:17,20 98:5
**showed** 29:14 29:15,18 36:12 42:17 98:19
**showing** 48:4 48:22 70:19 75:22
**shown** 55:24 91:15
**shows** 20:7 42:15 43:8,9
98:18 104:18
**side** 19:20
**sign** 59:20
**signature** 113:21
**simply** 84:9,10 86:1
**sir** 49:10 52:8,9 65:9
**site** 59:20
**situation** 38:3 92:22
**six** 54:4 81:7 110:7,13
**skip** 69:2
**skipped** 68:24
**slowdown** 88:9
**small** 57:2
**smile** 6:11
**somebody** 12:21 13:22 20:23
**someone's** 103:2
**sorry** 7:24 8:14 8:18 11:3,14 17:3,4,23 18:12 20:15 21:14 22:9,21 22:22 25:9 26:16 27:7 30:9,16 31:6 36:20 42:22 47:4 55:20

62:1 65:15 78:6 80:17,23 83:14 102:23 103:17
**sort** 10:17 29:3 31:16 62:18 74:20 89:21
**sound** 85:23
**sounded** 13:7
**sounds** 31:2 40:13
**source** 25:19
**south** 1:11 4:6 43:8 53:12 55:3 67:4,7 97:11 99:2,3 99:23 102:3,17 105:23 112:3
**speak** 109:1
**speaking** 49:24
**speaks** 32:18 32:21 39:3 44:11 71:13 94:2
**specialist** 54:2 62:7
**specifically** 22:20 23:12 40:9 90:14
**spell** 53:1 66:16 95:22
**spelling** 5:5 66:20
**spoke** 26:7,9,20 26:21
**spreadsheet** 7:15 8:22 17:14 20:21
**spreadsheets** 7:4,14
**square** 2:14
**ss** 113:4
**stand** 5:3
**start** 5:19 6:15 6:23 31:16 94:11
**started** 29:12 29:16 30:10 31:19,22 67:22 67:24 94:22
**starting** 47:15 108:9,22
**starts** 14:14
**state** 52:21 53:1 66:15 95:21 103:15
**statement** 3:19 15:17 56:24 58:18 71:2 73:9 74:24 84:11,23 85:1
**statements** 70:21 72:24 91:7
**stay** 44:22 64:10 65:5 82:11
**stayed** 45:20
**staying** 51:13
**steering** 75:16
**stenographic** 4:17
**step** 10:18,20 12:13,19,21 13:18,19,23 17:6 18:3,13 21:6,11,20 22:5 25:14 36:4 37:2,5,6 37:14 41:15 44:8 88:12,13 90:18 91:2,23 100:2,8,13,21 101:11,18,22 102:2,6,16,22 103:5,10,11,24 104:19,21
**stephen** 76:13 76:14 77:3
**steps** 12:11,14 12:16,22 13:22 22:6 35:7 100:18
**steward** 7:6 15:7,16 20:9 20:17 22:7 28:5 30:21 32:8 35:17 39:14 40:21 41:1,3,4,8 42:10 43:11 48:11,16 49:4 49:16 50:18 53:22 54:20 56:21 58:19 63:8 68:7 70:15 81:9 86:22 88:17,21 89:4,7,7,9,10 89:13 90:6 91:10,24 92:17 102:1,1,9,18 104:10 106:2
**steward's** 105:20
**stop** 9:7 96:8
**stress** 80:22,22
**stub** 3:20,21,22 3:23 56:21 58:16 59:13 71:12
**stubs** 62:3,18 62:21 70:9,11 70:13 72:22 75:13
**stuff** 5:22 94:8
**sub** 16:14,14
**subject** 28:3 74:18 83:2 84:4
**submission** 108:16
**subsequent** 38:23 62:21 87:23

**subsequently** 78:20
**substance** 26:22
**substantively** 85:4
**sue** 5:4 47:9 58:4 108:3 110:18
**suggest** 51:12
**suggestion** 5:13
**suggests** 90:12
**sum** 37:3,24 39:8,15 46:10 50:24 51:1,3 54:20 62:16 68:6 81:21,22 88:12 90:10,21 92:5,9
**summarize** 79:2
**summer** 110:2
**summons** 64:16
**suppose** 101:3
**supposed** 11:7 29:6 30:7 35:2 37:24
**sure** 5:15 6:19 11:5,19 13:21 14:7 18:22 23:4,12,15 24:14 29:9,17 31:15 38:9 39:6 46:15,22 64:21 74:4,16 81:19 89:6 94:18 95:12 102:24 104:14 110:14,24 111:2
**surrebuttal** 107:12,21
**susan** 113:5,22
**sustain** 94:7
**sworn** 52:18 66:13 95:19 113:9
**system** 105:21

**t**

**t** 53:4,4,4,4 95:24 113:1,1
**table** 10:15 12:8
**take** 12:9 14:18 28:19 33:8 39:10 41:15 44:14 48:5 52:3,23 64:18 66:4 83:22 91:8 94:7,9 104:16 106:9 108:11
**taken** 102:12 113:8,10
**talk** 18:13 25:16 29:8 50:7 65:7 88:6 94:11 106:14 108:8
**talked** 18:1 22:20 28:9 36:13 50:8,8 51:3 86:17 87:12 88:3,19 94:3
**talking** 9:18 17:19 18:7 22:16,19 27:9 29:13 36:8 61:11
**talks** 33:2 88:22 90:14
**target** 108:14
**team** 94:11
**technical** 15:4 15:20 16:20 89:2,17
**technician** 67:14 80:16,18 81:1,5,12,15 82:2
**technicians** 80:21,22
**technological** 19:11
**tell** 11:2,4 37:17 44:16 56:23 70:16,18 73:22 76:21 98:7 105:11 108:21
**term** 16:17 34:17
**terms** 39:7 69:6
**terrible** 110:4
**testified** 6:22 21:16 25:5,6 49:14,21 89:24 92:7 94:3,12
**testify** 91:18
**testimony** 21:10 25:8 26:4 31:17,23 39:6 40:6 65:8 65:22 72:5 80:13 86:2,18 88:4 89:6 94:12,23 99:19 106:14 112:4 113:10,10
**tests** 80:23
**thank** 6:3 17:21 26:2 30:3 40:2 42:22 52:13 58:8 60:13 69:22 80:13 82:22 84:24 95:16 96:10 109:24 110:19 111:4
**thanks** 13:17
**thematically** 85:15
**therapist** 80:15 80:16

**thereof** 64:17
**thing** 7:8 27:2 93:3 109:11
**things** 15:2 19:4,10 29:4 88:19 92:3
**think** 6:15 9:10 12:2 13:2 17:9 19:1 24:7,22 26:24 27:8 31:9,15 33:7 33:23 34:23 38:2 39:2 40:18,19 45:21 46:14 47:6 49:19,20,23 51:11 64:22 68:24 72:4 74:22 75:5 80:19 82:23 83:5,7,18,21 85:2 86:20 88:6 91:14 106:10 107:9 108:1 109:12
**thinking** 38:4 64:17
**thought** 17:18 21:10,16 46:21 64:17 95:8 109:17
**three** 10:19,21 44:7
**thursday** 69:21
**till** 37:5 44:18 111:3
**time** 4:12,20 6:11 19:4 27:8 29:5 34:23 36:14 40:17,18 43:1 49:18 51:20 56:24 64:15 71:3 78:13 87:18 90:13 93:13 94:9 98:20,21 105:22 106:24 107:15 108:15
**timing** 49:16
**title** 7:1 14:9 53:24 54:1 62:2,6,7 67:13 80:19 96:17
**titles** 87:8
**today** 4:13 63:7 80:13 89:24 95:9 99:20 109:4
**together** 17:15 20:5 44:19 98:19
**told** 50:23 79:2
**took** 9:21 49:16 59:14
**top** 42:6 70:23 71:1,1,15 77:8
**total** 43:8,9,12
**touch** 45:20
**towards** 36:12 87:6
**track** 75:5 106:20
**trades** 15:21 89:18
**transcribed** 113:11
**transcript** 4:18 5:5,9 108:4,9 108:20 113:13
**transfer** 53:21
**treat** 47:18
**trip** 110:10,17
**trips** 110:14
**trouble** 95:12
**true** 4:11 113:13
**trust** 74:11 109:16
**truth** 76:21
**try** 12:5 25:6 25:10 26:20 27:5 29:3 31:6 31:11 57:2 64:17 68:19 70:3 74:23
**trying** 23:18 33:8,15 34:11 43:16 62:5 82:1 91:13
**twenty** 67:12 67:13,16,17
**two** 8:7,8 9:22 9:24 10:3,19 10:20 11:23 12:11,11,12,13 12:14,15,15,19 12:22 16:6,13 19:4 20:18 21:4,12,13,17 21:21 22:8,10 23:10,16,23 24:19 26:4 29:9 32:1,1,5 32:10,15 33:2 33:10,21,22 34:11,12,16,18 34:20 35:5,8 35:13,14 36:17 36:20 37:2,23 37:24 39:8,15 40:8 41:7 42:17 43:22,23 44:3 52:15 54:12 56:5 57:11 68:18 70:18,21 72:24 81:23 85:22,24 86:3,9 87:13 88:2,11 90:15 91:18,20 97:21 100:2,12,13,17 100:18 101:11 101:17,22

103:4,23 105:2 105:4 107:7 108:4,5
**twos** 10:22 110:5
**type** 14:4
**typically** 35:9 100:10

**u**

**u** 66:21
**unanswered** 89:16 91:6
**under** 4:7,22 5:3 9:6,24 10:1 10:4,22 38:17 43:21 44:1 53:15 54:6 67:18 113:11
**underpaid** 11:8 11:12,20
**understand** 12:7 13:13 17:13 25:7,23 27:17 28:11 32:20 77:20
**understandably** 88:24
**understanding** 6:24 7:2 10:23 11:2,4 12:8,23 18:1,4 25:13 25:18,19 34:8 38:9 42:23 48:14,18 50:13 54:9,14 55:22 56:3 67:17 76:23 98:16,18 99:10 100:9,11 100:16,19 105:10
**understood** 54:23
**union** 2:17 3:16 3:18,19,20,21 3:22,23,24 4:12 6:17,21 7:5 17:15 20:18 23:1 24:17 32:8 35:19 40:21 41:22 45:6 46:18 47:1,2,3 47:6,7,7,21 48:1,19,20 49:1 56:7,9,12 57:5 58:4,9,10 58:22 59:3,7,7 59:23 60:16 68:21,22 69:5 69:5,7,14 72:8 72:11,16 73:11 74:23 75:4,4,6 75:8,23 79:14 83:2 84:3 85:18 86:6 89:5,11 91:16 92:7,18 93:13 93:17 95:4 98:10 107:4,18
**union's** 23:7 34:8 64:18 85:12,16
**unit** 28:23 85:19
**united** 1:9 4:5 112:2
**unmute** 95:8
**use** 20:1,12 40:12 41:3
**used** 9:17 21:24 34:16,17 81:9
**using** 16:17,18 16:19
**usually** 29:9 37:22

**v**

**v** 53:4
**vacation** 108:10,13 109:1,11 110:7 110:13
**vacations** 110:3
**various** 26:21
**verification** 29:1
**verify** 74:11
**versus** 41:5 104:4
**videoconfere...** 1:18
**view** 24:14 25:7 25:8,11
**violated** 91:17
**violation** 24:21 92:20
**virtue** 8:8,10 32:10

**w**

**w** 53:4
**wage** 7:19 9:17 10:4 19:1,14 19:23,23 20:6 20:12 21:7,11 22:12 23:14 35:7 38:13 57:23 61:9 68:3 77:21,22 81:9 86:5,7,11 86:13,14 87:16 87:17,20 91:19
**wages** 9:6 20:7 20:8,22 43:10 86:22
**wait** 22:14
**want** 5:18 6:10 10:7 12:3 13:1 13:7 18:21,22 24:10,10 25:4 33:1,5 35:21 35:23 36:23 41:2 44:17 46:22 52:23 74:12 79:11

81:19 82:21 87:8 93:3 96:2 96:7 101:8 104:17 106:13 108:19 109:24 110:1
**wanted** 6:15,23 40:16 49:15
**wants** 27:10
**ward** 57:8
**water** 52:22
**way** 13:12,13 25:22 29:6 32:23 38:21 55:10 69:17 80:3 87:5 90:22 96:2 102:11
**we've** 19:8
**week** 57:19 69:21
**weeks** 108:4,5
**weight** 102:13
**welcome** 84:2
**wells** 2:21
**went** 64:5 81:16
**whereof** 113:18
**wi** 8:14
**wish** 110:1
**witness** 3:2 6:2 25:5,6 26:6 31:14 34:3,10 39:24 45:2 51:18 52:4 53:5 60:24 61:2 64:14 65:12 66:23 82:17 93:15,20 93:23 95:4 96:1,3,11 104:6 106:18 106:22,24 107:2 113:18
**witness's** 5:4 25:7
**witnesses** 47:14 83:20 84:8 86:18 89:24 91:18 93:13 113:9
**wondering** 78:4,6,6
**word** 15:1 18:14
**words** 9:16 12:12 90:19
**work** 6:16 14:4 53:11 59:20 64:24 67:3 90:5 97:5 109:8
**workday** 106:5
**worked** 22:2 38:1 53:14 67:10
**worker** 12:9
**workers** 1:9 4:5 9:22 11:6,9,20 11:22 15:6,15 15:19 21:8 22:16,16,19 26:4 29:2 32:15 34:22 36:2,17,22,24 37:22 50:16,23 89:4,17 90:16 112:2
**working** 48:22 76:23 78:17,17
**works** 6:19 109:12
**worry** 4:24
**writing** 84:16 84:17
**wrong** 12:6 21:13 80:17 105:11

**x**

**x** 3:1 86:24

**y**

**y** 87:1
**yeah** 7:24 8:2 11:1,18 13:16 13:16 18:12 21:3,16,23 24:2,22 26:2,3 31:10 35:20 37:19 38:10 40:15,23 48:13 51:19 60:9 61:13 64:12,21 67:20 71:14,17 72:2 83:17 109:12 110:11 110:12
**year** 10:20,20 10:21,21,21 12:10,13,17,21 12:23 34:20 36:4 37:20 38:6,8 63:3 77:19 82:1 87:24 88:1,2,2 102:22
**years** 12:9,19 12:22 13:4,9 13:22 14:3,5 15:5,14 20:23 23:13 36:24 37:5 40:11 54:4 61:22,23 62:4 67:12,13 67:16,17 81:4 81:7 86:23 87:1 89:3 90:17 110:6,7 110:13

**z**

**zero** 23:9
**zoom** 1:18 70:3 70:24 71:4 74:3 76:10